**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| IN RE: COMMERCIAL MONEY | : | |
| CENTER, INC., EQUIPMENT | : | **Case No. 1:02CV16000 (All cases)** |
| LEASE LITIGATION | : | **(MDL Docket No. 1490)** |
| _____ | : | |
| | : | |
| JPMORGAN CHASE BANK, N.A. | : | **JUDGE O'MALLEY** |
| (SUCCESSOR BY MERGER TO BANK | : | |
| ONE, NA), | : | **Case No. 1:02CV16014** |
| | : | |
| Plaintiff, | : | **AMENDED MEMORANDUM OF** |
| | : | **OPINION AND ORDER** |
| -vs- | : | |
| | : | |
| SAFECO INSURANCE COMPANY OF | : | |
| AMERICA, | : | |
| | : | |
| Defendant. | : | |

On December 6 and 7, 2010, this Court conducted bench trial proceedings in one of the actions in this multidistrict litigation proceeding ("MDL") involving Bank One, N.A., n/k/a J.P. Morgan Chase Bank, N.A. ("Bank One") as plaintiff, and Safeco Insurance Company of America ("Safeco") as defendant.  Following submission of proposed findings of fact and conclusions of law, closing arguments were heard on February 15, 2011.  The trial was limited to the threshold, and potentially determinative, issue of who the parties intended to be the original obligee on certain lease bonds ("Lease Bonds") issued by Safeco.  Throughout these proceedings, this issue has been referred to by the parties and the Court as the "obligee issue." Resolution of this issue dictates the scope of the fraud defenses, if any, that Safeco may assert against Bank One's claims.

For the reasons explained below, upon careful consideration of the evidence presented by

the parties, the Court finds that (1) CMC was the intended original obligee on all of the Safeco Lease Bonds in the transactions at issue; and (2) the Guardian Entities and their secured lender, Bank One, succeeded to the rights of CMC by subsequent assignment.  As a result, Safeco may assert defenses based upon fraud in the inducement by CMC.

## I.      INTRODUCTION

The Court previously considered the obligee issue in a bench trial conducted by consent of the parties in nine other cases in this MDL, and memorialized its findings in a Memorandum of Opinion and Order issued May 28, 2010 ("Bench Trial Opinion," Doc. 2459).[1]  This case was not included in the prior bench trial proceedings because, unlike the parties in the other nine cases, Bank One contended that the obligee issue was not appropriate for Court determination, and did not agree to waive any applicable jury trial rights as to the obligee issue.

Given Bank One's objections, the Court ordered the parties to brief the question of the proper arbiter of the obligee issue.  Subsequently, in a Memorandum of Opinion and Order issued June 14, 2010 (02-16000, Doc. 2462; 02-16014, Doc. 57), the Court concluded that the obligee issue is a purely equitable one, subject to determination by the Court.  Following issuance of the June 14, 2010 Order, the Court scheduled these bench trial proceedings.

This action involves Lease Bonds issued by Safeco relating to equipment leases originated by Commercial Money Center, Inc. ("CMC").  CMC was engaged in leasing vehicles and equipment to subprime lessees.  CMC then assembled the leases into pools and sold the pools, or their associated income streams, to investors.  Investors in the CMC transactions purchased the lease pools or the income streams at prices discounted to reflect each investor's

---

[1] Familiarity with the Bench Trial Opinion is assumed.  Where not defined herein, capitalized terms used in this Opinion have the meanings ascribed to them in the Bench Trial Opinion.

negotiated rate of return.  In order to make the lease pools more attractive to potential investors, CMC obtained lease bonds from various Sureties, including Safeco, to guarantee certain portions of the transactions.

Determination of the obligee issue in this case requires the Court to analyze the structure of two CMC transactions involving Safeco Lease Bonds, and determine precisely what obligations the parties intended those Lease Bonds to guarantee.  The transactions at issue closed on December 1, 1999 and February 11, 2000, respectively.  The December 1, 1999 transaction involved a transfer of certain rights from CMC to Guardian Capital II, LLC ("Guardian II"), while the February 11, 2000 transaction involved a transfer of rights from CMC to Guardian Capital III, LLC ("Guardian III").  Guardian II and Guardian III are collectively referred to herein as the "Guardian Entities."  Bank One was a lender to the relevant Guardian Entity in each of the transactions at issue and, in each transaction, was granted a security interest in the assets purchased from CMC, including the Safeco Lease Bonds.

Safeco asserts that the Lease Bonds were meant as a guarantee of the obligations specified on the face of those Bonds—the obligations of the lessees to make lease payments to CMC.  Bank One argues, however, that the designation of CMC as obligee was a "nominal" designation, and that CMC was not intended to have any actual rights under the Lease Bonds. Rather, Bank One contends, the parties intended CMC to retain a "co-principal" status with its lessees.  According to Bank One, the ultimate benefit of each transaction was intended to flow to the relevant Guardian Entity and its assignees, and they must, therefore, be deemed the true "obligees" in each transaction.

As noted above and previously explained in the Bench Trial Opinion, the "obligee issue" is central to these proceedings for several reasons.  Most significantly, as the Court found in its

ruling on the Motions for Judgment on the Pleadings (02-16000, Doc. 1708), and reiterated in the Bench Trial Opinion (Doc. 2459), Safeco may not assert defenses against Lease Bond obligees based upon the fraud of a Lease Bond principal.  Accordingly, if the Guardian Entities and/or Bank One are found to be the original obligees on Safeco's Lease Bonds, Safeco's fraud defenses premised on fraud in the inducement by CMC and/or its principals will be unavailable.

The Court now resolves the question presented in this trial and sets forth its findings of fact and conclusions of law relating thereto in this Amended Memorandum of Opinion and Order ("Opinion").  In reaching its conclusions, the Court is mindful that Bank One was not party to the prior bench trial proceedings and, accordingly, is not bound by the Court's findings of fact in the Bench Trial Opinion.  The parties to this case, moreover, have to some extent presented documents and witnesses different from those addressed in the Bench Trial Opinion.  The Court is sensitive to these differences in evidence, and has given them appropriate weight.  The legal principles applied in the Bench Trial Opinion, however, are the law of the case, and apply with equal force to these proceedings.

To the extent, therefore, that the evidence proffered in this proceeding by Bank One and Safeco differs from that presented in the prior proceedings, the Court has examined that evidence and has set forth a detailed analysis of it and its impact on the Court's conclusions.  To the extent, however, the evidence presented by these parties duplicates, or overlaps, the evidence introduced in the prior proceedings, the Court has, in some instances, incorporated its prior analysis as set forth in the Bench Trial Opinion.

Where evidence presented by the parties in the prior proceedings is intertwined with or inseparable from new evidence presented in these proceedings, the Court has analyzed all evidence relating to certain issues together in a *de novo* fashion.  In many instances, this *de novo*

4

analysis of evidence has resulted in duplication between the Bench Trial Opinion and this Opinion.  Such duplication is necessary, however, to memorialize the Court's analysis of the entirety of the evidence introduced in these proceedings.


II.     **BACKGROUND**

   A.     **Procedural Background**

   The early procedural background of this case and related actions is set forth in section I.A. of the Bench Trial Opinion (Doc. 2459).  As explained above, subsequent to the issuance of the Bench Trial Opinion, the Court issued a Memorandum of Opinion and Order in this case on June 14, 2010 (02-16000, Doc. 2462; 02-16014, Doc. 57), finding that the obligee issue is a purely equitable one subject to resolution by the Court.  Based upon the Court's June 14, 2010 Memorandum of Opinion and Order, the Court conducted the bench trial proceedings in this case.

   On July 27, 2010, the Court also issued an Order (Doc. 2464) on various motions filed in these cases pursuant to *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579 (1993) and/or *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), challenging the qualifications of certain experts proffered in these actions.  With respect to the experts proffered by Bank One, the Court denied Safeco's motion to exclude the testimony of Paul Palmer, Charles Kerner, Jerry Hudspeth, and Michael Larrick, although the Court imposed significant limitations on the testimony of these experts.

   On January 25, 2011 and January 31, 2011, the Court issued an Order and Supplemental Order, respectively, addressing the parties' objections to certain exhibits and testimony proffered in these proceedings. (02-16014, Docs. 123, 124).  These Orders incorporated the Court's prior

rulings on motions filed pursuant to *Daubert*, and set forth numerous additional rulings regarding the proper scope of the record in these proceedings and the admissibility of certain proffered evidence. In reaching the Court's conclusions contained in this Opinion, the Court has not considered any evidence excluded from the record pursuant to the Court's January 25, 2011 and January 31, 2011 Orders.

The parties submitted pre-trial briefs on November 17, 2010 (02-16014, Docs. 72, 73). Bench trial proceedings were conducted before the undersigned on December 6-7, 2010 and, after submission of proposed findings of fact and conclusions of law on January 31, 2011 (02-16014, Docs. 125, 126-128), again on February 15, 2011.

As noted, this Opinion constitutes this Court's findings of fact and conclusions of law as to the issues presented to the Court during the bench trial proceeding.

### B.      Factual Background

The general factual background of this case and related actions is set forth in section I.B. of the Bench Trial Opinion (Doc. 2459), and familiarity with the general factual background is assumed.

As earlier noted, the transactions at issue here occurred on December 1, 1999 and February 11, 2000, respectively. Each transaction involved a loan by Bank One to the relevant Guardian Entity (here, Guardian II and Guardian III), each of which was a special purpose entity created for the purpose of investing in a CMC lease pool. In each transaction, the relevant Guardian Entity used the loan proceeds to purchase the income stream from CMC lease pools, and secured payment of all obligations under the loans by granting Bank One a security interest in the assets purchased from CMC. The transactions were structured in such a way that the monthly income stream to Bank One on the lease pools was greater than the monthly payment

the relevant Guardian Entity was required to make to Bank One.  Bank One would remit any monthly excess to the Guardian Entities, thus permitting the Guardian Entities to profit from the transactions.

As set forth in detail in the Bench Trial Opinion, the CMC lease bond program collapsed in early 2002.  This case involves a dispute between Bank One and Safeco arising from Safeco's issuance of Lease Bonds in the Guardian II and Guardian III transactions.  Bank One has sued Safeco, seeking payment under the Lease Bonds issued by Safeco in both the Guardian II and Guardian III transactions.

Safeco has denied liability, asserting that it was a victim of a massive fraud orchestrated by CMC and its principals, surety broker Michael Anthony, and others.  Safeco contends that CMC operated a Ponzi scheme, in which early investors were paid using money generated by new investors, while a large number of the supposed equipment leases were nonexistent or nonperforming.  Safeco also claims to have been defrauded by CMC's representations regarding its financial condition and the condition of its lease pools.  As a result of these misrepresentations, Safeco asserts, the Lease Bonds were void *ab initio*, and Bank One cannot recover on these bonds.

As previously noted, Safeco's ability to assert defenses of fraud in the inducement in this proceeding depends upon the obligation the Lease Bonds were intended to guarantee—*i.e.*, who was the principal obligor and who was the obligee.  The bench trial proceedings conducted by this Court, and the evidence presented to the Court by the parties, focused on precisely this issue.

## C.      Transaction Documents

Both of the transactions at issue in these proceedings involve Bank One as lender, Safeco as Surety, and a Guardian Entity (Guardian II or Guardian III) as purchaser of the CMC assets.

The transaction documents from both the Guardian II and Guardian III transactions, as introduced by the parties as trial exhibits, are summarized below.[2]

### 1.    Leases, Invoices and Supporting Documentation

#### a.    Guardian II

The Guardian II transaction closed on December 1, 1999.  The parties have introduced various documents pertaining to that transaction collectively as Joint Exhibit 2001AA.  Among the documents included in Joint Exhibit 2001AA are Master Lease Agreement No. 9812085, certain addenda and amendments to Master Lease Agreement No. 9812085, Supplementary Schedules Nos. 032-044 to Master Lease Agreement No. 9812085, as well as a Certificate of Acceptance for each Supplementary Schedule, invoices from BAS International, Inc. for the underlying leased equipment, and certificates of insurance.  Joint Exhibit 2001AA also includes the Safeco Lease Bonds for the Guardian II transaction, as well as copies of a Safeco Power of Attorney and California All-Purpose Acknowledgment for each bond.

Master Lease Agreement No. 9812085 was executed by CMC and by Roy Bresky on behalf of Shandoro Ventures, Inc. ("Shandoro") on February 19, 1999, and also contains an effective date of February 19, 1999.  Pursuant to the terms of that Master Lease Agreement, Shandoro committed to make lease payments to CMC.

Joint Exhibit 2001AA contains thirteen Supplementary Schedules to Master Lease Agreement No. 9812085, which itemize the equipment leased under each of the separate

---

[2] This summary references only those documents integral to analyzing the "obligee issue."  This summary is not, nor is it intended to be, an exhaustive summary of all transaction documents in the Guardian II and Guardian III transactions.

Further, while many of the documents introduced into evidence in this proceeding are similar or identical to those introduced and summarized in the Bench Trial Opinion, this summary of the documents relevant to these transactions is included for clarity, and to incorporate into this Opinion the precise provisions and language considered by the Court in reaching its conclusions.

Shandoro leases.  Contained in each of these Supplementary Schedules is a line designated "Acceptance Date."  Twelve of the thirteen Supplementary Schedules are fully completed and contain an acceptance date of December 3, 1999.[3]  The remaining Supplementary Schedule is signed and dated December 3, 1999, but the Acceptance Date has been left blank.  The invoice attached to each Supplementary Schedule bears a date of December 8, 1998.

Joint Exhibit 2001AA also contains a Certificate of Acceptance in connection with each Supplementary Schedule, each of which contains a representation that the items of leased equipment have been received and installed.  Each Certificate of Acceptance provides as follows:

> The Undersigned Lessee acknowledges that the last Leased item of Equipment described above was received by Lessee on [date] ("Acceptance Date") and all Equipment above was fully installed and in good working condition and after full inspection thereof accepts such Equipment as satisfactory for all purposes of the lease.
>
> Lessee certifies that Lessor (i) has fully and satisfactorily performed all covenants and conditions to be performed by and under the Master Lease with the undersigned, and (ii) in accordance with Lessee's directions has delivered the Equipment which was selected solely by the Lessee[.]
>
> Lessee acknowledges that Lessor, relying on this Notice, will promptly pay vendor upon receipt of original invoice or Bill of Sale in proper form, for the Equipment accepted hereby, and that Basic Rent as specified in the Supplementary Schedule shall begin on the Acceptance Date so stated thereon and above.

Joint Exh. 2001AA.  Each Certificate of Acceptance contains a line intended for the "Acceptance Date" of the equipment listed in the applicable Supplementary Schedule.  Of the Certificates of Acceptance contained in Joint Exhibit 2001AA, seven of them bear an Acceptance Date of December 3, 1999.  Five Certificates of Acceptance contain no Acceptance Date, although their

---

[3] In their Joint Stipulation of Facts, the parties stipulated that, at the time the Supplementary Schedules for the Guardian II and Guardian III leases were signed by Roy Bresky on behalf of Shandoro, all of those Supplementary Schedules were undated. Joint Stipulation of Facts (02-16014, Doc. 115), at ¶¶ 28, 56.

associated Supplementary Schedules bear the date of December 3, 1999.  One Certificate of Acceptance is undated and attached to a Supplementary Schedule in which the Acceptance Date also is left blank.

### b.     Guardian III

The Guardian III transaction closed on February 11, 2000.  The parties have introduced various documents pertaining to that transaction as Joint Exhibits 2002FF and 2002GG.  Joint Exhibit 2002FF contains Master Lease Agreement No. 9812084, as well as several associated forms and addenda to that Master Lease Agreement. Among the documents included in Joint Exhibit 2002GG are Supplementary Schedules Nos. 001-024 to Master Lease No. 9812084, as well as a Certificate of Acceptance for each Supplementary Schedule, invoices from BAS International, Inc. for the underlying leased equipment, and certificates of insurance.  Joint Exhibit 2002GG also includes the Safeco Lease Bonds for the Guardian III transaction, as well as copies of a Safeco Power of Attorney and California All-Purpose Acknowledgment for each bond.

Master Lease Agreement No. 9812084 was executed by CMC and by Roy Bresky on behalf of Shandoro on February 19, 1999, and also contains an effective date of February 19, 1999.  Pursuant to the terms of that Master Lease Agreement, Shandoro committed to make lease payments to CMC.

Joint Exhibit 2002GG contains twenty-four Supplementary Schedules to Master Lease Agreement No. 9812084, which itemize the equipment leased under each of the separate Shandoro leases.  Contained in each of these Supplementary Schedules is a line designated "Acceptance Date."   Each Supplementary Schedule is fully completed and contains an acceptance date of February 10, 2000.  Twenty-three of the Certificates of Acceptance also

contain an Acceptance Date of February 10, 2000.  The invoice attached to each Supplemental
Schedule bears a date of December 8, 1998.

>     2.      **Lease Bonds**

The Safeco Lease Bonds from the Guardian II and Guardian III transactions are attached
as part of Joint Exhibits 2001AA and 2002GG, respectively.[4]  Safeco issued Lease Bonds for the
Guardian II transaction on November 22, 1999 (*see* Joint Exh. 2001AA), and Lease Bonds for
the Guardian III transaction on January 20, 2000 and February 2, 2000 (*see* Joint Exh. 2002GG).

All of the Lease Bonds are identical, apart from the amount of the bond and identification
of the specific lease bonded.  Each Lease Bond names the lessee as "principal," Safeco as
"surety," and CMC as "obligee."  Notably, in the Guardian II and Guardian III transactions, the
principal on each Lease Bond is "Shandoro Ventures, Inc. and Med-Quik Supply, Inc."
(separately, "Shandoro" and "Med-Quik," and collectively, "Shandoro/Med-Quik").

The following relevant provisions appear in substantially similar form in each of the
Lease Bonds:

>     Know All Men By These Presents:
>
>     That we, Shandoro Ventures, Inc. and Med-Quik Supply, Inc., as
>     principal, and Safeco Insurance Company of America, . . . as
>     Surety, are hereby firmly bound unto Commercial Money Center,
>     Inc., as Obligee. . . .

Joint Exhibit 2001AA, at 8.

The initial paragraph, as well as Paragraph 1, of the Lease Bond reference the specific
lease bonded and provide as follows:

>     The Obligee accepts the bond and Safeco Insurance Company of
>     America, as Surety, agrees to pay to the Obligee any amounts due
>     and owing by the principal with regards to the lease known as lease

---

[4] An exemplar lease bond from the Guardian II transaction also is included as Joint Exh. 2001Z.

number 1999-21 Series 3-9812085-033 (Lease), subject to the following provisions:

1.    If all payments required by the Lease are made in accordance with the Lease provisions, then this obligation shall be void; otherwise it shall remain in full force and effect.

Joint Exh. 2001AA, at 8.

Each Lease Bond contains so-called "fraud waiver" language in Paragraph 2:

The Surety is responsible to Obligee for the individual underwriting of each lessee and Lease, including, but not limited to, all related credit matters, issues of fraud, bankruptcy and the accurate and timely performance by any sub-servicer designated by Surety, and Surety shall assert no defenses to any claim under this Bond as a result of any of the foregoing.  This Lease Bond and the Surety's obligation constitute an unconditional and absolute guarantee of payment, not collection.

Joint Exh. 2001AA, at 8.

Paragraph 5 of the Lease Bond defines the occurrence of "default" as follows:

If the Obligee fails to receive a payment under the Lease from the Surety, as servicer or from any sub-servicer, on the scheduled due date, default under the Lease occurs.  Upon such default, the Surety shall have thirty (30) days to cause the default to be remedied.  The Surety shall make payment on this Bond to Obligee upon receipt of written demand from Obligee, within this 30 day period.

Joint Exh. 2001AA, at 8.

Finally, Paragraph 7 of each Lease Bond contains language permitting CMC to assign the bond to a new obligee:

The Obligee shall notify the Surety within thirty (30) days by registered or certified mail of any assignment of Obligee's rights under this Bond.  Any such assignee shall become the Obligee under this Bond, effective as of the date specified in the notice of assignment, immediately upon the Surety's receipt of such notice of assignment.

Joint Exh. 2001AA, at 8.  The Lease Bonds in the Guardian III transaction contain substantively

12

identical provisions.

### 3.    Purchase and Security Agreements

As explained in detail in the Bench Trial Opinion, each of the Guardian Entities involved in the Safeco transactions received an assignment of CMC's interests in the Lease Bonds.  As part of the assignment transaction, each Guardian Entity entered into a Purchase and Security Agreement with CMC.  The parties to this proceeding have introduced copies of the relevant Purchase and Security Agreements into evidence as Joint Exhibits 2001X (Guardian II, dated November 30, 1999) and 2002BB (Guardian III, dated February 10, 2000).

The Purchase and Security Agreements contain certain warranties by CMC as to the validity of the leases and the lessees' underlying obligations.  The excerpts below are taken from the Purchase and Security Agreement in the Guardian II transaction:

> **5.    Representations, Warranties and Covenants of the Seller.**  The Seller represents and warrants to and covenants with the Purchaser as follows:
>
> ***
>
> (b)    Each Lease is a true, valid and existing obligation enforceable in accordance with its terms, all signatures, names, addresses, amounts and other statements and facts represented therein are true and correct, and each Lease, and the transaction underlying each Lease, conforms to all applicable laws, rules, regulations, ordinances and orders. The Lease is the only one executed by the Seller with respect to the equipment described in the Lease. The Seller will comply with all its duties under each Lease.
>
> (c)    At the time of the Closing, each Lease Bond will be a true, valid and existing obligation of the Surety enforceable in accordance with its terms, all signatures, names, addresses, amounts and other statements and facts represented in each Lease Bond will be true and correct, and each Lease Bond conforms to all applicable laws, rules, regulations, ordinances and orders. At the time of the Closing, each Lease Bond will be a valid and enforceable obligation of the Surety, enforceable by and in favor of the Purchaser in accordance with its terms and fully assignable by Purchaser to its lender, if any.

***

> (f)    The equipment that is the subject of each Lease has been,
> or will at Closing be delivered to the lessee set forth in the Lease
> and accepted by such lessee as in satisfactory condition. . . .

Joint Exh. 2001X, at 2-3.  The Purchase and Security Agreement in the Guardian III transaction

contains identical provisions.

In connection with the Purchase and Security Agreement in each transaction, CMC and

the relevant Guardian Entity also executed an Assignment of Obligations, which states:

> 1.  Assignment.  Assignor [CMC] hereby sells, assigns, transfers
> and sets over unto Assignee [Guardian], its successors and assigns,
> all of Assignor's right, title and interest in, to, and under the
> Leases, including without limitation the right to receive all
> payment of the Obligations. . . .
>
> ***
>
> 3.  No Assumption.  The foregoing does not constitute, nor is it
> intended to result in, the creation or assumption by Assignee of any
> obligation of Assignor or any person in connection with the
> Leases, or any agreement or instrument relating thereto, including
> any obligation to the lessees under the Leases.

Joint Exh. 2001Y (Guardian II); *see also* Joint Exh. 2002CC (Guardian III).

**4.    Sale and Servicing Agreements**

In each transaction, CMC also executed a Sale and Servicing Agreement ("SSA") with

Safeco and the relevant Guardian Entity.  The SSAs for the Guardian II and Guardian III

transactions have been proffered as Joint Exhibits 2001HH and 2002PP, respectively.

Apparently, there was often a significant delay between issuance of the Safeco Lease

Bonds and execution of the associated SSA.  In the Guardian II transaction, the delay between

issuance of the Lease Bonds and execution of the associated SSA was eight days. *See* Joint Exhs.

2001AA, 2001HH.  In the Guardian III transaction, the delay was 20 days. *See* Joint Exhs.

2002GG, 2002PP.

The SSAs govern various matters, including the collection of lease payments and servicing of the lease portfolios.  In each SSA, the relevant Guardian Entity is designated as "Purchaser"; CMC as "Seller"; Safeco as "Servicer"; and CMC as "Sub-Servicer".

The SSA for the Guardian II transaction was executed on December 1, 2000.  The SSA executed in the Guardian III transaction is substantively identical. *See* Joint Exhs. 2001HH, 2002PP.  The SSAs define "Lease Obligations" as follows:

> The 11.1577% Lease Obligations, Guardian Capital II LLC 1999-21 Series 2, consisting of all amounts payable to the Purchaser hereunder in amounts sufficient for the Purchaser to recover the Monthly Base Distribution Amount on each Payment Date up to and including the last Collection Period Payment Date, whether from Scheduled Payments, realizations upon the security interests granted hereunder, or other amounts as provided herein.

Joint Exh. 2001HH, at 8.

The SSAs define "Surety Bond" as follows:

> *Surety Bond*  With respect to each Lease, a surety bond underwritten and validly issued by SAFECO INSURANCE COMPANY OF AMERICA or its successor, or one of its affiliates, in each instance reasonably acceptable to the Purchaser, or any of their successors, in each instance, which CMC or the Seller has: (i) purchased in order to protect against losses incurred due to default by the Lessee, and (ii) in which the Purchaser is named as loss payee, beneficiary, or obligee.

Joint Exh. 2001HH, at 9.

Each SSA provides for the assignment of CMC's rights under the leases and Lease Bonds to the relevant Guardian Entity:

> SECTION 2.1 **Conveyance of Leases and Related.** (a) Subject to the terms and conditions of this Agreement, the Seller, pursuant to the mutually agreed upon terms contained herein, hereby sells, transfers, assigns, and otherwise conveys to the Purchaser, without recourse (except as provided in this Agreement), as of the Closing

Date, all of the right, title and interest, including any security interest, whether now owned or hereafter acquired, of the Seller in and to the following (the "Transferred Assets"):

(i)     all contract rights under each Lease to receive all Scheduled Payments. . . .

***

(iii)     all rights under the Surety Bonds. . . .

Joint Exh. 2001HH, at 14.  As part of Section 2.4, CMC, as Seller, also represents that it has "good title to the Lease Assets," and that "[t]he information with respect to the Leases contained in the Schedule of Leases is true, complete, and correct." Joint Exh. 2001HH, at 19-20.

The SSAs contain language providing that, upon full repayment to Guardian of the purchase price it paid to CMC, as well as a negotiated amount of interest, all rights under the Leases and Lease Bonds (included within the definition of "Transferred Assets") revert to CMC:

SECTION 2.8  **Termination of this Agreement.**  This Agreement shall terminate upon the receipt by Purchaser of the Original Principal Amount plus all Interest Distributable Amounts. . . .   ***   Any remaining Transferred Assets shall thence be conveyed to the Seller without recourse.

Joint Exh. 2001HH, at 21.

The definitional section of the SSAs defines Safeco as "Servicer," (Joint Exh. 2001HH, at 12), and Section 3.1 authorizes Safeco to perform servicing duties, including collecting amounts due under the leases:

SECTION 3.1  **Duties of the Servicer.**  The Servicer is hereby authorized and directed to act as agent, custodian and bailee for the Purchaser and the Seller and in such capacity shall manage, service, administer, and make collections on the Leases. . . .

Joint Exh. 2001HH, at 22.

Section 3.6(a)(ii) of the SSA imposes duties upon Safeco, as Servicer, to refrain from

16

taking any action that would impair the rights of CMC or the investors:

> (ii) <u>No Impairment</u>.  The Servicer shall do nothing, by act or omission, to impair the rights of the Purchaser or the Seller in the Leases, the Insurance Policies or the other Lease Assets or Surety Bonds. . . .

Joint Exh. 2001HH, at 28.

Under Section 3.7, CMC is designated as the "initial Sub-Servicer," but Safeco, as Servicer, retains responsibility for lease servicing:

> SECTION 3.7 **Sub-Servicers.**  CMC is hereby appointed to be the initial Sub-Servicer and assumes all responsibility, as agent for and on behalf of the Servicer, to perform the duties of the Servicer hereunder.  The Servicer may otherwise, with the Purchaser's consent, which shall not be unreasonably withheld, maintain or enter into one or more agreements with Sub-Servicers for the servicing and administration of the Leases by such Sub-Servicers.  Notwithstanding the terms or existence of any such agreement between the Servicer and a Sub-Servicer, including CMC, the Servicer shall not be relieved of any of its obligations under this Agreement by reason of such agreement and shall be obligated to the same extent and under the same terms and conditions as if the Servicer alone was servicing and administering the Leases, and neither the Purchaser nor the Seller shall have any obligation to deal with anyone other than the Servicer with respect to the servicing of the Leases; provided, however, that so long as CMC shall be the Sub-Servicer hereunder, the Purchaser and the Seller agree to deal directly with CMC as Sub-Servicer as CMC or the Servicer may reasonably request, but without in any way, releasing Servicer as primary obligor hereunder. . . .

Joint Exh. 2001HH, at 30.

Under the terms of the Safeco SSAs, CMC has the right, but not the obligation, to make "servicer advances" on the leases—i.e., to cover any shortfall between the lease payments CMC received and the payments due to the investor:

> SECTION 4.6 **Servicer Advances.**  On each Deposit Date, the Servicer may, but will not be required to, advance and remit to the Collection Account, in such manner as will ensure that there will be immediately available funds in the account on the related Payment

Date, an amount (a "Servicer Advance") equal to any Scheduled Payments due during the prior Collection Period but unpaid prior to such Deposit Date with respect to any Lease. . . .

Joint Exh. 2001HH, at 35.

Section 4.7 of the SSAs included a provision pursuant to which Safeco as servicer agreed to wire transfer all distributions required to be paid by CMC to Guardian to a Bank One-controlled account:

SECTION 4.7 **Distributions.**  On each Payment Date, the Servicer shall:

(a) distribute the Monthly Total Distribution Amount, from the Collection Account to the Purchaser by wire transfer to the account designated by the Purchaser in writing from time to time, provided, however, that the Servicer will not change the account designated by the Purchaser from an account at Bank One, N.A., to an account not with Bank One, N.A., without the written consent of Bank One, N.A. . . .

Joint Exh. 2002PP.

Finally, the SSAs also contain a provision permitting CMC, as Seller, to substitute defaulted leases under certain circumstances:

SECTION 9.1 **Substitution.**

(a)  Subject to the satisfaction of the requirements set forth in Section 9.1(b) hereof, and as provided in Section 2.6 and, with respect to the Servicer, Sections 3.2(f) and 3.4(g), the Seller and the Servicer will have the right (but not the obligation) at any time to substitute one or more Substitute Leases and the Equipment subject thereto for a Lease (for purposes of this Section 9.1, such Lease referred to as a "Predecessor Lease") and the Equipment subject thereto if:

(i)  the Predecessor Lease became (A) a Liquidated Lease, (B) a Warranty Lease or (C) an Adjusted Lease during the immediately preceding Collection Period; and

(ii)  the aggregate Principal Balance of the Liquidated Leases, Adjusted Leases and Warranty Leases that are

18

> Predecessor Leases shall not in the aggregate exceed 10% of the Initial Pool Principal Balance.

Joint Exh. 2001HH, at 43.

### 5.    Credit and Security Agreements

In both the Guardian II and Guardian III transactions, the Guardian Entity involved entered into a Credit and Security Agreement with its lender, Bank One.  Each Credit and Security Agreement sets forth the terms of Bank One's loan, and grants Bank One a security interest in (1) the Leases, including the right to receive all scheduled payments under the Leases; (2) the Surety Bonds; and (3) the SSAs. *See* Joint Exhs. 2001A, 2002A.[5]

In Section 6.17 of each Credit and Security Agreement, the Guardian Entity affirms the parties' understanding as to the accuracy and validity of documents contained in the lease files:

> Section 6.17  PURCHASE AGREEMENT, ETC.  Borrower has duly executed and delivered the Purchase Agreement and the Sale and Servicing Agreement, and to Borrower's knowledge, CMC and Safeco have duly executed and delivered such respective documents as they are parties to respectively and the same are legal, valid and binding obligations thereof.   To Borrower's knowledge, the Leases have been duly executed and delivered by the lessee named therein, and such Leases are the legal, valid and binding obligations of such lessees. . . .

Joint Exh. 2001A, at 21.

### 6.    Comfort Letters

In connection with the closing of each transaction, Safeco delivered a "comfort letter" to Bank One, confirming that the Safeco bonds and SSA were authorized and enforceable. *See* Joint Exhs. 2009, 2013.  The "comfort letter" provided by Safeco in connection with the Guardian II transaction states:

---

[5] An amendment to the Credit and Security Agreement in the Guardian III transaction, dated April 11, 2000, does not materially modify the provisions of the Credit and Security Agreement for purposes of this Court's analysis.

> SAFECO Insurance Company of America has approved the attached list of Lease bonds to be executed by our Attorney-In-Fact, Mr. Michael Anthony.  The aggregate liability for these bonds [is] Six Million Five Hundred Forty-Two Thousand One Hundred Two and 30/100 dollars ($6,542,102.30).  All bonds on this list are in full force and effect.  Each Lease Bond executed by SAFECO Insurance Company of America is a valid and binding obligation of the surety enforceable in accordance with its terms, has been duly authorized by all necessary corporate action and does not violate or constitute a breach of the organizational documents of the Surety, or any agreement, judgment, or order to which the Surety is a party or by which any of its property is bound.  Upon notification of non-payment to SAFECO, SAFECO will remit payment to Bank One regardless of payment made to intermediaries or services. . . .

Joint Exh. 2009.  A substantively identical letter was provided in connection with the Guardian III transaction.  *See* Joint Exh. 2013.

### 7.  Assignments and Notices of Assignment

Upon the closing of each transaction, CMC exercised its right to assign its interests under the Lease Bonds to a Guardian Entity.  The assignment documents in the Guardian II and Guardian III transactions are substantively identical.  The Assignment in the Guardian II transaction provides in relevant part:

> IN CONSIDERATION OF THE SUM OF Five Million and 00/100 DOLLARS ($5,000,000.00), the receipt, adequacy and sufficiency of which is hereby acknowledged, Commercial Money Center, Inc. . . . (the "Assignor"), hereby assigns, transfers and conveys to Guardian Capital II, LLC . . . (the "Assignee") . . . the following:
>
> (1)  All contract rights under each Lease. . .;
>
> (2)  All funds on deposit from time to time in the Collection Account;
>
> (3)  All rights under the Surety Bonds; and
>
> (4)  Any and all proceeds of the foregoing. . . .

Joint Exh. 2001JJ; *see also* Joint Exhibit 2002QQ.

Generally, upon execution of an Assignment, CMC provided Safeco with a Notice of Assignment, executed by both CMC and the relevant Guardian Entity, through which CMC notified Safeco that it had assigned its rights to the Guardian Entity.  The Notices of Assignment in the Guardian II and Guardian III transactions are substantively identical.  The Notice of Assignment in the Guardian II transaction states, in relevant part:

> Please accept this letter as notice by the undersigned, as Obligee under each of the Surety Bonds . . . that effective on the date hereof the undersigned has assigned and sold to Guardian Capital II, LLC . . . ("Assignee") all of the undersigned's right, title and interest in and to the Lease Bonds. . . .
>
> Please be advised that Assignee has granted a security interest in all of the Lease Bonds and all its rights thereunder to Bank One, N.A. . . .  With Assignee's acknowledgment and consent indicated below, until further written notice is received by Safeco Insurance Company of America from Bank One, N.A., any right to payment arising under any of the Lease Bonds accrues to Bank One, N.A., and any payments made by Safeco Insurance Company of America pursuant to any of the Lease Bonds shall be paid directly to Bank One, N.A. . . .

Joint Ex. 2001W. *See also* Joint Exh. 2002X.

### 8.    General Agreements of Indemnity.

On April 30, 1999 and June 24, 1999, respectively, CMC and its parent corporation, Capital Markets Corporation, each executed a General Agreement of Indemnity ("GAI") in favor of Safeco. *See* Joint Exhs. 2003, 2004.[6]  The GAI executed by CMC provides, in relevant part:

> THIS AGREEMENT is made by the Undersigned in favor of the SAFECO INSURANCE COMPANIES for the purpose of indemnifying them from all loss and expenses in connection with any Bonds for which any SAFECO INSURANCE COMPANY now is or hereafter becomes Surety for any as Principal:

---

[6] CMC's principals and their spouses, Wayne and Anita Pirtle and Ronald and Nancy Fisher, also executed the GAIs in favor of Safeco.

COMMERCIAL MONEY CENTER, INC. . . .

Joint Exh. 2003 (the GAI executed by Capital Markets Corporation is substantially similar).

Safeco also introduced into evidence an Indemnity Agreement (Safeco Exh. 1001) executed by Roy H. Bresky ("Bresky"), president of Shandoro, on behalf of Shandoro[7] and in his personal capacity.  In the Indemnity Agreement, Shandoro and Bresky promised:

> To reimburse Surety, upon demand made for; and to indemnify and keep indemnified Surety from:
>
> . . . all loss, contingent loss, liability and contingent liability claim, expense . . . for which Surety shall become contingently liable by reason of such suretyship, whether or not Surety shall have paid same at the time of demand. . . .

Safeco Exh. 1001.  While the Indemnity Agreement is executed and refers to "Surety," the actual name of the Surety is not filled in, and Safeco is not referenced anywhere within the document.


## III.    FINDINGS OF FACT AND CONCLUSIONS OF LAW

Pursuant to a joint filing made by the parties on December 8, 2010 (02-16014, Doc. 116), the parties jointly submitted trial exhibit lists, including a Joint Trial Exhibit List, Bank One Proffered Trial Exhibit List, and Safeco Proffered Trial Exhibit List.  The parties' joint filing details the exhibits proffered by each party, as well as any objections raised to each exhibit.  As set forth in the parties' joint filing, the parties agree that all exhibits as to which no objection has been raised may be admitted into the record of these proceedings, without the need for witness testimony as to those exhibits.  The Court has accepted the parties' stipulation and, with the exception of the evidence excluded pursuant to the Court's January 25, 2011 and January 31,

---

[7] Bresky signed the Indemnity Agreement as "Roy H. Bresky, Pres.," and also executed a separate section titled, "Statement of Personal Indemnitors."  Presumably, the first of these two signatures was intended to be a signature on behalf of Shandoro.  The name of the Shandoro entity, however, does not appear anywhere within the document.

2011 Orders (02-16014, Docs. 123, 124), has admitted the evidence proffered by the parties in the December 8, 2010 joint filing.

The Court sets forth its findings of fact and conclusions of law herein.

A.      Evidentiary Standard

The Court has, on several occasions, addressed the standard by which Bank One's claims in this action are to be measured.  In the Bench Trial Opinion, the Court determined that the lease bonds at issue there (which were virtually identical to those under consideration here) unambiguously denominate CMC as obligee, and are not reasonably susceptible to a contractual construction whereby a Guardian Entity and/or its lender bank could be found to be the obligee. The Court found, accordingly, that "Plaintiffs may prevail in this action only by demonstrating, by clear and convincing evidence, that the language of the Lease Bonds did not reflect the parties' actual intent to name the Guardian Entities as obligees. . . ." Bench Trial Opinion, Doc. 2459, at 38.

The Court addressed this issue again, this time in the context of this specific case, in its Memorandum of Opinion and Order dated June 14, 2010.  While the question involved in that Memorandum of Opinion and Order was the appropriate arbiter of the obligee issue, the Court analyzed the claims asserted by Bank One, and held that "the transaction documents unambiguously grant obligee status to CMC, and thus Bank One may demonstrate its entitlement to obligee status only through reformation. . . ." Doc. 2462, at 13.  As is well established under California law, and as noted by the Court in the Bench Trial Opinion, "[r]eformation or revision on the ground of mutual mistake . . . requires clear and convincing evidence of the alleged mistake. . . ." *Inamed Corp. v. Medmarc Cas. Ins. Co.*, 258 F. Supp. 2d 1117, 1123 (C.D. Cal. 2002).

The Court finds that the standards applied in the Bench Trial Opinion and in the June 14, 2010 Memorandum of Opinion and Order are the law of the case and also govern these proceedings.  Accordingly, the Court hereby incorporates by reference its analysis set forth in section II.A. of the Bench Trial Opinion, as well as section II.A. of the June 14, 2010 Memorandum of Opinion and Order.

The Court analyzes the evidence proffered by Bank One herein under the "clear and convincing" standard.  To prevail in these proceedings, Bank One must establish the propriety of reformation of the Lease Bonds under that heightened evidentiary standard.  As set forth herein, Bank One has fallen short of that standard.  The Court finds that, as designated on the face of the Lease Bonds, CMC is the intended original obligee in these transactions.

**B.       Analysis of Guardian II and Guardian III Transactions**

As in the prior bench trial proceedings, the parties have focused their respective proofs on the question of who the parties intended to be the obligee on the Safeco Lease Bonds in the Guardian II and Guardian III transactions.  The evidence presented by the parties includes (1) the transaction documents and the provisions contained therein; (2) correspondence between the parties and internal file documents that allegedly reflect the intent of one or more of the parties to the transactions; (3) testimony of the parties and other witnesses as to the parties' transactional intent; and (4) testimony of the parties' retained experts as to the transactional structure chosen by the parties, and the significance of certain elements of that structure, vis-à-vis the question of what the parties must have intended.

Safeco generally argues that the transactions were structured as "two-stage" transactions, where the first stage involved Safeco's assumption of obligations in favor of CMC, and the second stage involved CMC's assignment of rights to a Guardian Entity and/or its lender bank.

During the first stage, Safeco asserts, CMC and its lessees executed the underlying leases, CMC purchased equipment, and Safeco Lease Bonds were issued naming CMC as "obligee."  In the second stage, according to Safeco, the Guardian Entities secured funds from Bank One, purchased rights in the lease pools, received assignments of CMC's rights in the Lease Bonds, and ultimately granted security interests in the lease pools' income streams to Bank One.

In taking this position, Safeco does not deny that it understood that CMC intended to transfer its rights as the original obligee to Guardian or others, or that such transfer would occur almost immediately after execution of the Lease Bonds.  Safeco argues, however, that the fact that a second stage was contemplated in the transaction does not alter the legal significance of the first.  Safeco argues, moreover, that Bank One cannot demonstrate any mutual mistake or fraud by Safeco, such as would support reformation of the Lease Bonds.

Bank One, on the other hand, raises two alternative arguments in support of its position regarding the intended transaction structure.  First, Bank One argues, the transactions were designed to be "one-stage" transactions consummated upon the execution of the SSAs, since the final transactional structure desired by the parties did not come into existence until that stage.  Alternatively, Bank One argues, the execution of the SSAs at some point subsequent to the issuance of the lease bonds effected a novation, which extinguished Safeco's prior obligation to CMC under the lease bonds and gave rise to a new guarantee running in favor of the Guardian Entities and/or Bank One.

Bank One further asserts that, separate and apart from the parties' objectively expressed intent, the transaction documents should be reformed because Safeco's false and misleading statements to Bank One constituted constructive fraud on Bank One.  Bank One contends, in essence, that Safeco had a fiduciary or confidential relationship with Bank One by virtue of its

25

status as closing agent and servicer under the SSAs, and that Safeco's breach of its duties to Bank One entitles Bank One to reform the transaction documents to substitute Guardian and/or Bank One as obligee on the Lease Bonds.

Central to Bank One's position is its argument that the circumstances of these transactions—particularly in light of certain statements and representations allegedly made by Safeco and its agents—differ dramatically from the transactions involved in the prior bench trial proceedings.  Because of these differences, Bank One asserts, the Court's analysis set forth in the Bench Trial Opinion should not apply here, and the Court should reach a different conclusion as to the intended original obligees on the Safeco Lease Bonds.[8]

The Court conducts a detailed review below of the material evidence presented by all parties to these transactions.  Upon careful consideration of all relevant evidence, the Court finds that Bank One has failed to satisfy its burden of demonstrating that either the Guardian Entities or Bank One—and not CMC—were the intended original obligees on the Safeco Lease Bonds.  As set forth in detail below, the Court further rejects Bank One's assertion that alleged statements or representations by Safeco take this case out of the framework of the Court's prior analysis and compel a different conclusion.  Rather, the evidence in this case is, in all relevant aspects, virtually identical to that introduced in the prior proceedings and considered at length in the Bench Trial Opinion.  Accordingly, the Court adheres to the determinations made in the Bench Trial Opinion.  Bank One is not entitled to reformation of the Lease Bonds to substitute Bank One or a Guardian Entity as obligee on those bonds.

---

[8] Safeco argues that both the transaction documents and the factual circumstances of the Guardian II and Guardian III transactions were before the Court during the prior bench trial proceedings, since both Guardian II and Guardian III were parties to those proceedings.  Given the Court's conclusions, the Court need not address any potential collateral estoppel issues arising from the presence of Guardian II and Guardian III as parties to the prior bench trial proceedings.

### 1.    The Transaction Documents Support a Finding that CMC Is the Intended Obligee of the Lease Bonds.

In sections II.B.3.a. (incorporated into the Court's analysis regarding Safeco by section II.C.3.a) and II.C.1. of the Bench Trial Opinion, the Court carefully examined the transaction documents in five transactions involving Safeco Lease Bonds.  The Court has reviewed its prior analysis in connection with the Guardian II and Guardian III transaction documents, and has determined that the transaction documents here—including the lease documentation, Lease Bonds, SSAs, Purchase and Security Agreements, Credit and Security Agreements, Assignments and Notices of Assignment—are identical in all relevant aspects to those discussed by the Court in its Bench Trial Opinion.  The Court, accordingly, will not further analyze the transaction documents introduced in these proceedings in this Opinion.

Rather, the Court hereby incorporates by reference sections II.B.3.a. (as incorporated into the Court's analysis regarding Safeco by section II.C.3.a.) and II.C.1. of the Bench Trial Opinion and adopts their conclusions.  As set forth in the Bench Trial Opinion, "the Court's examination of the entirety of the transaction documents reveals that the transaction documents are consistent only with a finding that the Lease Bonds were intended to guarantee the underlying lease obligations to CMC as obligee. . . ." Bench Trial Opinion, Doc. 2459, at 131.  The transaction documents here compel the same result.

Further, as in the prior bench trial proceedings, the Court's interpretation of the transaction documents is buttressed by the extrinsic evidence, which reflects that all parties intended a transaction that would give effect to the plain language of the transaction documents.  As set forth below, the evidence in these proceedings again supports a finding that CMC was the original intended obligee on the Safeco Lease Bonds.

2. **The Majority of the Evidence and Testimony Supports a Finding that the Parties Intended a Two-Stage Assignment Structure Whereby CMC Was the Obligee on the Lease Bonds**

As in the prior bench trial proceedings, a detailed examination of the evidence confirms that all parties understood the two-stage transaction structure and intended that the Guardian Entities and their lender banks would assume rights in the Lease Bond transactions only by assignment of the rights of CMC. The evidence introduced here demonstrates that certain facts are virtually undisputed with respect to the parties' intent during the negotiation stage of these transactions: (1) negotiations as to the structure of these transactions were conducted at arm's length, and counsel for the Guardian Entities were extensively involved in these negotiations; (2) all parties intended a two-stage assignment structure, in which CMC was the original obligee, and the Guardian Entities (and later, Bank One) took their rights via assignment; and (3) while the Guardian Entities, Bank One, and CMC may have believed that the structure described above gave rise to an "absolute and unconditional" obligation, or even a financial guarantee structure, such an understanding was not consistent with the transaction agreed to, and in fact would have been directly at odds with the terms of the negotiated transaction documents.

The Court examines the evidence introduced by the parties below.

a. **Evidence of Negotiation of Bond Language**

As in the prior bench trial proceedings, the evidence introduced by the parties in this proceeding demonstrates that the language of each of the relevant documents was extensively negotiated by counsel for the Guardian Entities and by Michael Anthony, as broker on behalf of Safeco. It is undisputed that both the Guardian Entities and Bank One had ample opportunity to review the agreements proposed and, if desired, to seek changes in the terms of the transaction documents. The evidence reflects, in fact, that the Guardian Entities and Bank One took

advantage of this opportunity and achieved significant changes in the terms of the bonds and other transaction documents.

Michael Anthony, CMC's broker and the Sureties' attorney in fact, testified as follows with respect to the Banks' involvement in negotiations:

> Q.  To your knowledge did any of the ultimate, any of the banks that were either investors or lenders but were involved in the program in providing funds, were they involved in any way in developing the language, to your knowledge?
>
> A.  Absolutely.
>
> Q.  How was that?
>
> A.  And well, if they didn't like some of the language or they wanted to change a paragraph or phrase, they would demand it.  In order for them to accept the bond I would have to take it back to the surety, put the two together and let them work it out amongst their legal staffs or underwriters until they came up with a product they were both happy with.

Anthony Depo., at 62:11-63:1.  Wayne Pirtle similarly testified as to the Banks' involvement:

> A.  . . . .  Every one of those bonds and insurance policies had to be written.  They had to be written to fit the various institutions.  Most of the lawyers for the institutions would talk to Michael [Anthony] or they would talk with the insurance companies and they would work out certain language.

Pirtle Depo., at 116:21-117:2.  Michael Anthony also testified to the involvement of Neil Gurney and Thomas Holmes, counsel for the Guardian Entities, in the negotiation of the CMC transaction documents:

> Q.  Mr. Gurney and Mr. Holmes were requesting that changes be made on various CMC documents, isn't that correct?
>
> A.  Yes.

***

> Q.    They were trying to change the sureties['] language; is that correct?
>
> A.    I think every bank tried to change the sureties['] language.

Anthony Depo., at 170:5-21.

During this proceeding, Bank One presented the live testimony of the Guardian Entities' attorney, Neil Gurney. *See* Tr. 125-174.  Mr. Gurney testified that he began representing the Guardian Entities and Blaine Tanner in early 1999, and that he first negotiated with Michael Anthony in the early stages of the CMC lease program, in the context of an unsuccessful transaction involving Frontier Insurance Company ("Frontier") lease bonds. *See* Tr. 135 to 143. Mr. Gurney testified that Bank One rejected the Frontier transaction due to discomfort with the creditworthiness of Frontier, *see* Tr. 142:14-143:8,[9] and that he later continued negotiations with Anthony in Anthony's capacity as broker for Safeco. *See* Tr. 143-150.[10]

Both Bank One and Safeco introduced into evidence correspondence between Mr. Gurney and Michael Anthony, which documents the extensive involvement of Guardian counsel in negotiating the language of the form lease bond.  Safeco Exhibit 1002 is a memorandum dated February 18, 1999 from Michael Anthony to Neil Gurney and Thomas Holmes, specifically

---

[9] In its Proposed Findings of Fact and Conclusions of Law (02-16014, Doc. 126), Bank One has argued that the fact that CMC was unable to close on SSA transactions involving leases bonded by Frontier demonstrates that the parties generally did not consider the Lease Bonds to be effective on issuance.  The Court rejected this identical argument in the Bench Trial Opinion.  As noted there, the events relating to the Frontier lease bonds predated Safeco's involvement in these transactions, and thus cannot be reflective of any intent on the part of Safeco. *See* Bench Trial Opinion, Doc. 2459, at 173.  The Court further noted that the parties introduced no evidence as to the intent of the parties in discarding the Frontier lease bonds.  For the reasons set forth in section II.C.3.e. of the Bench Trial Opinion, the Court also rejects Bank One's arguments relating to the Frontier lease bonds (which are premised upon the same evidence), and does not discuss those arguments further in this Opinion.

[10] On cross-examination, Safeco sought to impeach Mr. Gurney with his prior deposition testimony, where Mr. Gurney testified that he did not recall having any dealings with Frontier Insurance Company, nor did he recall being advised by any bank that Frontier was an unacceptable surety. *See* Tr. 168:4-15.  Mr. Gurney testified on cross that he had not remembered his dealings with Frontier until he reviewed the file, shortly before trial. *See* Tr. 168:16-24.

approving two changes to the bond form requested by Gurney and Holmes, and rejecting other suggested changes.   In rejecting the additional changes proposed by Guardian counsel, Mr. Anthony stated:

> Surety is a three party agreement.  In this case we guarantee the lessee will honor their contract to CMC, Inc.  We are not guaranteeing a loan, but rather the performance of the lessee. . . .

Safeco Exh. 1002.  In responding to Mr. Anthony's memorandum by letter dated February 19, 1999, Neil Gurney stated, "We have no problem with a three-party agreement. . . ." Bank One Exh. 10. *See also* Tr. 138-140 (Gurney testimony).

The correspondence between Guardian counsel and Anthony thus reflects that the Guardian Entities understood the nature of the transactional structure created by the documents and, to the extent they objected to that structure, had the opportunity to propose and negotiate acceptable language.  Bank One does not seriously dispute this point, or the fact that Bank One agreed to the terms that were ultimately included in the transaction documents.  Rather, the testimony of Bank One witnesses relating to negotiations focuses on representations purportedly made by Michael Anthony regarding the "absolute and unconditional" nature of the bonds, and the absence of defenses available to Safeco.

The Court will further examine the evidence proffered by Bank One relating to alleged Safeco misrepresentations in connection with its discussion of evidence relating to the purported "absolute and unconditional" nature of the bonds, *see* section III.B.2.c., *infra*, as well as in its discussion of Bank One's constructive fraud arguments, *see* section III.B.6., *infra*.  What is plain from the testimony of all witnesses, however, is that the documents memorializing these transactions were negotiated at arm's-length, and with the opportunity for input from all parties. In this context, it is difficult to argue that the language ultimately negotiated does not accurately

31

reflect the parties' intent.

   **b.**  **Testimony as to the Parties' Understanding of the Two-Stage, "Assignee" Transaction Structure**

Witness testimony and other evidence presented at trial also reinforce the findings that the "two-stage" transaction structure described by Safeco reflected a shared intent on the part of all parties, and that the <u>assignee</u> status of the Guardian Entities (and later, Bank One) was universally understood.  Safeco presented evidence that the Sureties insisted upon the two-stage transactional structure for two reasons.  First, for some CMC lease pools, the identity of the financial institution that would "fund" a particular lease pool was not known at the time the Lease Bonds were executed, making it impossible to issue the Lease Bonds in favor of those financial institutions.  As a result, the Sureties involved in the CMC program adopted a uniform practice of issuing the Lease Bonds to CMC in all instances, regardless of funding status. Second, the Sureties refused to issue bonds directly to the Banks or Guardian Entities because they feared that doing so would place them in violation of New York's "Appleton Rule," N.Y. Ins. Law § 1106(c).

While the analysis of the evidence relating to the parties' transactional intent is complex, an examination of the undisputed evidence demonstrates that Safeco never could have intended to issue Lease Bonds directly guaranteeing the obligations of CMC to its lenders.  All parties were aware that such an undertaking would have placed Safeco in violation of regulations to which it was subject in at least one of the states where it did business.

Wayne Pirtle testified that one reason for naming CMC as "obligee" on the Lease Bonds was the fact that the financial institution "funding" the transaction might not be known at the time of issuance of the Lease Bonds:

   A.  . . .  When you originally do a lease, you don't know who,

> what pool it is going to go into, so you don't necessarily know which investor, so you can't write the lease—I'm sorry, you can't complete the lease and get it bonded or insured, depending on what you are doing here, unless you know what the insurance company is going to be, because you have to get the banks to agree to this insurance company. . . .

Pirtle Depo., at 1731:2-10.

With respect to the "Appleton Rule," witnesses proffered by Safeco explained that New York insurance laws prohibited multiline insurers doing business in New York from issuing surety bonds that guaranteed loans.  Since Safeco was a multiline insurer licensed in New York, it refused to issue surety bonds in the CMC transactions unless the bonds were structured as guarantees of leases rather than loans.  CMC's principals, as well as Michael Anthony, testified as to their understanding of this rule.

Wayne Pirtle testified:

> Q.  And were you a party to discussions about Appleton to the effect that if the bond wasn't [sic] written initially to the investors, such as NetBank who were purchasing the income streams from the leases, that would violate Appleton, but if it is set up where the bonds are issued to CMC as a lessor and then assigned, that would not violate Appleton?
>
> A.  That's my understanding of it.

Pirtle Depo., at 1728:22-1729:7.  Michael Anthony further testified that he understood that the structure of the CMC program, whereby CMC was designated as obligee, was based upon an explicit requirement imposed by the Sureties:

> Q.  Do you recall any surety discussing that with you that that would be an advantage of structuring it where CMC was a named obligee on the bond, that it would under that scenario not violate Appleton?
>
> A.  The only specific thing I can recall is, they didn't want to

guarantee[] loans.  They would only do it with leases, because they felt leases were excluded from the Appleton law and that protected them.

\*\*\*

Q. Did any surety discuss with you—you said that the sureties felt that they needed to structure this where they were bonding leases and not, what did you say, guarantee loans?

A. I didn't say they needed to structure it that way.  They refused to bond any loans, they would only bond leases.  It wasn't a pre-conceived structure.  It was a rule of theirs.

Anthony Depo., at 322:4-13, 323:4-13.  Michael Anthony further testified:

Q. When you entered into or provided the first bond on behalf of AIG, was it your understanding that that bond ultimately was going to be assigned to a financial institute of some kind who would be the obligee?

A. Yes.

Q. Was that your understanding for every bond that you issued, relating to CMC, through Anthony & Morgan?

A. Yes.

It was my understanding that every bond I issued would be assigned to a various bank or lender or funding source.

Anthony Depo., at 34:17-35:1, 35:5-7.  Anthony testified that the parties intended for the bonds to be assigned immediately upon CMC's sale of the income stream, and for the investors ultimately to gain the status of "obligees" through the assignments:

Q. Did Mr. Schrader indicate to you his understanding that the banks in the structure would ultimately attain the status of obligee under the assignments?

A. Mr. Schrader, as with every other underwriter, knew that the bonds were instantly assigned and that's how they generated their income to finance the leases.

Q. Okay.  And you have a specific recollection of this?

34

A.      Yes.

Q.      And that was true with the Guardian transactions?

A.      True with all transactions.

Q.      Did Mr. Schrader indicate to you any problems or concerns relative to the structure where the banks would ultimately be assigned this position?

A.      No.

Anthony Depo., at 2403:2-20.

Anthony further testified as to the reasons for the transactional structure and for the designation of CMC as "obligee":

Q.      Do you know why CMC was named obligee on the Safeco surety bonds in the context of Guardian II and Guardian III?

A.      That was how the surety wanted it to be.

Q.      When you say, the surety, that was whom on behalf of the surety?

A.      All sureties.

Q.      All sureties, so you specifically recall that Safeco wanted CMC named as obligee?

A.      Yes.

Q.      And who at Safeco informed you of that?

A.      Ken Martin.

Q.      Did Mr. Martin share with you his basis or reasoning for that directive?

A.      He was directed by Jim Schrader.

Q.      What did Mr. Martin tell you that Mr. Schrader directed?

> A.    That CMC be the obligee under the bond and that it be assigned to whatever financial institution was purchasing the lease.
>
> Q.    Did Mr. Martin share with you the reasoning behind that directive; in other words, what was the purpose of that structure?
>
> A.    I believe it was discussed that it was a way around the Appleton Law, of any conflict with the Appleton Law.
>
> Q.    When you say you believe, is it your recollection or some kind of conjecture on your part?   Were there discussions along these lines?
>
> A.    It's my recollection.

Anthony Depo., at 2398:19-2400:3 (objections omitted).  Mr. Anthony further explained the

impact of the "Appleton Rule" on the structure of the transactions as follows:

> Q.    What is the difference, what is the distinction you were drawing between banking and loan language rather than the concept of suretyship?
>
> A.    Suretyship is a three-party agreement, whereas a loan is a two-party agreement.
>
> Q.    And what is the significance of that agreement in the context of the language of the bond form?
>
> A.    I don't believe the sureties wanted to be in violation of the Appleton Act.
>
> Q.    I see.  And to your understanding, what would have put them in violation of that?
>
> A.    Guaranteeing of a loan.

Anthony Depo., at 1899:15-1900:6.  Anthony testified that the Sureties intended the Lease Bonds

to guarantee payments from the lessees to CMC or its assignees:

> Q.    . . .  I'm asking you were you guaranteeing the lessee's payments to CMC under the leases.

*** 

A.    We were guaranteeing the lessee's payment to CMC or any assignee.

Q.    On the face of the bond, the named obligee was always whom?

***

A.    Commercial Money Center, CMC.

***

Q.    Put in more particular [] terms, have you come to know why CMC was named obligee?

A.    That was the instruction of the insurance companies from the very beginning.

Anthony Depo., at 1901:5-10, 14-17, 19; 2420:13-17.  Finally, Anthony testified that he advised the Sureties, including Safeco, that the obligations sought to be bonded would be leases, not loans:

Q.    Did you ever tell the—were you in a position to tell the sureties that you were asking them to bond loans?

A.    I believe that every file submitted to us was a lease.  I believe that all the underwriters believed they were leases.

***

Q.    Can you give me a rough estimate of how many hours you might have spent in various meetings between CMC and representatives of sureties, hundreds, thousands?

A.    Hours?

Q.    Hours.

A.    My best guesstimate would be [] 400 or 500 hours.

Q.    And in that 400 or 500 hours, did you ever hear CMC communicate to sureties with respect to whether the

> underlying obligations on which they were seeking bonds
> would be loans or leases?
>
> A.    Yes.
>
> Q.    What did they say?
>
> A.    They would be leases.

Anthony Depo., at 1973:2-1973:4, 1973:7-9, 1973:24-1974:18.

The overwhelming majority of the testimony presented at trial demonstrates that all parties understood the two-stage "assignment" structure and the consequences of imposing such a structure on the Lease Bond transactions.  Wayne Pirtle testified simply that, according to his understanding of the transaction, "CMC was the original obligee and then they assigned it." Pirtle Depo., at 2357:9-10.  Mark Fisher, CMC's chief operating officer, testified:

> Q.    .  .  .    The obligee on the surety bond is CMC and/or its
> assigns.  Is that true?
>
> A.    To the best of my recollection.
>
> Q.    The obligor on the surety bond is the lessee.  Is that true?
>
> A.    I think so.
>
> Q.    Now, at the time that the surety approves that lease, rather
> approves the lessee and issues the surety bond, CMC has
> not yet assigned it, have they?
>
> A.    No.  I don't believe so.

M. Fisher Depo., at 132:16-133:2, 133:13.

CMC principal Wayne Pirtle testified as to his understanding of the "assignment" structure of the transactions:

> Q.    Now, do you understand that under the CMC program if an
> investor was not paid an investor would be entitled to make
> a claim on the surety bond associated with his pool or its
> pool?

A. The surety bonds were assigned to the respective investor as additional collateral for the payments that they purchased.  It came with that.

***

Q. The obligee must notify the surety by registered or certified mail of any default under this lease within 30 days after obligee discovers such default.

And who is obligee according to the third line of this instrument, CMC, right?

A. Well, CMC is the obligee, subject to, they may have well assigned it.  I don't know.

Pirtle Depo., at 2163:1-9, 2231:7-15.

Safeco introduced the testimony of various witnesses concerning their understanding that CMC was the original obligee and that the investors took their rights by assignment from CMC.

Mr. Martin testified:

Q. All right.  You were aware, were you not, that the investors in the CMC bond pool—particularly from Cleveland—in fact had lender banking institutions in those transactions to whom they assigned the bonds that were assigned to the investors?

A. Yes.

***

Q. OK.  So you were, then, aware that Diversity Capital I was purchasing a lease pool represented by the bonds listed on this notice of assignment and was financing them, assigning the bonds to Provident Bank, correct?

A. Yes.

Martin Depo., at 483:8-13, 530:24-531:2.  Mr. Martin further testified:

Q. CMC didn't make any claims on any defaulted leases on the bond relating to them, did they?

39

> A.      CMC wouldn't make a claim on the bond.
>
> Q.      They wouldn't make a claim because—
>
> A.      They'd assigned their rights.

Martin Depo., at 536:25-537:4.

The testimony of Blaine Tanner, principal of the Guardian Entities, demonstrates that the understanding of the Guardian Entities with respect to the transactions did not differ from that of CMC or of Safeco.  Tanner testified that CMC was the original obligee, and that the Guardian Entities received their rights by assignment:

> Q.      And did you have any understanding as to who the obligee was under the bonds issued in Royal's name when you entered into these transactions?
>
> A.      CMC, I believe, who assigned it to Guardian, who assigned it to the banks.
>
> Q.      And the original obligee was CMC, was that your understanding?
>
> A.      It was.
>
> Q.      Excuse me?
>
> A.      I believe so, yes.
>
> Q.      Let me—and how is it then that—did some other entity subsequently become the obligee under the Royal bonds?
>
> A.      I believe the chain went from, and I could be totally wrong, I'm just going to give you my belief, CMC to Guardian, or Diversity, whichever company was the single purpose entity that was formed, to the banks.
>
> Q.      So that CMC—it was your understanding that CMC assigned its rights under the lease bonds to Guardian?
>
> A.      Yes.

Tanner Depo., at 942:6-943:3.  Tanner further testified:

> Q.     With regard to the Safeco bonds and each of the transactions, was it your understanding that the particular Guardian or Diversity entity would be the assignee of all of the rights of CMC under those bonds?
>
> A.     Yes.

Tanner Depo., at 1583:14-20.

In fact, Tanner explicitly testified that he understood that the Guardian Entities would <u>not</u> be named obligees on the Lease Bonds:

> Q.     Was it your understanding pursuant to the sale and servicing agreement that Guardian Capital III LLC as the purchaser was to be a named obligee under the lease bond?
>
> Q.     Is that your understanding of how the transaction was supposed to work?
>
> A.     My understanding is that the purchaser, Guardian Capital III, LLC, was being assigned all the rights under the Safeco bond and the sale and servicing agreement.

Tanner Depo., at 1575:8-19.

The testimony of Neil Gurney, counsel for the Guardian Entities, confirms that the Guardian Entities understood that they were taking rights as assignees rather than original obligees.  Mr. Gurney testified that the Guardian Entities were "intended to be the protected party under the Safeco bond. . . ." Tr. 148.  Mr. Gurney further testified, however, that the Guardian Entities were to acquire that status, and all of their rights, via assignment from CMC:

> Q.     Now, if CMC was named the obligee on the bond then how, to your understanding, was Guardian to become the protected party or obligee under the bond?
>
> A.     CMC was to assign all of its rights under that bond to Guardian Capital.

Tr. 148:17-21.  Mr. Gurney gave virtually identical testimony as to the manner that Bank One

was to acquire its rights under the Safeco bonds:

> Q.    Do you have an understanding as to how Guardian and Bank One were intended to obtain their status as obligee under the Safeco bonds?
>
> A.    Yes, I do.
>
> Q.    And what is your understanding?
>
> A.    CMC was to assign all their rights to Guardian, and Guardian was to assign all of their rights to Bank One.
>
>                   ***
>
> Q.    And what was your understanding of the effect of this assignment once completed at the Sale and Servicing Agreement closing?
>
> A.    That first Guardian and then Bank One would become the obligee under the bond.

Tr. 158:6-12, 158:14-18.

Mr. Gurney further testified that the Guardian Entities acquired their obligee status in the lease bond transactions <u>as of the date of the assignment from CMC</u>:

> Q.    And once received by Safeco, what is your understanding of the effect of that notice in relation to this transaction?
>
> A.    Guardian Capital became the obligee immediately upon receipt of that notice by Safeco.

Tr. 160:4-8.

In addition, Mr. Gurney testified on cross-examination that he had conducted research regarding the assignability of the CMC lease bonds, and the rights that would be conveyed to the Guardian Entities upon such assignment.  In this regard, Mr. Gurney testified:

> Q.    You would agree with me, would you not, in the course of your representation of Guardian Capital you had some research done at Ulmer Berne to assure yourself that the rights under these bonds could be assigned?

A.      Yes.

Q.      And you came away—you came to the conclusion that the rights of Commercial Money Center could, in fact, be assigned to Guardian Capital?

A.      Yes.

Q.      And that Guardian Capital could then assign those rights to Bank One, for instance?

A.      Yes.

Q.      And would it then be your understanding that Guardian Capital was assigning to Bank One that which it had received from Commercial Money Center?

A.      Yes.

Tr. 169:4-19.  Mr. Gurney also agreed with the legal proposition, posed by Safeco counsel, that

"an assignee can only receive those rights which his assignor has. . . ." Tr. 172:24-173:1.

Thomas Holmes, another attorney for the Guardian Entities, confirmed the testimony of

Mr. Gurney with regard to the Guardian Entities' understanding of their assignee status:

Q:      Was the bond issued to CMC originally, yes or no?

A.      Originally, yes.

Q.      Then CMC assigns the bond to Guardian and Diversity, correct?

A.      I don't recall whether we were—I think we were in the chain.  Yes, we were in the chain.

Holmes Depo., at 217:8-15.

During Mr. Holmes's deposition, he also was shown a copy of Safeco Exhibit 1002, a

memorandum dated February 18, 1999 from Michael Anthony to Mr. Holmes and his co-

counsel, Neil Gurney, explaining the structure of the CMC Lease Bond program.  Mr. Holmes

43

testified that he communicated that structure to the Guardian Entities' lender banks:

> Q.     Did you ever provide that language to any bank with whom
>        you dealt with on behalf of Guardian or Diversity?
>
> A.     Absolutely.  The deals were always structured to reflect the
>        fact that the guarantee was of the payment by the lessee and
>        that the bank received an assignment of the guarantee from
>        the insurance company, but it, the surety did not guarantee
>        the loan agreement.  It only guaranteed the performance by
>        the lessee, which was collateral for the loan.

Holmes Depo., at 309:2-23.

To the extent the intent of Bank One, as lender bank to the Guardian Entities, is relevant
to the inquiry, the testimony of Moses Jhirad, Bank One's Relationship Manager for the
Guardian II and Guardian III transactions, demonstrates that Mr. Jhirad also knew of and
understood the "assignment" structure created by the parties in the Lease Bond transactions.  On
cross-examination, Mr. Jhirad was questioned regarding certain language contained in Bank
One's credit analysis memorandum for each of the transactions.  Mr. Jhirad read into the record
the language contained in the Guardian II credit analysis memorandum, which was created by
Bank One:

> The lease bonds were issued to CMCI, who has assigned them to
> Guardian.  They will be further assigned to the holders of the notes
> as security on the leases. . . .

Joint Exh. 2007, at 2.  *See also* Joint Exh. 2011, at 4.

Mr. Jhirad acknowledged at trial that, pursuant to each of the Safeco Lease Bonds, CMC
was the named obligee:

> Q.     Now, would you agree with me then in all of the Safeco
>        lease bonds for the Guardian Capital II and Guardian
>        Capital III transactions that the named obligee in the bonds
>        is Commercial Money Center, Inc.
>
> A.     I believe that's correct.

Tr. 108:3-7.

Mr. Jhirad also testified on cross that the SSAs provided for assignment of the Lease Bonds from CMC to the Guardian Entities:

> Q.    So you then would agree pursuant to the Sale and Servicing Agreement the Safeco lease bonds were to be assigned from Commercial Money Center to Guardian Capital?
>
> A.    I would.

Tr. 112:21-24. *See also* Tr. 113:13-18.  Mr. Jhirad further testified that the assignments and notices of assignment were consistent with Bank One's expectations as to how the transactions would function. *See* Tr. 115:9-12, 116:3-9; *see also* Joint Exhs. 2001W, 2002X.  Finally, Mr. Jhirad testified that the "assignment" structure described in the opinion letters drafted by Irwin Frank, Esq. also was consistent with Bank One's transactional expectations. *See* Tr. 117:2-6, 15-20; *see also* Joint Exhs. 2001CC, 2002II.

In the face of the undisputed testimony relating to the agreed transactional structure, it would be virtually impossible to find that the Guardian Entities, or subsequently Bank One, acquired their rights under the Lease Bonds by any mechanism other than assignment.  As demonstrated by the record references above, the overwhelming weight of the evidence reflects that all parties understood and consented to the two-stage "assignment" structure created by the transaction documents.  Thus, despite Bank One's assertion that the parties contemplated a one-stage transfer of rights directly from CMC to the Guardian Entities (or to Bank One), the Court finds that all parties understood that all rights conveyed to the investors were conveyed via an assignment structure.  Given the parties' chosen mechanism of transfer, the Court necessarily also finds that the rights received by the Guardian Entities—and subsequently assigned to Bank One—were precisely those rights previously held by the original obligee, CMC.

45

        **c.**        **Testimony Regarding Alleged "Absolute and Unconditional"**
                     **Nature of Bonds**

Bank One argues that the parties understood Safeco's bonding obligations to provide an "unconditional guarantee" of payment, whereby Safeco would pay the amounts due the investors in absolutely any circumstance.  As discussed previously in this Opinion, Bank One bases its position in part on alleged representations made to it and to the Guardian Entities on behalf of Safeco, primarily by Michael Anthony.  Bank One seeks to demonstrate, through the testimony of representatives of CMC and the Guardian Entities, that those entities expected that the Lease Bonds would provide an absolute and unconditional guarantee of payment under any circumstances.

Initially, Bank One focuses on the authority of Michael Anthony to speak on behalf of Safeco, arguing that Safeco is bound by the acts of, and representations made by, Anthony. *See* Bank One Proposed Findings of Fact and Conclusions of Law, 02-16014, Doc. 126, at section III.C.  Safeco does not seriously dispute the proposition that, for purposes of representations allegedly made regarding the CMC Lease Bond program, Anthony was its authorized agent. Neither Safeco's Trial Brief nor its Proposed Findings of Fact and Conclusions of Law speaks to this issue.  In any event, for purposes of this Opinion, the Court assumes, without deciding, that Anthony was authorized to speak for Safeco for purposes of communicating with potential investors regarding the Lease Bond program.

Bank One introduced testimony from the CMC principals, as well as representatives of the Guardian Entities, regarding their understanding that the Safeco Lease Bonds would be "unconditional" with respect to all eventualities, including fraud.  In this regard, CMC principal Mark Fisher testified:

        Q.      Was there any discussion at the NetBank/Safeco meeting

> that we've been—that we've been talking about, was there any discussion about the bond being an unconditional guaranty to pay?
>
> A.    The—yeah, the bond was to be an unconditional guaranty to pay, even—you know, and I distinctly remember in this meeting that it was stated, and I don't know if Michael Anthony stated it or if Ken Martin stated it, but they basically said if CMC took the $25 million from this first transaction and just disappeared, NetBank would get paid.

M. Fisher Depo., at 1298:4-18 (objections omitted).  Similarly, Wayne Pirtle testified:

> Q.    I believe that you said yesterday that you didn't distinguish or don't distinguish between a guaranty and an absolute guaranty; do you recall that statement?
>
> A.    Yes.
>
> Q.    What do you mean by that?
>
> A.    I don't know the definition between the two.  The intent of the whole thing was it was all—the only thing I can really associate that with is like an insurance policy guarantees against all risks.
>
> In other words, the program was worked out with the sureties, it was worked out with the banks, and the understanding was that it was cradle to grave, it covered all eventualities, fraud, bankruptcies, all these other things, that no matter what happened, the sun came up in the west, if there was a default in the sense that the banks didn't receive their payments, that the sureties would make the payments.

Pirtle Depo., at 1840:3-23.  Mr. Pirtle further testified:

> Q:    Sir, let me restate the question so the record is clear.  Did Mr. Anthony ever state that the bond constituted an unconditional and absolute guaranty of payment?
>
> A.    Yes.  Yes, to answer your question.

Pirtle Depo., at 1530:20-25 (objection omitted).  Mr. Pirtle testified specifically that fraud in the

leasing industry was extensively discussed and that all parties negotiated the lease bonds with

fraud issues in mind:

> Q.    Do you recall any discussions where frauds in the leasing industry were specifically mentioned?
>
> A.    Fraud is a real problem in the leasing industry, and, yes, it came up all these times, and the question of fraud and what the intent of the covering all aspect[s] of fraud in these bonds and insurance companies, the banks wanted to know come hell or high water that if there was a problem with this lease, that they were going to get paid, and, therefore, everybody was trying to tighten up the fraud aspect of it.
>
> And the sureties knew and everybody knew that the banks were going to have to pay—the banks—the sureties would be obligated to pay in all events having to do with fraud, and that was the understanding.

Pirtle Depo., at 1637:13-1638:5.

Blaine Tanner, principal of the Guardian Entities, testified that the Guardian Entities also believed they were getting an absolute and unconditional guarantee of payment:

> Q.    Let's do it this way:  It wasn't just a guaranty you were expecting, you were expecting an absolute guaranty, weren't you?
>
> A.    That's correct.
>
> Q.    And that wasn't enough either, was it?
>
> A.    No.
>
> Q.    In fact, you wanted an unconditional and absolute guaranty, right?
>
> A.    Correct.
>
> Q.    And, sir, when you accepted the bonds from the sureties, did you understand that document to read this bond constitutes an unconditional and absolute guaranty of payment?
>
> A.    That's correct.

Tanner Depo., 1679:10-1680:8.

A substantial portion of the proffered evidence regarding representations allegedly made to the Guardian Entities on behalf of Safeco comes from the testimony of Guardian counsel, Neil Gurney.  Mr. Gurney testified that, in early 1999, while he was negotiating with Anthony for the issuance of Frontier lease bonds, Anthony assured him that Frontier's obligation would be "unconditional and absolute," and would protect Bank One against nonpayment in any circumstances. *See* Tr. 136-37.  According to Mr. Gurney, when Safeco was substituted as the proposed surety for the lease bond transaction, Anthony reiterated all of his representations and assured Mr. Gurney that the Safeco bonds would guarantee that all lease payments would be made when due, under any circumstances. *See* Tr. 145-146.  Moreover, Mr. Gurney stated, Anthony advised him that the final version of the Frontier bond, which Mr. Gurney had negotiated with Anthony, also would be acceptable to Safeco. *See* Tr. 147.

Mr. Gurney specifically testified that he discussed with Anthony the necessity for "unconditional and absolute" surety bonds, without any defenses, including fraud-related defenses:

> Q.   And did your discussions include the intended purpose of— what did Mr. Anthony say about the intended purpose of the Safeco bond in the program?
>
> A.   He said that their purpose was to insure that all of the lease payments would be made when due and that Guardian would not have to be concerned at all about that.
>
> Q.   Did your discussions include again whether the bonds needed to be noncancelable or irrevocable?
>
> A.   Yes.
>
> Q.   And what did Mr. Anthony say?
>
> A.   That would not be a problem.

Q.      Did you have discussions with Mr. Anthony concerning whether the bonds needed to be unconditional and absolute as you did on the Frontier bonds?

A.      Yes.

Q.      And what did Mr. Anthony say?

A.      That would not be a problem.

Q.      Did your discussions include the issue of what defenses that the surety may or may not have to any claims that Guardian would make under the bond?

A.      Yes.

Q.      And what did Mr. Anthony say?

A.      Well, I said to him that there must be no defenses, and he agreed that that would be the case.

Q.      Did you have any discussions specifically to the issue of any defenses of fraud with Mr. Anthony?

A.      Yes, I did.

Q.      And what did Mr. Anthony say?

A.      That that would not be a problem, that would not be a defense available to the surety.

Tr. 145:10-146:14.[11]

---

[11] Michael Anthony, in his deposition testimony, seemed to acknowledge that such representations would have been consistent with his understanding of the transaction.  Mr. Anthony testified as follows with respect to this issue:

Q:      Was it truthful testimony by you that in July of 2002 that it was your understanding that even if fraud of CMC was established that the surety companies still owed the banks on the bonds that were issued?

***

A.      I believe that both the bond and the insurance coverage—insurance policy covered issues of fraud.

Anthony Depo., at 419:5-419:17.

Bank One Exhibit 11, introduced through the testimony of Mr. Gurney, is a March 8, 1999 letter from Mr. Gurney to Michael Anthony.  The attachment to that letter contains certain provisions from an offering circular memorandum, part of which focused on "credit enhancement."  According to Mr. Gurney, he had sent these provisions to Anthony in order to explain some of the essential provisions that Bank One required to be included in the surety bond:

> Q.    So why did you provide this particular attachment to Mr. Anthony on credit enhancement if you were discussing a surety bond?
>
> A.    Because it contained some of the essential provisions that we needed to make sure were in the lease or surety bond, such as irrevocability, unconditional obligations to pay, and noncancelability.

Tr. 141:2-8.

The testimony of Mr. Gurney also confirmed Tanner's description of the Guardian Entities' transactional understanding.  Mr. Gurney testified that Anthony represented, and that he believed, that the Guardian Entities would have absolute protection and be subject to no defenses:

> Q.    Did you have any discussions with Mr. Anthony about the nature of the protection that Guardian would have if it accepted an assignment from CMC under the bond?

---

> Q.    Let me get to the bonds.  Is it your understanding then that since, your understanding was that CMC was a co-principal of the lessee, the surety companies that issued bonds and represented, made the representations that you have testified about to the investors, would still owe the investors on the bonds even if the fraud of CMC was established?
>
> ***
>
> A.    Correct.

Anthony Depo., at 424:23-425:12.

51

A.      Yes.

Q.      Okay.  And what did Mr. Anthony tell you?

A.      He said that they would have all of the protections that we had previously discussed and agreed upon, including absolute, irrevocable, noncancelable assurance that all of the lease payments would be made when due.

Q.      Did you have discussions about what defenses would be available to Safeco if Guardian accepted an assignment of CMC under the bonds?

A.      Yes.

Q.      And what did Mr. Anthony say?

A.      None.

Q.      Did you have discussions specific to fraud on that point?

A.      Yes, we did.

Q.      And what did Mr. Anthony say?

A.      That would not be a defense.

Q.      And is that consistent with your understanding of the language in that bond?

A.      Yes.

Tr. 148:22-149:19.

Bank One asserts that Safeco issued its Lease Bonds with an understanding that those bonds would be used not only to guarantee lease payments to CMC, but to facilitate CMC's borrowing by providing a measure of security to CMC's lenders.  Bank One proffers the testimony of several witnesses to support its contention that Safeco knew of this purpose of the Lease Bonds.  Kenneth Martin, Safeco's former senior account analyst, testified that CMC had the right, as an obligee, to make a claim under the Lease Bonds only for the period of time prior

to the assignment of the Safeco Lease Bonds to an investor, and that Safeco never actually expected CMC to make such a claim:

> Q.    But you're aware that this whole matter happened simultaneously and CMC never actually for any period of time existed as an obligee except at the instant they assigned it to Guardian; isn't that correct?

> A.    That would be correct.

> Q.    It was never expected or anticipated by you that CMC would ever make a claim under these bonds, was it sir?

> A.    That is correct.

Martin Depo., at 454:22-455:6; *see also* Martin Depo., at 192:21-193:4, 193:18-194:13.   Mr.

Gurney confirmed Mr. Martin's understanding of the transaction in this regard:

> Q.    To your understanding, did the parties to the Sale and Servicing Agreement—Safeco, CMC and Guardian—intend for CMC to have a right to make an actual claim under the Safeco bonds?

> A.    No.

> Q.    And why do you say that?

> A.    Because by the time this transaction was closed or effectuated, CMC had no rights under the bond.

> Q.    And did anyone from Safeco ever disclose or represent to you that Safeco intended for CMC to have the right to make an actual claim under the Safeco bonds?

> A.    No.

> Q.    Did Michael Anthony ever disclose or represent to you that CMC was intended to have the right to make an actual claim under the Safeco bonds?

> A.    No.

Tr. 160:19-161:8.  Bank One argues that, in agreeing to issue bonds that would facilitate CMC's

borrowing for its lease program, Safeco also was agreeing to assume the enterprise risk of CMC as subservicer. *See* 6/1/2000 Boh Dickey e-mail, Bank One Exh. 49 ("[I]f all the leases became a problem or if [CMC] were unavailable to service them that [Safeco] could be left with the proverbial bag. . . .").

Mr. Martin testified that the purpose of the CMC lease program, ultimately, was to guarantee income flow to the investors:

> Q.   Okay.  And you understood, again, that what Anthony & Morgan was again proposing was that CMC was bundling leases and selling them to investors?
>
> A.   That was my understanding.
>
> Q.   And that they wanted Safeco to issue bonds to guarantee the income flow to the investors?
>
> A.   That is correct.
>
> Q.   And that was the purpose of the lease bonds that Safeco ended up issuing regarding CMC, was to guarantee the income flow to the investors, correct?
>
> A.   That is correct.  May I state that maybe in a little different way—we were guaranteeing the lease payments by the lessees to ultimately go to the investor.
>
> Q.   Correct.  And you recognized—your memo states that the discussion was while the obligee on the bond would be CMC, they would pass the benefit of the bond on to the investors?  Do you see that?
>
> A.   Yes, I do.
>
> Q.   Do you remember discussing why the obligee would be CMC?
>
> A.   Because CMC was the entity leasing the equipment to the lessee. . . .
>
> ***
>
> Q.   And you knew that was the whole purpose of pooling the

leases, was to sell them to investors, correct?

A.     Yes.

Martin Depo., at 104:13-105:9, 113:1-6. *See also* M. Fisher Depo., at 1266-67 ("the sureties would pay on the bonds because they, you know, quote, had no weasel clauses in them.  And they—you know, no matter what happened, they were to pay the investors. . . .  From the bank's perspective, the banks were secured because, you know, it was an unconditional financial guarantee that, you know, took into consideration every single thing that the CMC program was. . . .").

Safeco introduced no evidence specifically disputing that certain representations may have been made by Anthony to the Guardian Entities, or even to Bank One.[12]  Even assuming such representations were made (and authorized by Safeco), however, the testimony of Bank One's witnesses suffers from several inherent defects.  First, although the Guardian and Bank One witnesses testified that Michael Anthony represented that the Lease Bonds would be unconditional and would cover issues of fraud, no witness specifically testified that discussions occurred with respect to whether the bonds were intended to cover fraud in the inducement by CMC.[13]  As discussed previously in the Bench Trial Opinion, the guarantees provided by the

---

[12] Moses Jhirad, Bank One's Relationship Manager for the Guardian II and Guardian III transactions, testified that both Michael Anthony and Safeco employee Ken Martin made representations to him regarding the terms of the bonds, and whether defenses would be available to Safeco pursuant to the terms of the bonds. *See generally* Tr. 61-68.  Particularly with respect to alleged representations by Mr. Martin, however, Mr. Jhirad's testimony was so vague that the Court is unable to credit the testimony of specific representations allegedly made to Mr. Jhirad.  Even more troubling, on cross-examination, Mr. Jhirad acknowledged his prior deposition testimony to the effect that, with the possible exception of one conference call, he had not met or spoken to Mr. Martin prior to the default in payment on the lease bonds. *See* Tr. 96-97.

[13] As noted in this section, Mark Fisher testified that he was told that Safeco would pay on the Lease Bonds even if "CMC took the $25 million from this first transaction and just disappeared. . . ."  The context of this representation, however, suggests that it related to fraud by CMC occurring after the consummation of the transaction, in CMC's capacity as servicer.  As explained in detail later in this Opinion, the Court finds that the only fraud cognizable as a defense to Safeco under the Lease Bonds was fraud by CMC in the inducement to enter into the Lease Bond transactions.  Thus, the narrow defense available to Safeco in this case does not encompass any fraud allegedly committed by the lessees, or later fraud by CMC in its capacity as servicer of the leases.

Lease Bonds were extensive and covered a broad range of events, including fraud.  The one exception to these guarantees was fraud by CMC, with respect to the inducement to enter into the transaction. *See* Bench Trial Opinion, Doc. 2459, at 179.  Thus, to the extent that representatives of Bank One, CMC and the Guardian Entities discussed with Michael Anthony matters relating to fraud in a general sense—such as fraud by the lessees or the servicer of the income streams—Anthony's alleged representations may well have been accurate.

Second, the statements allegedly made by Michael Anthony were necessarily part of the negotiation process, and to that extent, could not have reflected the parties' final transactional intent.  The significance of this point is underscored by the fact that representations as to the "unconditional" nature of the bonds, if made, were actually inconsistent with the final negotiated language of the transaction documents, and the legal consequences flowing from those negotiated terms.

As the Court has explained on numerous occasions, the language of the transaction documents clearly conveys obligee status to CMC.  Moreover, California law bars enforcement of a provision exempting a party from its own fraud. *See, e.g., Danzig v. Jack Grynberg & Assocs.*, 208 Cal. Rptr. 336, 342 (Cal. App. 1st Dist. 1984).   Accordingly, the language of the Lease Bonds, as negotiated by the parties, permits assertion of fraud defenses by Safeco in the context of fraud in the inducement by CMC.

To the extent the Guardian Entities and/or Bank One did not understand the legal impact of the negotiated language, those parties had the opportunity to review that language, and had access to skilled counsel to aid in interpreting the language.  Neil Gurney, an experienced transactional lawyer, testified that he represented the Guardian Entities throughout the Lease Bond transactions.  Moses Jhirad testified that Bank One retained the services of Kahn Kleinman

to assist Bank One in the transaction.

Michael Anthony, on the other hand, is not an attorney, and his duties did not include interpreting the legal effect of the language ultimately agreed to.  While Anthony arguably had (and the Court assumes he had) authority to speak for Safeco in negotiations, his primary function was to communicate with Safeco and advise the Guardian Entities as to the bond language that was ultimately acceptable to Safeco.[14]  In this arm's-length, multimillion-dollar

---

[14] Bank One designated the following deposition testimony with regard to the function of Michael Anthony in negotiating the Lease Bonds:

> Q.    In your testimony in response to Mr. Prough's questions on behalf of RLI, and correct me if I'm wrong, but I believe you testified that as an agent of the surety, you believe that you had the right to interpret a surety's bonds, is that a fair summary of your testimony?
>
> A.    Well, in this case all my interpretation of the bonds were based on the statements made by the underwriters.
>
> Q.    And I understand that that's your testimony, and I'm certainly not here to argue with that.  And I assume that your testimony would be the same as to Safeco?
>
> A.    Yes.
>
> Q.    That your interpretations flowed from your impressions from Safeco representatives.  And you've said that before; isn't that true?
>
> A.    Correct.
>
> Q.    Assuming that, if you were out interpreting these bonds, would you as a matter of practice discuss with Safeco your interpretation before you provided it to a third party?
>
> A.    Well, I'd always clarify with a third party.  First of all, let me back up and give a little history.
>
>       When you sit with a bank side by side with an underwriter of Safeco and he says, if you don't get paid, we will pay you under any—there's no conditions we will not pay you.  You will get paid, unless we're bankrupt.  Okay.  If subsequently, a week later, a bank calls me and says, what is your interpretation of this bond?  I would say, if you don't get paid, you're going to get paid under any condition, unless the surety is bankrupt.  If you don't believe me, call Ken Martin.
>
> Q.    And I believe it has been your testimony consistently that you obtained that information or you heard that comment from Mr. Martin.

business transaction, it would be incomprehensible for the investors to accept Michael Anthony's legal interpretations with no further analysis.  Rather, both Bank One and the Guardian Entities had adequate opportunity, and bore the obligation, to analyze any documents proposed and determine whether they achieved the desired results from a legal standpoint.

A further difficulty with Bank One's position is the inconsistency between Bank One's assertion of an "unconditional guarantee" and the virtually undisputed evidence reflecting all parties' understanding of the assignment structure of these transactions.  As described in section III.B.2.b., *supra*, all parties recognized that these transactions involved a two-stage structure, through which the rights of CMC were conveyed by assignment to the Guardian Entities, and ultimately, to the investors.

It is clear that the parties understood that the obligations to be guaranteed by the Lease Bonds were the underlying leases, and not CMC's loan obligations.  The fact that the guarantee of the lease payments to CMC provided some comfort to the lender banks, and thus facilitated the Banks' extension of credit to CMC, does not compel a finding that the Lease Bonds themselves guaranteed the obligations of CMC.

As Guardian attorney Neil Gurney acknowledged, "an assignee can only receive those rights which his assignor has. . . ."  Tr. 172:24-173:1.  Thus, while it may have been true that Bank One, and perhaps even the Guardian Entities, expected the Lease Bonds to guarantee payment in virtually all circumstances, any such expectation would necessarily have been inconsistent with those parties' intent to succeed to the rights of CMC via a series of assignments.

---

A.        I heard that comment from virtually every underwriter.

Anthony Depo., at 2806:19-2808:13.

Taking the testimony as a whole, the Court is compelled to view the parties' expressions of subjective transactional intent in the context of the objective reasonableness of the parties' expectations.  It is not reasonable to assume that witnesses who clearly understood the assignment structure of the transactions could have anticipated that the Guardian Entities or Bank One would acquire, through assignment, rights greater than those possessed by their assignors.  Accordingly, the Court finds that the evidence and testimony with regard to the alleged "absolute and unconditional" nature of the Lease Bonds is insufficient to negate the two-stage assignment structure carefully constructed by the parties.[15]  The rights the investors expected to receive included only those rights previously held by CMC.

### d.      Testimony as to Alleged "Financial Guarantee" Structure of Transaction

In an alternative argument, Bank One has pointed to certain evidence which, it maintains, compels a finding that the commitments undertaken in the Lease Bonds actually constitute financial guarantee obligations, rather than simple surety bonds.[16]  The weight of the evidence defeats this argument as well.

Bank One argues, first, that the amounts guaranteed by Safeco in the Lease Bonds are indicative of an intent to guarantee loans made to CMC from lender banks (using the Guardian Entities effectively as conduits), rather than to guarantee the underlying lease payments.  Bank One notes that the amount guaranteed by Safeco, in each instance, is equivalent to the amount

---

[15] As discussed in the Bench Trial Opinion (Doc. 2459), to the extent Bank One and the Guardian Entities hoped for a virtually risk-free transaction, the one they entered into was not far off; they were protected from claims of fraud by the lessees, by CMC as servicer and subservicer, by Michael Anthony, and by Safeco itself.  They just were not protected from claims of fraud in the inducement by CMC.

[16] In support of its characterization of the Lease Bonds as "financial guarantees" or securitizations, Bank One has introduced the testimony (via affidavit) of expert witnesses Paul Palmer, Charles Kerner, and Michael Larrick.  For the reasons set forth in section III.B.2.e., *infra*, the Court declines to rely on the testimony of these experts, and discerns the intent of the parties through an examination of the relevant transaction documents and extrinsic evidence.

due and owing to Bank One, not to the entire amount due on the underlying lease. *See* Tr. 161:4-162:15 (Gurney testimony); Bank One Exhs. 2001HH, 2001Z, 2001AA, 2002PP, 2002GG. Although the precise nature of Bank One's argument in this regard is unclear, Bank One apparently contends that the symmetry between the amounts guaranteed in the Lease Bonds, and the amounts owed on the Guardian Entities' loans, suggests that Safeco actually intended to guarantee the loans themselves.

Bank One thus argues that the Lease Bonds were not intended to function as standard surety bonds, but rather as letters of credit or similar financial guarantee instruments.  Bank One relies, in part, on the testimony of surety broker Michael Anthony, who described the Lease Bonds as "credit enhancement" bonds:

> A. . . . The type of bonds that in the CMC were more used as a credit enhancement, where there was, contracts that were enhanced with the surety bond, guaranteed.
>
> Q. Well, could you elaborate a bit on the concept of credit enhancement, not necessarily for the matter at hand but just in the industry?  Could you explain to us what you mean by a credit enhancement?
>
> A. Well, credit enhancement to me was taking a risk and applying some type of mitigation factors to reduce that risk. Having a surety of good caliber stand behind it and make whoever was[] the obligee feel more comfortable with the risk.

Anthony Depo., at 29:1-15.

In this regard, Bank One introduced at trial a June 22, 2000 letter written by Michael Anthony to Wayne Pirtle at CMC (Bank One Exh. 55).  That letter includes a general description of the CMC program.  It provides, in pertinent part, as follows:

> A surety bond of this nature is similar to a letter of credit issued by banks.  In the case of the lease bond program, if the lessee fails to make their payments, the surety will.  This type of obligation is

pure and simple from the surety's perspective by the language on the bond.  It is a **strict financial guarantee**.

*** *** ***

The bond is non-cancelable by the surety and runs for the entire term of the lease.  The bond is also fully assignable.

Bank One Exh. 55 (emphasis in original).

Anthony testified as follows with respect to the June 22, 2000 letter:

> Q.  And does that specifically set forth your understanding of the obligations of the sureties?
>
> A.  In my opinion, yes.
>
> Q.  Beginning with the time that you wrote the first bond relating to . . . any of the sureties that are part of the current CMC litigation was that your understanding at that time?
>
> A.  From the inception to the end, it's always been my understanding.
>
> Q.  Now, if you look at the fourth paragraph, could you read that for us, please, as you wrote it?
>
> A.  The bond is non-cancelable by the surety and runs for the entire term of the lease.  The bond is also fully assignable.
>
> Q.  Did that also reflect your understanding from the beginning of the program to the end?
>
> A.  Yes, sir.
>
> Q.  Did you have any discussions or receive any documents or learn anything prior to this litigation from any of the sureties or any of the insurance companies involved in this litigation that either of those two understandings were not accurate?
>
> A.  No.

Anthony Depo., at 137:18-139:6.

Bank One further argues that Mr. Pirtle's testimony as to the "no-loss" nature of the

surety obligations supports its contention that the parties intended Safeco to undertake financial

guarantees in its Lease Bonds.  Mr. Pirtle testified:

> Q.   What do you mean, and I just want the record to be clear,
> what do you mean when you say the intent was to provide
> the investors with a no-loss situation?
>
> A.   I mean that there was no eventuality that could occur that
> the investors would not have been paid by the insurance
> company.
>
> Q.   And did you explain that intent to the initial sureties that
> participated in the program?
>
> A.   Yes.
>
> Q.   Did you explain that intent to the sureties who are parties in
> this case, American Motorists, RLI, Royal, Safeco?
>
> A.   Yes.
>
> ***
>
> Q.   . . .  Did Safeco ever, anyone at Safeco ever indicate to
> your knowledge that Safeco was unwilling to provide
> bonds that would provide 100 percent guarantees to the
> investors?
>
> A.   No.
>
> Q.   Did anyone at Safeco to your knowledge ever indicate they
> were unwilling to provide bonds that would protect the
> investors from all risks?
>
> A.   No.

Pirtle Depo., at 1848:20-1849:7, 1853:21-1854:8.

Pirtle specifically testified that CMC had represented to Safeco and other Sureties that the

Lease Bond program was designed to provide investors with strict financial guarantees:

> Q.   And then the last sentence of that paragraph states that,
> quote, the program is designed to give investors protection
> by shifting the credit and prepayment risk to the surety

62

> companies in the form of their strict financial guaranty, close quote; do you see that?
>
> A.     Yes.
>
> Q.     And was that statement commonly made to potential investors looking at purchasing income streams with regard to the bonded lease program?
>
> A.     Yes.

Pirtle Depo., at 1834:9-22.

Bank One further presented testimony to the effect that surety broker Michael Anthony may have marketed the Lease Bonds to investors as strict financial guarantees, and that both CMC and Safeco were aware that the program was so marketed.  Wayne Pirtle testified:

> Q.     Let me break it into two questions.  To your knowledge, were the sureties aware that the bonds and policies [were] being presented as strict financial guarantees beginning from the start of the program in 1998?
>
> A.     Yes.
>
> Q.     And did you participate in meetings yourself with each of the sureties with counsel present here, RLI, American Motorists, Royal, Safeco and also ACE Illinois Union where it was discussed that the bonds and policies were intended to be strict financial guarantees[?]
>
> A.     Yes.

Pirtle Depo., at 1835:15-1836:7.

Based on Safeco's understanding that the benefits of the Safeco Lease Bonds ultimately would flow to the investors, Bank One has argued that the Safeco bonds actually should be understood as financial guarantees, and presumably should be reformed to operate as such.  In connection with that argument, Bank One also presented evidence demonstrating that Safeco classified the Lease Bonds internally as financial guarantee bonds.  Bank One presented the

testimony of William Carron, Safeco's director of surety operations, who testified that Safeco's 1999 annual account report (Bank One Exh. 25) classified the CMC bonds as financial guarantees:

> Q.   This is for Commercial Money Center account—it [is] a summary for the Commercial Money Center account. Correct?
>
> A.   Yes.
>
> Q.   And it states at the bottom—or toward the bottom of the first page, "Current credit lines."  Under financial guarantee it has outstanding liability, current, $32,199,000.  Do you see that?
>
> A.   Yes.
>
> Q.   And that's categorized as financial guarantee bonds. Correct?
>
> A.   Yes.

Carron Depo., at 92:24-93:10.  *See also* Declaration of Gene Sawyer ("Sawyer Declaration"), Bank One Exh. 75, at ¶ 3 ("Safeco issued at least 696 bonds known as financial guarantee bonds. . . .").

Despite Bank One's general categorization of the Safeco bonds, and the broad references to the Lease Bonds as "financial guarantees," Safeco's witnesses were clear in stating that they did not understand the Lease Bonds as financial guarantees in the same sense as would have been prohibited by the New York "Appleton Rule."  All of Safeco's witnesses testified that the industry-specific use of the term "financial guarantees" would apply to the bonds generally, but would not render them credit enhancement vehicles as contemplated by Appleton.

Bank One relies, in part, on the testimony of James Schrader, Safeco's Senior Underwriting Officer, that Safeco internally classified the Lease Bonds as commercial financial

guarantee bonds:

> Q. From your point of view—I'll just have you span your career at Safeco—would you consider these bonds as financial guarantees?
>
> A. Lease bonds?  Yeah.  Lease bonds already fall under that classification in the Bond Surety Association.  There are—there are many, many types of financial guarantee bonds that are written by surety companies and written on a daily basis.  I know that people hear that term "financial guarantee," and they associate it with that thin slice of the financial guarantee book of business; that is the—their verboten bonds under the New York regulations.
>
> But lease bonds—indeed lease bonds are a financial guarantee as are tax bonds, as are custom bonds, as are utility guarantee bonds.
>
> So there are many hundreds of financial guarantee bonds out there.

Schrader Depo., at 483:9-24. *See also* Tr. 249:23-250:1.  Mr. Schrader testified at trial, however,

that all bonds could be categorized as "financial guarantees" in some sense:

> Q. Do you have an understanding of the term financial guarantee?
>
> A. Yes.
>
> Q. What is it?
>
> A. In our business, it's a very broad term.  There's kind of a universe of financial guarantee bonds, many of which are standard, surety-type obligations.  More frequently, we hear people refer to financial guarantee as that very small part of that universe, that's the restricted portion, which is a—I shouldn't say forbidden—which is restricted to being issued by only types of companies.
>
> Q. Aren't all bonds to some extent a financial guarantee bond?
>
> A. I think that can be made, yes.  That generally guaranteed the payment of money in default.

> Q. The lease bonds are in the same category of that greater category?
>
> A. Yes, lease bonds are part of the large financial guaranteed group of which there are many types that are legitimate surety obligations and written on a daily basis.

Guardian/CadleRock Trial Tr. 184-185 (adopted into the record of these proceedings by stipulation at Tr. 223).

Mr. Schrader further explained that he did not understand the lease bonds issued in the CMC program to involve the type of restricted credit enhancement bond prohibited by the New York Appleton Rule:

> Q. And you understood that one class of restricted financial guarantees are credit enhancement bonds, that's what you testified earlier in this case?
>
> A. Correct.  Ones that would actually raise the—a credit rating, as I've mentioned.  I think you can actually look at all surety bonds as a form of credit enhancement.
>
> Q. Okay.  And so, if Safeco were to issue a surety bond to support a transaction that had an institutional credit rating agency like Standard & Poor's that would raise the actual credit rating on the offering, that would be a credit enhancement that's a restricted financial guarantee?
>
> A. If that were the purpose of the bond, correct.
>
> Q. Now, you understood the Guardian transactions were not rated public offerings; correct?
>
> A. I had no knowledge of that—
>
> Q. Had no knowledge at all?
>
> A. --on whether they were.
>
> ***
>
> Q. Okay.  You certainly wouldn't expect Mr. Martin to enter into a Sale and Servicing Agreement if there was a rating

66

agency involved in the transaction, would you?

***

A.      Yeah.  I would not expect him to do that.

Q.      So at least based on the information you had, you had no
        concern that the bond Safeco was issuing in the program
        and to Guardian would constitute restricted credit
        enhancement financial guarantee bonds?

A.      Correct.

Tr. 252:6-22; 253:11-13, 153:18-23.

In fact, both Mr. Schrader and Mr. Martin testified that the CMC lease program had been modified from the structure originally proposed to Safeco, which was akin to a credit enhancement.  These witnesses testified that the restructuring of the obligations as lease bonds was a significant adjustment, since it allowed Safeco to participate in the program without running afoul of the Appleton Rule.  Under the new lease bond structure, Schrader and Martin testified, the surety obligations were not credit enhancement vehicles.

Mr. Martin testified that he authored a memorandum dated April 20, 1999 (Bank One Exh. 14), which summarized a meeting held between Safeco employees and principals of A&M relating to the CMC lease bond opportunity.  In that memorandum, Mr. Martin stated, "We had an opportunity to review this program a year or so ago and declined because it was structured as a credit enhancement.  They have made several adjustments in the program and so it is possible that we could participate and underwrite each leasee [sic] and guarantee only the lease payments, thus overcoming the NY Appleton law.  Basically, the program will guarantee income flow to the investors. . . .  While the obligee on the bond is CMC, they pass the benefit of the bond on to the investors. . . ." Bank One Exh. 14.

Mr. Schrader testified:

67

> Q.   . . .  You said you had a concern that the Appleton Rule would apply to the bonds in this—that were being issued in this program?
>
> A.   I said that when the—when the program was first submitted to us, it was submitted in a fashion where the bonds would run directly to the banks and I said that that's something we cannot do.
>
> Q.   Even if it's not part of an institutionally rated public offering?
>
> A.   Yeah.  That's correct.

Tr. 254:3-12.

Mr. Schrader further explained:

> Q.   Ultimately, sir, to get to the point, did Safeco decide to participate in the Commercial Money Center program?
>
> A.   Yes, it did.
>
> Q.   Did it decide to participate the first time it was offered the program?
>
> A.   The initial offering that came to us was presented on a basis other than something that we were comfortable with, and we turned that down.
>
> Q.   Was that something you were uncomfortable with?
>
> A.   The way it was initially presented to us, bonds would run directly to banks.
>
> Q.   What's wrong with that?
>
> A.   Well, that runs contrary to some restrictive insurance regulations that we have to deal with in the state of New York, which basically says it's—it's regarding financial guarantees. . . .
>
> ***
>
> Q.   With respect to this Appleton Rule, did the existence of that rule enter into Safeco's decision to participate in this

program?

A.      It entered into our decision to decline it the first time.

Q.      Why?

A.      We felt that as presented to us, it would fall into that restricted category of the restricted portion of the financial guarantee bond market.

Q.      What was it about the second presentation that you were more comfortable with, with respect to the CMC program?

A.      It was presented to us as a simple lease bond program, and leases may be bonded under the—under the financial—they don't run afoul of the financial guarantee regulations.

Guardian/CadleRock Trial Tr. 170-172. *See also* Tr. 177.

Bank One does not dispute, and in fact apparently acknowledges, that Safeco agreed to participate in the CMC program only after restructuring of the program to address the Appleton concerns.  Perhaps even more significantly, as discussed previously in this Opinion, the weight of the evidence introduced by all parties overwhelmingly demonstrates that the parties to the Safeco transactions understood and intended to effect a two-stage "assignment" structure.

Both Wayne Pirtle and Michael Anthony testified that the Appleton Rule was a significant factor in determining the structure of the Lease Bond transactions.  Testimony from Mark Fisher, Michael Anthony and Blaine Tanner also demonstrates all parties understood that (1) the Lease Bonds guaranteed the obligations of the lessees to make lease payments; and (2) the Guardian Entities would acquire rights under the Lease Bonds only by virtue of assignments from CMC.

Testimony from Neil Gurney, counsel for the Guardian Entities at the time of negotiation of the Lease Bond transactions, further bolsters the Court's findings in this regard.  The testimony of Mr. Gurney makes clear that the investor banks were aware that other products

existed in the financial markets that would have accomplished the Banks' goal of securing direct rights as obligee.  Mr. Gurney stated, on cross-examination, that he was aware of documents available in the market through which a surety could have guaranteed payments on the lease bonds to the Guardian Entities and Bank One. *See* Tr. 170-171.  Mr. Gurney specifically testified that he had discussed a letter of credit with Mr. Anthony, and was told that a letter of credit would not be available. *See* Tr. 170:16-21.  Mr. Gurney also stated that Mr. Anthony informed him that Safeco would not agree to designate a Guardian Entity as obligee in the lease bonds. *See* Tr. 171:25-172:4.  This testimony makes clear that the investor banks were aware, at the time of the consummation of the transaction, that they were acquiring something <u>other than</u> a letter of credit, and something less than direct obligee rights.  If the banks believed that the agreed-upon structure provided insufficient protection, they were free to seek other products in the marketplace—albeit perhaps at greater cost.[17]

Bank One places great emphasis on the fact that the parties to the Safeco transactions designated CMC as obligee, at least in part, to ensure Safeco's compliance with regulations to which it was subject—specifically, the New York Appleton Rule.  Regardless of the purpose for the designation, however, the testimony of Safeco witnesses, as well as that of CMC principals and Blaine Tanner, demonstrates that the parties did understand that structure and understood that the Guardian Entities (and their lender banks) would take rights in the transactions only by virtue of assignments from CMC.

After considering the documents upon which Bank One relies,[18] as well as all other

---

[17] Indeed, as explained in section II.B.4. of the Bench Trial Opinion (Doc. 2459), and discussed in section III.B.2.e.v., *infra*, other transactional structures have been analyzed in the course of this MDL and found to provide the type of strict financial guarantee Bank One says it wanted.  That structure was more costly, however, and not available from standard surety companies such as Safeco.

[18] In addition to the evidence and testimony proffered by Bank One, Bank One has submitted an Appendix to its brief, which consists only of an article.  *See* Robert Aicher, Deborah L. Cotton, and TK Khan, *Credit Enhancement:*

evidence presented by the parties, the Court rejects Bank One's argument that the transaction documents created a financial guarantee arrangement in favor of the Banks.  First, the fact that the Lease Bonds, by their terms, guaranteed only a portion of the scheduled lease payments is not indicative of a financial guarantee structure.  While Safeco has not disputed that the parties intended to "fractionalize" the leases and guarantee only a portion of the scheduled lease payments, the parties' agreement in that regard does not change the nature of the underlying guarantee.

Although the amount ultimately guaranteed on each pool may have been equivalent to the amount due on each investor's loan to the respective Guardian Entity, these parties were entitled to structure a transaction in which Safeco agreed to guarantee payments attributable to assets <u>of any type</u>.  The Lease Bonds state that Safeco intended to guarantee <u>lease payments</u> in the amount set forth on the face of each Lease Bond.  The testimony from virtually all witnesses also confirms that Safeco intended to assume responsibility for payments due and owing under the leases, in the amount set forth in the Lease Bond.  The fact that there may have been additional payments due and owing under the leases, which payments Safeco did <u>not</u> undertake to guarantee, does not change the nature of the obligations assumed.

---

*Letters of Credit, Guaranties, Insurance and Swaps (The Clash of Cultures)*, The Business Lawyer, Vol. 59, at 897. Leaving aside whether this article is properly considered by the Court to aid in determining the transactional intent of the parties in this bench trial proceeding, the article does not support Bank One's contention that certain language in the transaction documents requires a finding that credit enhancement was intended.  The article acknowledges the general rule that, in the context of a surety bond, "fraud on the part of the obligee . . . may provide a defense for the surety against any claims by the obligee. . . ." *Id.* at 927.  The authors further acknowledge that no legal precedent exists to distinguish a financial guarantee bond from a surety bond based upon the use of certain "financial guarantee" language. *See id.* at 931-932.  The article proffered by Bank One in fact does no more than express the authors' view that courts <u>should create</u> a common law framework that would require bonds containing certain "financial guarantee" language to be treated as akin to a letter of credit. *See id.* at 949-950.  As the Court has stated throughout this Opinion, however, the Court finds that such treatment of the Safeco Lease Bonds would be contrary both to the negotiated language of the documents and to the parties' transactional intent.  In any event, given that Bank One acquired its interests only by assignment from the Guardian Entities, the Court believes it unlikely that adopting the framework suggested by these authors would actually grant original obligee rights in the Lease Bonds to Bank One.

With regard to the testimony of Michael Anthony and Wayne Pirtle concerning their understanding that the lease bonds constituted financial guarantees, this evidence also is insufficient to outweigh (1) the plain language of the transaction documents; and (2) the extensive witness testimony indicating that the parties intended to create surety bonds guaranteeing leases.  In fact, Michael Anthony repeatedly testified in these proceedings both (1) that Safeco issued surety bonds guaranteeing leases; and (2) that he advised all parties to the transaction to that effect. *See* Anthony Depo., at 322:4-13; 323:4-13; 1899:15-1900:6; 1901:5-10, 14-17, 19; 2420:13-17; 1973:2-4, 7-9, 1973:24-1974:18. In light of that testimony, the Court cannot infer from the June 22, 2000 letter that (1) Mr. Anthony believed that the Safeco Lease Bonds acted as letters of credit or other financial guarantee instruments; or (2) Mr. Anthony advised his surety clients that they would be issuing financial guarantees of CMC's repayment of loans.

Similarly, with respect to the testimony of Wayne Pirtle, Mr. Pirtle's testimony cannot reasonably be read to suggest that Mr. Pirtle believed that the Lease Bond transactions created obligations on the part of Safeco running directly to the Guardian Entities.  Testimony to that effect would be inconsistent with Mr. Pirtle's testimony as to CMC's status as the original obligee on the Lease Bond transactions.  As previously noted within this Opinion, Mr. Pirtle testified, "CMC was the original obligee and then they assigned it." Pirtle Depo., at 2357:9-10.

The entirety of the testimony concerning the Safeco lease pools reflects, first, that all parties, including Safeco, believed that the Lease Bonds were guarantees of the underlying leases and not direct guarantees of CMC's loan obligations.  The testimony of the Safeco witnesses is far more consistent with the agreed "assignment" structure than with any intent to issue financial guarantees directly to Bank One.  Safeco's witnesses testified, without contradiction, that the

structure of the CMC transactions was implemented, at least in part, in order to ensure the Sureties' compliance with the New York Appleton Rule.   Despite the imprecise references to "financial guarantees" made by Safeco's employees, the witness testimony and exhibits demonstrate that Safeco did not intend to issue credit enhancement bonds within the meaning of the Appleton Rule.   That rule would have prohibited Safeco from guaranteeing CMC's obligations to its lender banks, and thus undertaking obligations equivalent to credit enhancement.   The history of Safeco's review of the CMC transaction opportunity, as summarized by Martin and Schrader (and memorialized in numerous Safeco-generated exhibits) indicates that, if Safeco had believed the CMC Lease Bonds guaranteed CMC's obligations to the Guardian Entities and/or Bank One directly, it would have declined to participate in those transactions.  The testimony of Michael Anthony makes clear that he was given instructions from Safeco to that effect.

In any event, none of the extrinsic evidence presented in these proceedings may serve to create a meaning at odds with the plain language of the transaction documents, nor may it impose a meaning to which the language of the transaction documents is not reasonably susceptible.  The Lease Bonds simply are not susceptible to a meaning whereby "CMC" would mean "Guardian" (or, for that matter, "Bank One").  Nor can the Court reasonably infer from the transaction documents that the parties intended "Lease Bond" to mean "financial guarantee," or that Safeco's guarantee of "lease payments" would mean "loan payments."

Accordingly, the Court rejects Bank One's arguments and finds that the Lease Bonds did not create or effect a financial guarantee structure between these parties.  Rather, the Guardian Entities, and later Bank One, acquired the rights previously held by CMC through a series of assignment transactions.

e.    **Bank One's Expert Testimony and the Securitization Argument**

In connection with its assertions regarding the "financial guarantee" structure of these transactions, Bank One proffered evidence that these transactions are properly understood as exemplifying "securitizations", which are frequently utilized by parties in structured finance transactions.  In support of this argument, Bank One has proffered the testimony of the following experts via affidavit: Paul Palmer, Charles Kerner and Michael Larrick.[19]  Safeco proffered no expert testimony in these proceedings, taking the position that expert testimony was not necessary to determine the intent of the parties with respect to the original obligee on the Lease Bonds.

As a general matter, Bank One proffers its experts to testify that certain characteristics of the Safeco Lease Bond transactions are consistent with, and/or typical of, those found in structured finance transactions or securitizations.[20]  As set forth herein, the Court finds that (1) given the ample evidence and testimony in the record as to the parties' intent, the Court need not rely on the testimony of Bank One's experts to determine the intended transactional

---

[19] Pursuant to its Order dated January 25, 2011 (02-16014, Doc. 123), the Court excluded the proffered testimony of Bank One expert Jerry Hudspeth in its entirety, as that affidavit merely summarized facts and, as such, was unhelpful to the finder of fact.

[20] Bank One also proffered the deposition testimony of three Safeco experts: Mark Arvin, George Beutner and James Morelewicz.  Pursuant to its Order dated January 25, 2011 (02-16014, Doc. 123), the Court excluded the entirety of the testimony of Mr. Arvin and Mr. Morelewicz, as well as portions of the testimony of Mr. Beutner, finding that the proffered testimony either (1) was irrelevant to this stage of the proceedings; (2) lacked foundation; (3) purported to offer legal conclusions; or (4) was cumulative. 02-16014, Doc. 123, at 4-5.

The portions of Mr. Beutner's testimony admitted into the record included the following: (1) Safeco did not have a standard form for simple lease bonds; (2) the bond form utilized in the CMC program was specifically tailored for that purpose; (3) the parties' decision to utilize lease bonds for small equipment leases was an unusual structure; and (4) Mr. Beutner believed that it was not customary for a bond obligee to provide indemnity to a surety.  The Court has considered the entirety of Mr. Beutner's testimony admitted into the record; however, for various reasons discussed throughout this Opinion, the Court finds that the non-expert evidence introduced by the parties is amply sufficient to discern the intent of the parties to these transactions.  The Court accepts, moreover, the proposition that these transactions were unique.  The fact that they were atypical surety transactions does not compel the conclusion that they were financial guarantees, however.

structure; and (2) regardless of whether the testimony of these experts is considered, the Safeco Lease Bond transactions are not properly regarded as structured finance or securitization transactions.

A brief summary of the testimony of each of these experts is provided below.

### i. Paul Palmer

Mr. Palmer is an expert in the area of capital market/structured finance transactions. Palmer Aff., at ¶ 8. Bank One proffered this expert to testify about the structure of the CMC Lease Bond transactions, which he described generally as structured finance transactions, credit enhancement, or securitizations.  Mr. Palmer testified that surety bonds may be used as financial guarantee instruments, and that the use of particular language in the bond—including the phrase "absolute and unconditional guarantee of payment"—would signify to the market that a strict financial guarantee was intended.  *Id.*, at ¶ 18.

Mr. Palmer testified that certain language and provisions within the Safeco bonds, including (1) the language of the default provision; (2) the "unconditional and absolute" language; (3) the waiver of defenses; (4) Safeco's assumption of responsibility for underwriting; and (5) Safeco's guarantee of CMC's performance as servicer, were consistent with those used in credit enhancement instruments, and that investors in the market would have understood them to be such. *Id.*, at ¶¶ 25, 31.  Mr. Palmer further testified that certain structural elements of the transaction, including the role of the indemnity agreements, the "comfort letters," and the posting of cash collateral by CMC, all would have contributed to the investors' understanding that they were purchasing financial guarantee instruments. *Id.*, at ¶ 33.

### ii. Charles Kerner

Mr. Kerner currently is a principal in an asset management firm, which specializes in

leveraged investment strategies for institutional investors utilizing asset-backed securities and other structured financing. Kerner Aff., at ¶ 3.  Mr. Kerner thus has expertise in market structure; practices and expectations with respect to capital market/structured finance transactions; the nature, role, function and purpose of insurance/surety products as credit enhancements in such transactions; the roles, responsibilities and risk assumption of the parties to such transactions; and underwriting standards applicable to insurance/surety financial guarantee products issued as credit enhancements in such transactions. *See id.*, at ¶ 8.

Mr. Kerner testified that securitization is a subset of structured finance, and is a process by which the various risks of commercial financing activity can be unbundled, and those risks placed with different parties to the transaction. *Id.*, at ¶ 16.   According to Mr. Kerner, securitization may, but does not always, involve the issuance of securities. *Id.*   Mr. Kerner further testified that the Safeco Lease Bond transactions were structured finance transactions, in which Safeco agreed to provide financial guarantees to support CMC's financing needs. *Id.*, at ¶ 25.  Mr. Kerner based this opinion, in part, on (1) Safeco's assumption of responsibility for the individual underwriting of each lease; (2) the "fraud waivers" within the Lease Bonds; and (3) the use of "unconditional and absolute" language within the Lease Bonds. *Id.*, at ¶ 26.   Mr. Kerner testified that, based upon these features, the market expectations of investors would be that Safeco was assuming the solvency risks of CMC and the lessees, as well as the credit risks of the income streams of the lease portfolios. *Id.*, at ¶ 29.

### iii.    Michael Larrick

Michael Larrick has more than forty years of experience in the insurance industry, and has knowledge of industry standards, principles, customs and practices applicable to financial and payment guarantee products issued by insurance companies and sureties. Larrick Aff., at

¶ 23.  Mr. Larrick testified that several features of the transaction demonstrate that the Lease Bonds are properly viewed as financial guarantee instruments rather than surety bonds. *Id.*, at ¶ 34.

Mr. Larrick based his opinion primarily on the following transactional elements: (1) Safeco negotiated with CMC, rather than the lessees, in developing the terms of the bond; (2) the Lease Bonds contain language indicating Safeco's responsibility for the underwriting of the leases; (3) the Lease Bonds contain a waiver of fraud defenses; (4) the Lease Bonds contain "unconditional and absolute" language; and (5) the definition of "default," as well as the language in the Lease Bonds regarding assignment, are consistent with a financial guarantee construct. *Id.*, at ¶¶ 28-30.  Mr. Larrick testified that, based on these features, and CMC and Safeco's marketing of a bond instrument containing these features, investors in the CMC lease bond program would have believed that they were purchasing financial guarantee instruments rather than simple surety bonds. *Id.*, at ¶¶ 34, 39.

### iv.    Analysis of Expert Testimony

Bank One relies on the proffered testimony of its experts principally to support its argument that certain language in the lease bond form departed from ordinary surety bond principles and employed concepts consistent with a financial guarantee or securitization instrument. *See* Bank One Proposed Findings of Fact and Conclusions of Law, at 28.  The language in question, as well as substantially similar expert testimony, were considered at length in section II.B.2.g. of the Bench Trial Opinion (incorporated into the Court's analysis regarding Safeco by section II.C.2.a.).

Plaintiffs in the prior bench trial proceedings proffered the testimony of Mr. Palmer as to the structure of the CMC Lease Bond transactions, and his opinion that those transactions were

structured financial transactions or securitizations.  As in these proceedings, Mr. Palmer testified

in the prior proceedings that the purpose of the Lease Bonds was to mitigate the credit and

performance risks on the leases and their respective income streams.  Mr. Palmer further testified

in those proceedings that he based his opinion in part on the language within the bonds,

including those features of the bonds previously identified in this Opinion.  In the Bench Trial

Opinion, the Court considered the opinions articulated by Mr. Palmer as well as those articulated

by Geoffrey C. Hazard, Jr., an expert proffered by the Sureties in those proceedings.  The Court

stated in the Bench Trial Opinion:

> Given the substantial witness testimony presented to the Court
> bearing upon the parties' transactional intent, as well as the
> language of the transaction documents themselves, the Court does
> not find expert testimony necessary to discern the intent of the
> parties to the CMC Lease Bond transactions.  Indeed, most of what
> these experts discussed was placed into the record through a
> combination of (1) the parties' respective fact witnesses; and
> (2) the arguments of counsel regarding the legal and logical
> implications of that fact testimony. . . .

Bench Trial Opinion, Doc. 2459, at 87.

While Bank One, in these proceedings, has offered additional expert testimony by Mr.

Kerner and Mr. Larrick, the substance of the testimony of those experts adds little to the opinions

previously articulated by Mr. Palmer in the prior proceedings, or to the Court's analysis of that

testimony.  In particular, the following discussion from the Bench Trial Opinion is relevant:

> . . . [T]he record is replete with evidence reflecting the intent of the
> parties, and that evidence supports the Court's finding that the
> parties actually intended to consummate a transaction where CMC
> was named as the original obligee.
>
> None of the expert testimony relied on by the parties is sufficient
> to override or outweigh the evidence bearing directly on intent.  . .
> .

\*\*\*

78

> Mr. Palmer's testimony seems to suggest, at best, that certain
> parties to the transaction, particularly the lender banks, may have
> hoped for a securitization structure—and, in fact, may have
> negotiated to create transactions that were <u>as close as possible</u> to a
> securitization structure within the framework of a surety bond.  In
> reality, however, the transactions ultimately entered into were not
> structured as securitization transactions, and the Court cannot
> construe them as such. . . .

Bench Trial Opinion, Doc. 2459, at 88.  Since the Court finds its prior analysis equally pertinent

here, the Court hereby incorporates by reference section II.B.2.g. of the Bench Trial Opinion (as

incorporated into the Court's analysis regarding Safeco by section II.C.2.a.).

### v.      Analysis of the Securitization Issue

In the Bench Trial Opinion, in addition to considering the expert testimony introduced by

all parties to the prior proceedings, the Court also conducted a detailed structural analysis of the

transactions at issue.  That analysis was contained in section II.B.4. of the Bench Trial Opinion

(incorporated into the Court's analysis regarding Safeco by section II.C.4.).

In section II.B.4. of the Bench Trial Opinion, the Court compared the transactions at

issue—transactions involving surety bonds issued by Safeco and Royal Indemnity Company—

with transactions previously considered by the Court in its Illinois Union Opinion.  As explained

in the Bench Trial Opinion, the Illinois Union Opinion (Doc. 1709) was an opinion resolving a

Motion for Judgment on the Pleadings filed by certain investor banks as to the liability of Illinois

Union Insurance Company ("Illinois Union") on certain insurance policies issued to the Banks

and CMC, as co-insureds.

In the Illinois Union Opinion, the Court found that (1) the Illinois Union policies created

a suretyship, rather than an insurance relationship; and (2) the actual obligees of the surety

obligations created in the Illinois Union transactions were the investor banks.  As a result of the

Court's Illinois Union Opinion, one bank, J.P. Morgan Chase Bank ("Chase") subsequently was granted final judgment against Illinois Union.  Illinois Union appealed, and that appeal resulted in a decision by the Sixth Circuit affirming this Court's Illinois Union Opinion in substantial part. *See Commer. Money Ctr., Inc. v. Ill. Union Ins. Co.*, 508 F.3d 327 (6th Cir. 2007).[21]

In section II.B.4. of the Bench Trial Opinion, the Court conducted a detailed comparison between the surety bond transactions at issue there and those considered in the prior Illinois Union Opinion.  The Court described multiple features that differentiated the Illinois Union insurance policies from the bonds issued by the Sureties, including (1) the inclusion of an investor bank as a named insured in the policies; and (2) the lack of any "assignment" structure. In the Illinois Union transactions, unlike the transactions considered in the Bench Trial Opinion, each bank dealt directly with Illinois Union and was a party to the contract giving rise to Illinois Union's guarantee obligations. *See* Bench Trial Opinion, at 115-116.

The Court further noted that the transaction involving Chase, also discussed at length in the Illinois Union Opinion, contained additional unique features and was, in fact, a securitization transaction. *See* Bench Trial Opinion, at 116-117.  The Court noted that the Chase transaction— which involved the presence of an Indenture and the Issuance of Notes to a Trustee—was in fact "the single 'securitization' transaction considered by the Court thus far in these cases. . . ." Bench Trial Opinion, at 116.  The Court found that the lease bond transactions, on the other hand, contained none of the features present in the Chase "securitization" transaction, and that the parties could not have intended to effect a securitization structure in executing lease bonds.

---

[21] The Sixth Circuit upheld this Court's findings that (1) the Illinois Union insurance policies actually were surety bonds; (2) the Banks were the intended obligees on the surety bonds; and (3) Illinois Union could not assert the fraud of CMC as a defense to its payment obligations under those bonds.  The Sixth Circuit reversed this Court's award of damages, however, and remanded the case for further proceedings related to calculation of damages. *See Commer. Money Ctr., Inc. v. Ill. Union Ins. Co.*, 508 F.3d 327 (6th Cir. 2007).

There is no basis—and Bank One has suggested none—on which the transactions at issue here can be distinguished from the surety bond transactions discussed in section II.B.4. of the Bench Trial Opinion. It is clear that, like the surety bonds considered in the Bench Trial Opinion, the lease bonds here omitted Bank One as a party, and on their face, conveyed rights only to CMC. Like the bonds considered in the Bench Trial Opinion—and, most notably, unlike the insurance policies considered in the Illinois Union Opinion—these transactions granted rights to the Guardian Entities, and later to Bank One, only via a series of assignments. There is simply no discernable structural difference between these lease bond transactions and those previously analyzed in detail in the Bench Trial Opinion.

Accordingly, the Court incorporates by reference the discussion contained in section II.B.4. of the Bench Trial Opinion (incorporated into the Court's analysis regarding Safeco by section II.C.4.), and adheres to the findings contained there. The Court declines to find that a securitization was either intended or created by the Safeco Lease Bonds in the Guardian II and/or Guardian III transactions.

### 3. The Evidence and Testimony Relating to Various Structural Elements of the Transaction Also Supports a Finding that CMC Was the Intended Original Obligee.

In addition to the substantial evidence described above pertaining to the parties' understanding of the two-stage "assignment" structure of the transactions, evidence and testimony were introduced by Bank One relating to certain other aspects of the transactional structure which, according to Bank One, support a finding of original obligee status on the part of the Guardian Entities and/or Bank One. Bank One asserts that the Guardian Entities and/or Bank One should be found to be original obligees in these transactions based upon (1) evidence presented as to the time of "funding" of the lease transactions; (2) evidence

presented as to CMC's right to substitute leases; (3) "comfort letters" issued by Safeco to Bank One in the context of the closing of the Guardian II and Guardian III transactions; and/or (4) evidence relating to alleged "admissions" by Safeco.  For the reasons set forth herein, the Court rejects all of Bank One's arguments and holds that the weight of the evidence again demonstrates the parties' intent to confer original obligee status upon CMC.

### a.    Testimony as to Time of "Funding" of Lease Transactions

In connection with Bank One's arguments regarding the original obligee status of the Guardian Entities, Bank One has presented evidence and testimony relating to the time of "funding" of the Lease Bond transactions—that is, the timing of actual payment for the underlying leased equipment.  Bank One argues that, until the moment of "funding," the obligations set forth in the leases and Lease Bonds were essentially inchoate, and that Safeco's obligations sprang to life upon payment of the purchase price for the underlying equipment.  If no equipment had been purchased when the Lease Bonds issued, then, Bank One argues, no valid lease could have existed and no bond obligation could have been created prior to execution of the SSAs.  The Court disagrees, and finds that evidence as to the time of "funding" of the transactions does not alter the Court's conclusions regarding the original obligee status of CMC in these transactions.

Bank One has proffered the testimony of several witnesses, including Michael Anthony,[22]

---

[22] Michael Anthony testified:

> Q.    Were any bonds issued by you before the underlying leases were funded?
>
> A.    I think all bonds were issued before the underlying leases were funded.
>
> Q.    How do you know that?
>
> A.    Because they would need the bonds to take to the investor before they would fund CMC in order to have the money to pay for the equipment.

Ron Fisher,[23] and Mark Fisher,[24] to demonstrate that lease pool transactions ordinarily were funded after execution of the transaction documents.  *See also* Hoser Depo., at 45:8-46:13; 116:8-117:5.  Safeco does not dispute, however, that "funding" of each transaction generally occurred subsequent to execution of the SSA, upon the closing of a loan from Bank One to the relevant Guardian Entity.  *See* Joint Stipulation of Facts, ¶¶ 33, 49, 52, 53, 54, 60, 75, 78, 79, 80.  Rather, Safeco apparently takes the position that evidence as to the timing of funding is simply irrelevant in the face of the plain language of the transaction documents.

This issue was examined in detail in section II.B.2.d. of the Bench Trial Opinion (incorporated into the Court's analysis regarding Safeco by section II.C.2.a.).  In the Bench Trial Opinion, the Court also considered extensive testimony designated by the parties as to the time of delivery of equipment to CMC's lessees, in relation to the funding of the respective leases.  In

---

Anthony Depo., at 2894:16-2895:1.

[23] Ron Fisher testified:

> Q.    I just want the record to be clear.  You don't have any personal knowledge, do you, sir, whether Safeco had any knowledge of whether the leases were unfunded at the time Safeco issued their bonds, do you?
>
> A.    Yes, I do.  In the dog and pony shows, or whatever you call them, they would go through and one of the subjects of conversation was that we didn't have a line of credit, so some of the leases would not be funded.

R. Fisher Depo., at 1292:14-1293:1.

[24] Mark Fisher testified:

> Q.    And what information did you provide as to the timing of funding of purchase of the equipment for the leases that were being sold and bonded?
>
> A.    That the leases got bonded, would be sent to the bank for funding.  The bank would send the purchase price of the portfolio and then CMC would fund the leases as they—as all the—as all the documentation was finalized on each individual lease.

M. Fisher Depo., at 1345:25-1346:9.

these proceedings, the parties have not proffered testimony relating to the timing of equipment delivery, and accordingly, the Court does not rely on any such testimony.[25]

Here, Bank One has introduced testimony by James Schrader to the effect that Mr. Schrader did not initially know that bonds were issued prior to funding, and that he discovered this information during a subsequent audit of CMC. *See* Schrader Depo., at 80:22-81:15.  The purpose of this testimony in supporting Bank One's argument that the parties intended a one-stage transaction is unclear.  It would seem, in fact, that evidence that Safeco was unaware of the delay in funding would support Safeco's assertion that it intended a two-stage transaction, in which Safeco issued Lease Bonds on existing leases.  In any event, this evidence is of no more than tangential relevance to the issue presently before the Court.

In the Bench Trial Opinion, although the Court considered extensive testimony, the conclusions there were premised largely on representations contained in the transaction documents, including representations contained in Certificates of Acceptance and similar documents, as to the delivery of equipment prior to closing.  The transaction documents here contain equivalent representations regarding the timing of delivery.  Given the parties' lack of focus on the funding issue, and in the absence of <u>any</u> testimony in these proceedings relating to the timing of equipment delivery, the Court finds no basis to deviate from its prior holding.  The Court holds that Bank One's evidence relating to the time of funding of the lease pool transactions does not alter the conclusion that CMC was the intended original obligee in these transactions.

---

[25] In their Proposed Findings of Fact and Conclusions of Law, the parties actually have addressed the "funding" issue only in passing.  The Court nonetheless has considered all proffered evidence in reaching its conclusions herein.

**b.     Guardian Representations as to Effectiveness of Leases and
Lease Bonds at Closing**

In section II.B.2.e. of the Bench Trial Opinion (incorporated into the Court's analysis

regarding Safeco by section II.C.2.a.), the Court described and considered various

representations made by the Guardian Entities in the transaction documents (specifically, the

Purchase and Security Agreements and the Credit and Security Agreements) (1) adopting

representations made by CMC as to the validity and effectiveness of the leases and Lease Bonds;

and/or (2) making affirmative representations as to the validity and effectiveness of those

documents.  The Court expressed its view that "[i]n light of these representations, it is difficult

for Plaintiffs now to assert that they believed the Lease Bonds would be effective only upon

delivery and funding of equipment at a later date. . . ." Bench Trial Opinion, at 81.

While none of the parties to these proceedings have discussed the representations made

by the Guardian Entities in the transaction documents, the documents at issue here are virtually

identical to those considered in the Bench Trial Opinion, and contain the same representations

considered in the Court's prior analysis.  Therefore, despite the parties' failure to focus on this

issue in these proceedings, the discussion contained in section II.B.2.e. of the Bench Trial

Opinion provides further support for the Court's rejection of Bank One's arguments relating to

the timing of funding in these transactions.

**c.     Testimony Relating to "Substitution" of Lease Bonds**

The issue of CMC's ability to "substitute" new leases for defaulted leases in a pool was

discussed at length in sections II.B.2.f. and II.C.2.c. of the Bench Trial Opinion. In those

sections, the Court considered extensive evidence and testimony relating to (1) the issue of

substitution; (2) whether such substitution actually occurred in the CMC lease pools; and (3) the

mechanical process by which such substitution occurred.  Plaintiffs in the prior bench trial

proceedings argued, in essence, that CMC's ability to "substitute" new leases meant that the obligation underlying the Sureties' Lease Bonds was actually the SSA rather than the lease. Ultimately, the Court concluded in the Bench Trial Opinion that the provisions in the SSA permitting substitution of lease bonds lent no support to Plaintiffs' argument that they were the intended original obligees on the CMC Lease Bonds.

Unlike the Plaintiffs in the prior bench trial proceedings, Bank One has not seriously pursued any arguments relating to CMC's ability to substitute leases.  In fact, Bank One's Proposed Findings of Fact and Conclusions of Law make no reference to the issue of substitution.  Regardless of this omission, the Court has reviewed the entirety of the evidence and testimony proffered by Bank One on this point.  For essentially the same reasons set forth in the Bench Trial Opinion, the Court finds that evidence relating to substitution of leases is irrelevant to the Court's determination of the obligee issue.

In these proceedings, Bank One has proffered testimony as to the parties' understanding that CMC would "substitute" or replace problem leases in the Banks' pools. *See, e.g.,* Carron Depo., at 131:12-25; Martin Depo., at 302:16-304:25; Campos Depo., at 106:9-107:1; Pirtle Depo., at 2442:9-2443:7; 2443:21-2444:2; Anthony Depo., at 107:16-108:25.  Nearly all of this testimony was considered by the Court in connection with the prior bench trial proceedings.

Bank One also introduced the testimony of Kenneth Martin, Safeco's former senior account analyst.  Mr. Martin testified that he believed that substitution of leases would not require issuance of a new bond:

> Q.    And what was your understanding of how the substitution procedure would work?
>
> A.    That they would pull a lease out that was a problem lease and insert one in of equal or greater value to keep the lease payment flow going.

\*\*\*

Q.    So your—it was your understanding that if CMC—if Safeco bonded a particular lease and the lease went into default and CMC substituted another lease in that pool—just hang on, please—that Safeco's bond would make—would remain valid[?]

A.    Correct.

\*\*\*

Q.    . . . In a hypothetical pool where there are ten leases and ten bonds.  If one of those leases goes into default, that lease was ABC Company, the lessee, it goes into default, your testimony is that CMC would then get another lease with XYZ Company and replace it; correct?

A.    That—that is correct.

Q.    And the reason for that, I take it, is so that the cash flow coming out of the pool would be the same to the obligee.

A.    That is correct.

Q.    And it was necessary that CMC structure this and would operate it such that there was always the set cash flow going to the obligee, it didn't matter which bonds were in the pool as long as they were producing sufficient dollars to produce this income stream; correct?

A.    That is correct.

\*\*\*

Q.    Just tell me how it worked, sir, or how you expected it to work.

A.    Our initial reaction was that it would have gone in there with the remaining amount of time being the same as the original one and there would be no need to change the bond.  The obligee was covered, the assignee was covered.

Q.    So in other words, as you understood it, the existing bond like the ones you identified wouldn't change, they would

87

> just essentially, this is overdoing it or simplifying it, pull off the bad bond and staple a new—the bad lease and staple a new lease onto that bond and the bond would cover the new lease; is that correct?
>
> A.    That was my understanding, yes.

Martin Depo., at 323:22-324:1, 326:2-8, 456:18-457:10, 458:14-15; 458:22-459:10.

Safeco also has proffered testimony from various witnesses—nearly all of which was considered by the Court in the prior bench trial proceedings—relating to the issue of substitution in the lease pools.  First, Safeco proffered testimony of several witnesses indicating that substitution occurred only rarely, if at all, in CMC's lease pools. *See, e.g.*, M. Fisher Depo, at 1274:16-1275:3; Holmes Depo., at 90:18-21.  Safeco also proffered the testimony of Wayne Pirtle to the effect that he was uncertain whether substitution of a lease would require issuance of a new bond. *See* Pirtle Depo., at 268:6-18.  Jill Marisa Campos, the CMC employee who had responsibility for all lease and bond documentation at CMC, testified unequivocally that issuance of a new bond <u>was</u> required for substitution of a lease:

> Q.    Was Michael Anthony or A&M informed of the substitution of one lease for another?
>
> A.    Yes, because we had to get a bond for the new one that was being replaced.

Campos Depo., at 203:3-6.

The Court has considered all of the testimony proffered by the parties relating to the issue of substitution of leases by CMC.  As in the prior bench trial proceedings, the testimony reflects that at least one Safeco witness apparently believed that substitution of leases in the Safeco pools could occur without the issuance of a new bond.  Bank One introduced no testimony, however, indicating that "substitution" actually occurred in the Safeco pools in the manner contemplated by Mr. Martin.

As noted in the Bench Trial Opinion, CMC employee Jill Campos was the employee responsible for all lease and bond documentation within CMC.  Based upon Ms. Campos's responsibilities, the Court finds the testimony of Ms. Campos more reliable than that of Mr. Martin with respect to describing the procedure for substitution of leases.

In any event, the Court does not find the conflicting testimony on this point particularly significant.  As set forth in the Bench Trial Opinion, CMC's decision to substitute a lease for a defaulted lease within a pool would not change either the obligee or the assignee on that lease.  Thus, even if Bank One could show that each Lease Bond would remain effective upon substitution of a lease, without any additional action by Safeco, the result would be the assumption of obligations by Safeco equal in amount, to the same obligees.  Accordingly, for the reasons set forth in the Bench Trial Opinion, the Court finds that the parties' decision to allow substitution of a lease under an original lease bond has little probative value with respect to the parties' intent in naming CMC as the obligee of Safeco's guarantee obligations.

### d.    Comfort Letters

In support of its contention that Safeco undertook obligations in the Lease Bonds directly to the Guardian Entities and/or to Bank One,[26] Bank One has proffered evidence relating to the issuance of "comfort letters" by Safeco to Bank One as part of the closing of the Lease Bond transactions.  The Safeco "comfort letters" were addressed in detail in section II.C.3.c. of the Bench Trial Opinion, and the letters introduced at trial in these proceedings are substantively

---

[26] Bank One's presentation of evidence throughout these proceedings has left considerable doubt as to whether Bank One claims that the intended obligee in each Lease Bond transaction was a Guardian Entity or was, in fact, Bank One itself.  As the Court made clear in the Bench Trial Opinion, however, based upon the language of the transaction documents and the transactional structure, there is no question that the rights of the investor banks (including Bank One) were no more than "assignee" rights conveyed to the investor banks from the various Guardian Entities. Bench Trial Opinion, Doc. 2459, at 182 ("Even taking the Banks' argument in the best possible light, only the Guardian Entities could possibly have been the original obligees. . . .").  The Court considers Bank One's argument regarding the comfort letters, therefore, as it relates to the alleged obligee status of Guardian II and/or Guardian III in the transactions at issue here.

identical to those previously analyzed. *See* Joint Exhs. 2009, 2013.

Like Plaintiffs in the prior bench trial proceeding, Bank One relies primarily on the language contained in the final sentence of the Safeco comfort letters: "Upon notification of non-payment to SAFECO, SAFECO will remit payment to Bank One regardless of payment to intermediaries or services [*sic*]. . . ." *See* Joint Exhs. 2009, 2013.  Bank One points out that this sentence indicates an acknowledgment by Safeco that Bank One would be the actual recipient of any payments on claims under the bonds, and thus the ultimate beneficiary of the Lease Bond transactions.

As previously set forth in the Bench Trial Opinion, however, Safeco's recognition (through its comfort letters) of Bank One's role in the transaction cannot be interpreted as conveying obligee status either to the Guardian Entities or to Bank One.  First, the majority of the text does no more than confirm the existence and validity of the Lease Bonds, as well as the amounts guaranteed.  The letters acknowledge that the Lease Bonds are valid and "enforceable in accordance with [their] terms," but contain no explanation or analysis of the terms of the Lease Bonds.  The comfort letters certainly do not designate any obligee under the Lease Bonds.

As set forth in the Bench Trial Opinion, the comfort letters are directed to Bank One and do not reference the Guardian Entities, or the status of those entities in the Lease Bond transactions.  The letters appear to be intended to assure Bank One that Safeco will honor the contemplated assignment of rights to Bank One, and pay claims submitted by Bank One as necessary.  Safeco's acknowledgment of Bank One's right to receive payment does not alter the manner in which Bank One received its rights, nor can it expand the scope of those rights.  Most significantly, the comfort letters cannot serve to convey any status on the intermediate assignees, the Guardian Entities.

Accordingly, for the reasons set forth in section II.C.3.c. of the Bench Trial Opinion, the Court rejects Bank One's assertion that the comfort letters provide any basis for reformation of the Lease Bonds to designate a Guardian Entity, or Bank One, as obligee therein.

### e.        Alleged Safeco "Admissions"

During the prior bench trial proceedings, Plaintiffs introduced evidence of various references, by Safeco employees and agents, to CMC as "principal" under the Lease Bonds. Plaintiffs asserted in those proceedings that, particularly in connection with Safeco's initial handling of bond claims, Safeco frequently referred to and treated CMC as the principal on the Lease Bonds. Plaintiffs further argued that the various references by Safeco reflected Safeco's actual understanding that the parties intended CMC to have principal status in these transactions. Accordingly, Plaintiffs contended, these references should be treated as admissions by Safeco.

The issue of alleged "admissions" by Safeco was discussed in detail in section II.C.3.d. of the Bench Trial Opinion. In that section, the Court declined to adopt Plaintiffs' position, finding that statements made by clerical and/or claims employees years after the closing of the transactions at issue were not particularly relevant or meaningful as to the parties' transactional intent at the time of closing.

The alleged "admissions" relied upon by Bank One in these proceedings are virtually identical to those cited by Plaintiffs, and discussed in detail by the Court, in the prior proceedings. Bank One relies on (1) Safeco's Complaint filed in February 2002 against CMC, its principals and their spouses in the United States District Court for the Southern District of California (the "California Action"), premised upon the GAIs, Bank One Exh. 74; (2) internal communications within Safeco, as well as correspondence authored by Safeco and/or its counsel between February and June of 2002, in which Safeco and/or its counsel referred to CMC as

91

"principal" on the Lease Bond transactions, Bank One Exhs. 65, 66, 67, 68, 81, 82, 83, 93, 96, 100, 103; (3) the Sawyer Declaration, sworn to February 20, 2002 and filed in the California Action, in which Mr. Sawyer referred to CMC as "principal" and stated, "SAFECO is obligated to guarantee payment by individual lessees in its 13 lease pools to investors in those pools through its Sub-Servicers CSC or CMC . . . .", Bank One Exh. 75; and (4) Safeco's Proof of Claim filed in the consolidated CMC/CSC bankruptcy proceedings, which was based in part upon the obligations undertaken by CMC and its principals in the GAIs. Bank One Exh. 109. The Court considered extensive evidence as to all of the above in the prior bench trial proceedings.

Bank One also has proffered evidence that, on July 6, 2009, the Bankruptcy Court in the CMC/CSC bankruptcy proceedings entered an Order authorizing the Trustee to distribute $10,151.81 to Safeco as payment on the claims asserted in Safeco's Proof of Claim (Bank One Exh. 109).  The parties agree that Safeco subsequently accepted a distribution in that amount on account of its Proof of Claim. *See* Joint Stipulation of Facts, ¶ 94.

With the exception of Bank One's evidence relating to Safeco's acceptance of a distribution on account of its Proof of Claim in the CMC/CSC bankruptcy proceedings (an event that apparently occurred after the conclusion of the prior bench trial), the entirety of the evidence presented by Bank One as to alleged Safeco "admissions" was previously considered, and discussed in detail in section II.C.3.d. of the Bench Trial Opinion.  As explained in that section:

> [T]he context of the alleged 'admissions' does not permit the Court to draw any inferences (or at least not sufficient ones to reach the conclusions Plaintiffs urge) as to the parties' intent at the time of the Safeco Lease Bond transactions.  With respect to the references to CMC as 'principal' within Safeco's computer system, regardless of the reason for those designations, the Court agrees with Safeco that those references, created primarily by clerical staff after the negotiation and consummation of the Safeco Lease Bond

> transactions, are not determinative of the intent of the parties at the
> time of execution of those transactions. . . .
>
>                      \*\*\*
>
> With respect to the Sawyer correspondence, the Court similarly
> declines to find that statements by Safeco's claims employee, years
> after execution of the Safeco transaction documents, may
> retrospectively serve as evidence of Safeco's intent to denominate
> CMC as a 'principal' on its Lease Bonds. . . .

Bench Trial Opinion, Doc. 2459, at 170-71.

      For the reasons set forth in the Bench Trial Opinion, the Court further declines to attribute any significance, from the perspective of transactional intent, to (1) Safeco's filings in the California Action; (2) Safeco's Proof of Claim in the CMC/CSC bankruptcy proceedings; or (3) Safeco's acceptance of a distribution in the bankruptcy proceedings on account of its Proof of Claim. As with the evidence of correspondence and other documents generated by Safeco during its claims process, Safeco's filings in the California Action and in the bankruptcy proceedings postdated the closing of the Lease Bond transactions by many years. As such, while these filings arguably may have some relevance in showing Safeco's understanding of the transactions, they cannot be used to contradict or override the substantial evidence of the parties' intentions at the time the Lease Bond transactions were consummated.[27]

      Finally, to the extent that Bank One premises its arguments regarding alleged "admissions" on communications relating to the GAIs, the Court finds that the existence of indemnity rights running from CMC to Safeco on the obligations guaranteed by the Lease Bonds (to the extent such rights existed) would not be sufficient to override the substantial evidence of transactional intent. *See* section III.B.4., *infra*. As set forth in section III.B.4. of this Opinion,

---

[27] Bank One's argument that Safeco should be judicially estopped from asserting CMC's obligee status, based upon its filings in the California Action and in the bankruptcy proceedings, will be addressed in section III.B.7. of this Opinion.

the GAIs, either alone or in combination with other evidence, fail to support Bank One's claims for reformation.

Accordingly, for the reasons set forth in section II.C.3.d. of the Bench Trial Opinion and in this Opinion, the Court declines to retrospectively grant obligee status to the Guardian Entities and/or Bank One based upon post-transactional representations and/or conduct by Safeco. Rather, the Court adheres to its prior findings based upon the plain language of the transaction documents, and concludes that CMC is the intended original obligee on the Safeco Lease Bonds.

> **4.    The Existence of Indemnity Agreements Executed by CMC in Favor of Safeco Does Not Support a Finding of "Principal" Status on the Part of CMC.**

In support of its contention that CMC was intended to be a "principal" rather than an obligee on the Lease Bonds, Bank One has relied heavily on certain components of the transaction structure which, according to Bank One, are inconsistent with a finding of obligee status on the part of CMC.  A primary focus of Bank One's argument is the existence of indemnity agreements running from CMC (and its principals) to Safeco.  According to Bank One, upon execution of the SSAs, "Safeco's bonds were sold and assigned by CMC to the investors and CMC became sub-servicer, bond principal, and indemnitor. . . ." Bank One Proposed Findings of Fact and Conclusions of Law, 02-16014, Doc. 126, at 6.

The heart of Bank One's argument is that the existence of indemnity agreements running from CMC to Safeco suggests an intent by Safeco to undertake guarantee obligations directly to the Guardian Entities as original obligees—i.e., if Safeco does not normally seek indemnification from obligees on its Lease Bonds, but did seek indemnification from CMC here, then Safeco must not have viewed CMC as an obligee.  Safeco, on the other hand, argues that no such inference can be drawn, since Safeco in fact did <u>not</u> take indemnity from CMC on the Lease

Bonds.

Bank One proffered the testimony of various witnesses to support its assertion that the indemnity agreements were intended to protect Safeco from any potential losses on the Lease Bonds. Bank One relies, in part, on the testimony of Ken Martin, Safeco's underwriter, who testified that he believed Safeco did take indemnity from CMC and its principals for the Lease Bond program. Mr. Martin testified that he authored a letter (Bank One Exh. 15) explaining that Safeco would receive indemnity from both the lessees and from CMC, and further testified that taking indemnity from a principal would have been a standard procedure for Safeco in the context of bond issuance:

> Q. In regard to indemnification, at the bottom of the page you talk about indemnification for individual lessees and you also state that you will require an indemnity of C.M.C. and the personal indemnity of its owners and their spouses; correct?
>
> A. Correct.
>
> Q. And as far as the indemnification from C.M.C., you were going to require that it be on the Safeco general indemnity agreement form; correct?
>
> A. Correct.
>
> Q. But you didn't make that requirement about the indemnification from the lessees?
>
> A. That is correct.
>
> ***
>
> Q. At any rate, you made sure that you had this in hand before you—this indemnification agreement from CMC and its principals before you issued any bonds under the bonded lease program; correct?
>
> A. That is the normal procedure is to have it in hand prior to issuance of any bonds, yes.

***

Q. Because you wanted to be sure that if—if Safeco had to pay any bonds issued on the CMC account that CMC—you would be protected that CMC would have to reimburse you for the payments.

A. Well, the—anybody in the umbrella of Capital Market Corporations would, yes.

***

Q. And when you provided—at Safeco you provided the bond, where the principal—when you were at Safeco, when you bonded the obligations of a principal that was a closely held corporation, was it common to get an indemnification agreement not only from the corporation but from the owners of the corporation?

A. Yes.

Martin Depo., at 131:6-18, 227:22-228:3; 230:18-23; 42:22-43:3.  Martin also testified that he

was unaware of any other situation in which Safeco had taken indemnification from the obligee:

Q. And in surety, unlike the other types of insurance, the risk generally remains with the principal, correct?

A. Yes.

Q. Have you ever, in your experience in the surety field, obtained an indemnification agreement from the obligee of the bonds?

A. I do not recall ever receiving one from an obligee.

Q. To obtain an indemnification agreement from the obligee would render the bond meaningless, wouldn't it?

A. Yes.

***

Q. And so the record's clear, to your knowledge, you have never entered into this form of general agreement of

96

indemnity with the obligee of a surety bond.

      A.      To my recollection, that is correct.

Martin Depo., at 39:10-40:12; 228:15-19. Bank One also proffered (1) an April 20, 1999 memorandum authored by Mr. Martin, in which Mr. Martin noted, "[w]e also have the indemnity of each leasee [*sic*] and of CMC . . . ", Bank One Exh. 14; and (2) an April 21, 1999 letter from Ken Martin to Michael Anthony, referencing Safeco's requirement that CMC, its principals and their spouses provide indemnity to Safeco for any losses incurred in the Lease Bond program. Bank One Exh. 15.

     In support of its assertion that Safeco required the indemnity of CMC as a condition of issuing the Lease Bonds, Bank One also proffered the following testimony of surety broker Michael Anthony:

      Q.      I believe you already testified about this, but is that a fact of the program that you discussed or somebody discussed with each of the sureties and the insurance companies who participated, that there would be a full indemnity for CMC and its principals?

      A.      Yes, correct.

      Q.      And did that structure of the program ever change for any of the sureties?

      A.      No.

      Q.      That CMC was fully indemnifying the sureties and its principals were fully indemnifying the sureties?

      A.      At all times.

      Q.      And in regard to Safeco is that part of the discussions, that were held initially where Mr. Schrader was present, at that CMC would be fully indemnifying Safeco?

      A.      Yes.

> Q.     Okay.  Did Mr. Schrader ever tell you that he understood the indemnity agreements only if it applied to replevin bonds or bonds other than the lease bonds that Safeco issued?
>
> A.     No.

Anthony Depo., at 345:18-346:19.

In addition to witness testimony, Bank One also cites to Safeco's prior pleadings and filed documents (both in this case and the CMC bankruptcy case), in which Safeco asserted indemnity claims against CMC and its principals premised on the Safeco GAIs.  *See* Bank One Exhs. 74, 75, 109.  Similarly, Bank One references several 2002 letters to the CMC principals authored by Eugene Sawyer, Safeco's Senior Claims Representative, demanding that those individuals agree to indemnify Safeco for any losses incurred due to claims filed on the CMC Lease Bond program. *See* Bank One Exhs. 77, 78.

Bank One further cites to a May 1, 2000 e-mail from James Schrader, which stated, "[W]e have an indemnity agreement with CMC requiring them to take whatever action necessary to prevent us suffering from defaults. . . ."  Bank One Exh. 47.  Bank One asserts, finally, that the testimony of CMC principal Mark Fisher demonstrates that CMC believed it had an indemnity obligation to Safeco. *See* M. Fisher Depo., at 1346:20-22 ("CMC had an indemnity to Safeco, so CMC holding the bonds for itself would be circular, I suppose. . . ."). *See generally* Pirtle Depo., at 1593-1597 (upon default of a lease, CMC had option of making a servicing advance, or making a claim, which would then be repaid under the indemnity agreement).

Safeco, on the other hand, argues that it had no indemnity agreement with CMC with respect to the obligations guaranteed by the Lease Bonds.  Rather, Safeco asserts, its GAIs were intended to cover only those circumstances under which Safeco issued bonds for CMC <u>as principal</u>—for example, those situations in which CMC intended to repossess equipment from a

lessee and required a replevin bond.  Safeco relies on the language of its GAIs, which state that they apply to "any Bonds for which any SAFECO INSURANCE COMPANY now is or hereafter becomes Surety for <u>any as Principal</u>: COMMERCIAL MONEY CENTER, INC. . . . ." Joint Exh. 2003 (emphasis added).  Safeco proffered into the record copies of some of the bonds allegedly issued for CMC as principal, as well as associated records of Safeco demonstrating that such bonds were issued. *See* Safeco Exhs. 1022-1039, 1041.  Safeco also proffered into evidence an indemnity agreement which, according to Safeco, was to be secured from each lessee in favor of Safeco at the time of issuance of a Lease Bond. *See* Safeco Exh. 1001.[28]

James Schrader, Safeco's underwriting officer, testified in the prior bench trial proceedings that Safeco did not intend the GAIs to provide Safeco with indemnity from CMC and its principals for the obligations secured by the Lease Bonds:

> Q.    This is a written indemnity agreement that protects the surety, correct?
>
> A.    Correct.
>
> Q.    Can you take a look at this document, sir, and let us know whether or not this document, in your understanding as a surety underwriting officer, protected Safeco from any payments or loss claims on the lease program?
>
> A.    No.
>
> Q.    How can you tell?
>
> A.    The bond would protect only—would cover us only for bonds issued for CMC as principal.

---

[28] Bank One criticizes the indemnity agreement allegedly executed on behalf of Shandoro/Medquik insofar as it (1) is not on a Safeco form; (2) does not identify Safeco as the surety; (3) does not identify any Safeco-bonded leases; and (4) was never completed.  Moreover, Bank One notes that Safeco never made a demand against Shandoro under its supposed indemnity agreement. Sawyer Depo., at 559:8-18.  Given the Court's finding that the existence of indemnity rights from CMC in favor of Safeco is insufficient to justify reformation of the Lease Bonds to grant original obligee status to the Guardian Entities and/or Bank One, the Court need not determine whether the Shandoro/Medquik indemnity form actually was intended to grant Safeco indemnity rights against the lessees.

Q.      Okay.  How do you know that?

A.      Because that's what the document says.

Q.      Where does the document say that?

A.      Right up at the top where they name—Commercial Money
        Center, Inc. is typed in, in the situations where we look to
        have an indemnitor cover more than just one entity.  We
        either name those entities or if there's going to be many
        entities, we use what we call omnibus wording, which
        would say something along the lines of Commercial Money
        Center, any company subsidiary to Commercial Money
        Center, anyone else for whom they requested a bond or
        bonds.

                                  ***

Q.      Okay.  So this document reads this agreement is made by
        the undersigned in favor of the Safeco Insurance
        Companies for the purpose of indemnifying them from all
        loss and expense in connection with any bonds for which
        any Safeco Insurance Company now is or hereafter
        becomes surety for any as principal and then there's only
        one name?

A.      Correct.

Q.      What's the name?

A.      Commercial Money Center, Inc.

                                  ***

Q.      So if there were a loss or a claim made on the lease
        program, a claim was made to Safeco and Safeco paid it,
        could they enforce their indemnity rights pursuant to the
        Exhibit in Tab 2?

A.      No.

Q.      Not at all?

A.      They don't—they would not expect any rights under this
        agreement for a loss as you described.

Q.    Why not?

A.    Because this covers strictly bonds where Commercial Money Center was the principal.

Q.    And this—and what we're talking about is the bonds you referred to as replevin bonds, license[] bonds, those kinds of things?

A.    Correct.

Guardian/CadleRock Trial Tr. 191-194 (adopted into the record of these proceedings by stipulation at Tr. 223).

Grace Reza, a Safeco underwriting trainee, agreed with Mr. Schrader that the GAIs did not cover the obligations guaranteed by Safeco as part of the Lease Bond program:

Q.    And you understood that CMC had provided indemnity agreements to indemnify Safeco in case they ever had to pay on any of the bonds; correct?

A.    No.  That indemnity agreement was for the L&P [license & permit] obligations and the Replevin-type obligations that we were seeing on the account.

Q.    Where did you get that understanding from?

A.    Because you can't—the indemnity agreement covers the principal on the bond.  The indemnity agreement doesn't cover an obligee, so there's no way to use the indemnity agreement for that.

So if they were originally the obligee on the bonds, you couldn't cover—the indemnity agreement couldn't cover that.  It would cover the L&P obligations where they are the principal, like the Replevin activities.

***

Q.    Well, again, you understood the reality of these transactions was that it wasn't simply some name given to the account, but that the reality was that C.M.C. was the principal, as you just testified; correct?

101

> A. On some of the bonds, they were principal and on some of the bonds, they were the obligee.  You had them both on the account.

Reza Depo., at 69:16-70:9 (objections omitted), 80:11-80:19 (objections omitted).

Mr. Schrader testified, however, that Safeco entered into indemnity agreements with its lessees as principals on the bonds, and that Safeco also had informal "indemnity" or protection agreements with CMC, through which CMC agreed to use its best efforts to cure defaults and minimize losses to the Sureties:

> Q. Did Safeco have any indemnity rights you're aware of with respect to a potential loss on the leases?

> A. In the indemnity rights, yes.  We have a—we had a number of indemnity rights.  And when I say that, we kind of use the term indemnity and protection interchangeably in our business, at least in our organization.
>
> And our indemnity package, if you will, included a number of things, such as common law against our principals, the lessees, specific indemnities from the lessees.  We had an agreement with Commercial Money Center, Inc. where they would use their best efforts to cure defaults under leases through rapid, you know, response to repossessing the equipment, selling it, paying off the lease, or releasing it to keep the income stream going.
>
> And finally, we also had some collateral.  So we had a—we had a package of—protection package, an indemnity package in place that included those things.  Is that to which you refer?

> Q. Well, I'm wondering if you were to pay a loss on the lease program, I think I understand you to be saying that your only remedy for reimbursement, regardless of what you call it, whether indemnity or protection, subrogation, whatever, but that has to come from what party?

> A. Well, first it comes from the lessee, and then we had, as I mentioned, we had—we did have some collateral, and we would hope we had an agreement where CMC would do its best efforts to cure the default, but once all those remedies

had been exhausted, then there's nothing more for us to look to.

Guardian/CadleRock Trial Tr. 194-195 (adopted into the record of these proceedings by stipulation at Tr. 223).   Mr. Schrader testified that his e-mail reference to an "indemnity agreement" actually referred to this type of informal arrangement with CMC:

> Q.    You go on to generally describe the program, 3 percent collateral, collateral is more than adequate to cover all the defaults, and then in the parent, that ends that paragraph, the phrase appears, quote, "We have an indemnity agreement with CMC requiring them to take whatever action necessary to prevent us from suffering from default." Do you see that?
>
> A.    Yes, I do.
>
> Q.    Doesn't that refer to these general indemnity agreements we talked about at Tab 3 and 4?
>
> A.    No, it does not.  This refers to an agreement we had with them where they would take action to cure defaults.  And those actions were when we had interviewed them, they showed us their system and what they were currently doing and what they were doing for the existing sureties.  They had—all their plea agreements [*sic*] were online auto bill payments, and they were within 24 hours of a default, and within ten days, they gave their lessees the option, opportunity to cure those defaults or they would repossess the equipment and immediately start the process of either liquidating it or releasing it.
>
> That's part of that indemnity package I mentioned we had with them, our protection package.  This is one of those layers of protection.  We had their agreement to do the— make their best effort to cure defaults.
>
> Q.    Looks like indemnity agreement to me is indemnity agreement.   You're saying that that's not a term of precisional art in the nature of this memo?
>
> A.    No, not in this—as you can see, I'm referring to some specific performance on their behalf, which would not be delineated in a general agreement of indemnity.

Guardian/CadleRock Trial Tr. 212-213 (adopted into the record of these proceedings by stipulation at Tr. 223).  Mr. Schrader conceded that the informal arrangement between Safeco and CMC was not memorialized in any writing.  *See* Guardian/CadleRock Trial Tr. 227-28 (adopted into the record of these proceedings by stipulation at Tr. 223).

Mr. Schrader testified specifically that the testimony of Ken Martin to the effect that Safeco had taken indemnity from CMC for the Lease Bond program was incorrect:

> Q.  Okay.  Mr. Martin testified by videotape that if Safeco had a claim on MedQuik/Shandoro leases and Safeco paid it, that CMC would be obligated to repay Safeco.  Do you agree with that statement?
>
> A.  No, that's incorrect.
>
> Q.  Why do you disagree with the guy you supervise?
>
> A.  Because we didn't have any indemnity agreement from CMC that said it would cover bonds for Shandoro.
>
> Q.  Mr. Martin is just wrong, right?
>
> A.  He's absolutely wrong.

Guardian/CadleRock Trial Tr. 195-96 (adopted into the record of these proceedings by stipulation at Tr. 223).  Mr. Schrader further testified that Safeco would not take indemnity from an entity in the position of CMC in the ordinary course, since CMC was designated as obligee under the lease bonds:

> . . . Occasionally, I get these kinds of offers from people in the field who think that it is a good deal.  I have to explain to them that we don't.  When you issue a bond to an obligee and then take the indemnity of the obligee, you've painted a picture of protection that doesn't really exist, and at the very least, it's deceptive, and at the very wors[t], it's potentially fraud. . . .

Guardian/CadleRock Trial Tr. 203 (adopted into the record of these proceedings by stipulation at

Tr. 223).

Although the vast majority of the evidence relating to the indemnity issue was previously considered by the Court in the Bench Trial Opinion, the Court has nonetheless reviewed the entirety of the evidence proffered by the parties in these proceedings.  As in the Bench Trial Opinion, the Court finds that the existence of the indemnity agreements is, in connection with all other evidence, insufficient to support a reformation of the plain language of the Lease Bonds.

Initially, in light of the filings made by Safeco in this litigation and in the CMC bankruptcy case, Safeco's position that it did not believe it had entered into an indemnity agreement with CMC as to the Lease Bonds is difficult to accept.  For purposes of the obligee issue, however, the Court need not actually determine whether Safeco's GAIs were intended to encompass the obligations undertaken by Safeco in the Lease Bonds.[29]  Even assuming that the indemnity agreements executed by CMC and its principals were intended to provide Safeco with indemnification for the obligations undertaken in the Lease Bonds, the Court nonetheless holds that such a circumstance would not entitle Bank One to reformation of the Lease Bonds.

As discussed throughout this Opinion, the great weight of the evidence and testimony presented by the parties undercuts Bank One's reformation arguments.  Witnesses proffered by all parties to these transactions testified that (1) the parties understood the "two-stage" structure of the Lease Bond transactions; (2) CMC and the Guardian Entities made unambiguous representations, both in the transaction documents and elsewhere, as to the validity of the leases and Lease Bonds upon execution, prior to the assignment of CMC's rights to the Guardian Entities; (3) the parties understood that the obligations undertaken in the Lease Bonds constituted

---

[29] As previously noted in the Bench Trial Opinion, this evidence, and its inherent strengths and weaknesses, may be highly relevant to other stages of these proceedings, most particularly to any claim by Safeco that it reasonably relied on any fraud by CMC in entering into these transactions.

guarantees of lease payments, not loans; and (4) all parties intended that the Guardian Entities would take the rights of CMC as assignees.

In the face of the overwhelming evidence of transactional intent, the Court again concludes that the indemnity obligations undertaken by CMC in the GAIs do not override the parties' clear designation of CMC as obligee in the Lease Bonds, and do not support Bank One's reformation claims.  To the extent the obligations undertaken by CMC in the GAIs suggest an inconsistency with the Lease Bonds, that apparent inconsistency is explained by the parties' recognition of the two-stage nature of these transactions.  The execution of the GAIs by CMC, while creating an apparently circular obligation at the first stage of the transactions, gave rise to a logical structure—one that was intended by the parties—upon the assignment of CMC's rights through the SSAs at the second stage.

In any event, given the unique structure of the Lease Bond transactions, including CMC's assumption of servicing duties upon the execution of the SSAs, Safeco's requirement of indemnity from CMC would be neither illogical nor unreasonable.  As Bank One acknowledges, upon execution of the SSAs, "CMC became sub-servicer, bond principal, and indemnitor. . . ." Bank One Proposed Findings of Fact and Conclusions of Law, 02-16014, Doc. 126, at 6.[30]

It is evident, accordingly, that CMC held two distinct roles throughout the unfolding of these transactions.  Initially, CMC was lessor of the equipment on each underlying lease, and obligee on the Lease Bonds issued by Safeco.  Following execution of the SSA in each transaction, however, CMC's role changed.  After assignment of its obligee rights to the investors, CMC's primary role in the transaction was that of sub-servicer of the leases.  In its

---

[30] The deposition testimony of Ken Martin, proffered by Bank One, also supports this understanding on the part of Safeco.  *See* Martin Depo., at 225:9-13 ("once CMC was replaced as the obligee on the bond by the lending institution, they as subserver [*sic*] would take care of the—any—any problems that might exist in the flow of the premium. . . .").

servicing capacity, CMC unequivocally bore obligations both to the investors and to Safeco. Given the centrality of CMC's role as sub-servicer to the performance of the Lease Bonds, it would not have been unreasonable for Safeco to require indemnity by CMC and its principals to guarantee those servicing obligations.

Once again, however, CMC's subsequent obligations as sub-servicer—which arose only following execution of the SSAs—are necessarily separate from CMC's original role as obligee under the Lease Bonds.[31]  That original designation was clearly set forth in the language of the Lease Bonds, and Bank One has not introduced any evidence sufficient to override the parties' negotiated agreement.  The Court finds, accordingly, that evidence of indemnity obligations running from CMC (and/or its principals) to Safeco, while relevant circumstantial evidence of Safeco's intent, does not compel a finding of original obligee status on the part of the Guardian Entities and/or Bank One.

As noted previously, these transactions were atypical in many respects—attempting to provide assignees as many protections as possible while still allowing Safeco to participate.  In this context, that an atypical indemnity agreement was entered into between CMC and Safeco is not surprising.

The Court's findings in this regard are entirely consistent with those set forth in sections II.B.3.b. and II.C.3.b. of the Bench Trial Opinion.  To the extent applicable, and where not otherwise discussed herein, the Court hereby incorporates by reference its findings set forth in

---

[31] As set forth throughout this Opinion, as well as in the Bench Trial Opinion, the distinct nature of these roles and functions also places a limitation on the scope of the fraud defenses available to Safeco in this matter.  As the Court has repeatedly stated, the only fraud assertable by Safeco as a defense to its Lease Bond obligations is fraud by CMC in the inducement to enter into these transactions.  Once the SSAs were executed, and CMC had assumed its role as sub-servicer of the leases, CMC effectively was no longer an obligee on the transactions, and thus any fraud by CMC in its sub-servicer capacity could not provide any defense to Safeco in these transactions.

those sections of the Bench Trial Opinion.[32]

### 5.    Bank One Cannot Establish the Parties' Intent to Effect a Novation.

Throughout these proceedings, Bank One has relied heavily on its alternative argument that the parties intended the execution of the SSAs to constitute a "novation," in which the Guardian Entities, with the consent of all parties, were substituted for CMC as obligee on the Lease Bonds.  Bank One argues that the parties intended, upon the execution of the SSAs, to extinguish Safeco's obligations to CMC and substitute a contract in which the Guardian Entities and/or Bank One were the beneficiaries of Safeco's Lease Bond obligations.

The novation issue was discussed in section II.B.3.e. of the Bench Trial Opinion (incorporated into the Court's analysis regarding Safeco by section II.C.3.a. of the Bench Trial Opinion).  Since Bank One has placed great reliance on this argument in these proceedings, the Court conducts a *de novo* review of the issue here.  As with Plaintiff's argument in the prior proceedings, Bank One's assertions regarding novation are based entirely on the language of the transaction documents, as well as certain structural features of the transactions.  Among the aspects of the transactions alleged to support Bank One's position are (1) the fact that each lease and Notice of Assignment was dated to coincide with the effective date of the relevant SSA; (2) the language in the Lease Bonds providing that an assignee "shall become the Obligee . . . as of the date specified in the Notice of Assignment"; and (3) the fact that CMC's sub-servicer status, as well as its indemnity obligations, became effective upon execution of the SSAs.

---

[32] The Court's incorporation by reference of its analysis set forth in sections II.B.3.b. and II.C.3.b. of the Bench Trial Opinion includes the discussion of certain other aspects of the transaction, which Bank One argues refute the parties' intent to designate CMC as original obligee, including the facts that (1) CMC applied for, and paid for, the Lease Bonds for the benefit of its investors; (2) CMC was required to maintain internal cash reserves to fund sub-servicer advances; (3) CMC also posted cash collateral reserves with each Surety upon the closing of each SSA transaction; and (4) following the execution of each SSA transaction, each investor was in possession of the original Lease Bonds.  For the reasons set forth in sections II.B.3.b. and II.C.3.b. of the Bench Trial Opinion, the Court again finds that none of these elements of the transactional structure indicate the existence of original "obligee" status on the part of the Guardian Entities and/or Bank One.

Bank One has not proffered any witness testimony to the effect that, in executing the SSAs, the parties intended to create a novation.  Given that Bank One's claims are premised on the transactional language and structure only, the novation issue is essentially a question of law, and the Court has considered the legal authorities proffered by both parties on this issue.

It is well established that a "[n]ovation is the substitution of a new obligation for an existing one. . . ." *Wells Fargo Bank v. Bank of America*, 32 Cal. App. 4th 424, 431 (2d Dist. 1995), *citing* Cal. Civ. Code § 1530; *see also Howard v. County of Amador*, 220 Cal. App. 3d 962 (3d Dist. 1990).  The substitution of obligations may be accomplished by "(1) a new obligation between the same parties, or (2) a new obligation arising because of new parties, either a new debtor or new creditor. . . ." *Wells Fargo*, 32 Cal App. 4th at 431.  "The effect of a novation is to make the original agreement a nullity (that is, void and of no effect), and the rights of the new parties are governed solely by the new agreement. . . ." *Eckart v. Brown*, 34 Cal. App. 2d 182, 187 (2d Dist. 1939); *see also Wells Fargo*, 32 Cal. App. 4th at 431 ("[a] novation thus amounts to a new contract which supplants the original agreement and 'completely *extinguishes* the original obligation . . . .'")(emphasis in original)(citations omitted).

Under California law, there are four essential requirements for creating a novation: "First, a previous valid obligation; second, the agreement of all the parties to the new contract; third, the extinguishment of the old contract; and fourth, the validity of the new one. . . ." *Airs Int'l v. Perfect Scents Distributions*, 902 F. Supp. 1141, 1147 (N.D. Cal. 1995).  No particular form of agreement is required to effect a novation; a novation may be written or oral, express or implied. *See, e.g., Silva v. Providence Hospital of Oakland*, 14 Cal. 2d 762, 773-74 (1939); *Porter Pin Co. v. Sakin*, 112 Cal. App. 2d 760, 762 (2d Dist. 1952); *Tucker v. Schumaker*, 90 Cal. App. 2d 71, 74 (1st Dist. 1949).

One means of effecting a novation is "[b]y the substitution of a new creditor in place of the old one, with intent to transfer the rights of the latter to the former." Cal. Civ. Code § 1531(3).  Bank One asserts, essentially, that the transactions that occurred here were equivalent to the form of transaction described in section 1531(3) of the California Civil Code—*i.e.*, the substitution of a new creditor (the Guardian Entities) in place of the old creditor (CMC), with intent to transfer CMC's rights to the Guardian Entities.  In that context, Bank One asserts, it need not demonstrate that the parties intended to extinguish the Lease Bonds or the obligations thereunder, but rather simply that the parties intended to substitute a new creditor to assume all rights previously held by the former creditor.

Bank One relies primarily on two California cases: *Eckart*, 34 Cal. App. 2d at 187; and *Law v. San Francisco Gas & Electric Co.*, 168 Cal. 112, 116-117 (1914).  *Eckart* involved the assignment of contract rights to purchase stock shares by the buyer of the shares to a third party, with the consent of the seller.  The *Eckart* court held that, by consenting to the assignment, the defendant effected a novation, released the original buyer from all obligations, and entered into a new contract. *Eckart*, 34 Cal. App. 2d at 187.

*Law* involved a contract whereby the defendant agreed to supply steam heat to three buildings owned by plaintiffs.  When plaintiffs sold two of the buildings and defendant consented to an assignment of rights to the purchaser, the court held that a partial novation occurred. *Law*, 168 Cal. at 116-117.

Bank One relies on this case law, in part, to support the proposition that novation can occur through the mechanism of assignment, where the obligor on the contract at issue consents to the substitution of a new obligee.  Bank One also cites the *Law* case for the proposition that a novation does not require the extinguishment of an entire contract; rather, a novation may be

110

partial if such is the intent of the parties.

Safeco does not dispute that novation may, in some circumstances, occur through assignment. Safeco focuses, rather, on the element of intent, and argues that Bank One cannot demonstrate any intent by these parties to effect a novation upon execution of the SSAs. Safeco asserts that neither the lease bonds nor the SSAs contain any language suggesting an intent to release Safeco and/or the lessees from their obligations to CMC. Rather, Safeco asserts that, following the execution of the SSAs, CMC remained the lessor on the equipment leases, with all of the rights and obligations attendant to that status. Safeco also introduced the testimony of Senior Underwriting Officer Schrader, who testified that Safeco had no "intention at any time for an entirely new contract to evolve between Safeco and [the] investor. . . ." Guardian/CadleRock Trial Tr., at 180 (adopted into the record of these proceedings by stipulation at Tr. 223).

Safeco further cites to section 2.8 of the SSAs, which provides for the reversion of any remaining "Transferred Assets" to CMC upon the investors' receipt of all sums due. Safeco argues that CMC's reversionary interest in the Lease Bonds is inconsistent with any intent to extinguish all rights of CMC upon the execution of the SSAs.

Safeco argues, finally, that even if Bank One could demonstrate that the parties intended the execution of the SSAs to effect a novation, a novation here would not defeat Safeco's fraud in the inducement defense, since the existence of a "previous valid obligation" is essential to a novation. *See Airs Int'l*, 902 F. Supp. at 1147. *Holder v. Maaco Enterprises*, 644 F.2d 310, 313 (4th Cir. 1981); *Gertsch v. Johnson & Johnson, Fin. Corp. (In re Gertsch)*, 237 B.R. 160, 171 (B.A.P. 9th Cir. 1999).[33]

_____

[33] Bank One counters that, where a new creditor is substituted for an original creditor, and "the rights of others have intervened and circumstances have so far changed that rescission may not be decreed without injury to those parties and their rights . . . ", *Gill v. Rich*, 128 Cal. App. 4th 1254, 1265 (2d Dist. 2005), then an obligor must be barred from asserting fraudulent inducement by the original creditor as a defense against the innocent new creditor. Since

Significantly, as noted in the Bench Trial Opinion, the record in this case is entirely devoid of any evidence that the parties intended the SSAs to constitute a novation of the prior agreement memorialized in the Lease Bonds.  There has been no testimony to that effect, and the Court is unable to reach such a conclusion based either upon the language of the transaction documents, or upon the transactional structure.  Even if the Court accepts Bank One's argument that extinguishment of the Lease Bonds would not have been required to create a novation, the record still fails to demonstrate that the parties actually intended to substitute Guardian (and later Bank One) as creditor in place of CMC.

It is beyond dispute that, even after execution of the SSAs, CMC remained the lessor on the underlying leased equipment, and the lessees owed lease payment obligations to CMC alone.  Undisputedly, the lessees had no intent to substitute a different creditor in place of CMC, and as non-parties to the SSAs, they engaged in no such substitution.  Bank One apparently argues that the intended substitution of rights was intended to effect a <u>partial</u> novation, in which CMC intended to assign only the rights to payment and/or performance of obligations owed to it by Safeco.  Such intent, according to Bank One, is evident based upon (1) the parties' execution of a document that permits the assignment of CMC's rights; and (2) Safeco's knowledge that the rights in question would be assigned to a Guardian Entity, and subsequently to Bank One.

Adoption of Bank One's theory would blur the distinction between simple assignment and novation nearly beyond recognition.  Moreover, based upon the evidence and testimony relating to the parties' intent in these transactions, the Court finds that Safeco's <u>knowledge</u> of the contemplated assignment of rights cannot be equated with Safeco's assent to discharge CMC as

---

the Court finds herein that no substitution of creditors, and thus no novation, was intended by the parties, the Court need not determine whether a finding of novation herein would preclude Safeco's assertion of fraud defenses in these proceedings.

the party to which it owed obligations, and to enter into a new contract with a Guardian Entity and/or Bank One.

While Safeco does not dispute that it knew, and even intended, to issue Lease Bonds that would be assignable to the Guardian Entities, and later to Bank One, Safeco witnesses have testified extensively in these proceedings as to the reason for designating CMC as obligee on the Lease Bonds. Safeco witnesses testified, without contradiction, that Safeco deliberately structured a transaction in which Safeco's obligations would run to CMC, not to an investor bank. By so structuring the transaction, Safeco intended to comply with the "Appleton Rule" and avoid running afoul of insurance industry regulations to which it was subject.

By accepting the novation theory that Bank One proposes, the Court would find, in essence, that upon execution of the SSAs, Safeco agreed that it would no longer owe its obligations to CMC, but rather would be party to a new agreement, in which Safeco owed obligations directly to a Guardian Entity (or even to Bank One). The Court finds that Safeco's intent to effect such an arrangement cannot be gleaned from any testimony or evidence presented in these proceedings. It is plain that Safeco intended _not_ to be a party to any contract in which its obligations ran directly to the investor banks, and that Safeco went to great lengths to avoid such a result.

In neither of the cases cited by Bank One was there similar evidence of the obligor's intent to avoid assuming direct contractual obligations in favor of the substituted creditor. To the contrary, in both cases, the courts based the novation determination on evidence of the obligor's intent to assume such obligations to the substituted creditor. In *Eckart*, at the time the share purchase contract was assigned, defendant executed a separate contract with the purchaser of the shares, which acknowledged the assignment. *See Eckart*, 34 Cal. App. 2d at 185-187. Similarly,

in *Law*, upon the conveyance of the two buildings subject to the steam contract, defendant wrote to the purchaser's attorneys <u>offering</u> to execute a new contract with the purchaser, in the event the purchaser should "desire to have a separate contract made upon the same terms . . . ." *Law*, 168 Cal. at 114.  Although the separate contract never was executed, the court held that the defendant's conduct demonstrated its intention "to release the [plaintiffs] and to substitute their vendee as to that part of the contract relating to the buildings purchased by her. . . ." *Id.* at 116.

The evidence in these proceedings does not reflect any conduct by Safeco comparable to that exhibited by the defendants in *Eckart* and *Law*, and accordingly, the Court is unable to find any intent by Safeco to effect a novation upon execution of the SSA.  As confirmed by Bank One's cited cases, a fundamental difference exists between (1) a party's assumption of obligations, with an accompanying consent to the subsequent assignment of rights; and (2) a manifestation of that party's intent to enter into a direct agreement with any subsequent assignee. In these transactions, the difference was plainly recognized by Safeco, and was foundational to Safeco's transactional intent.  As previously noted in this Opinion, the Banks were aware of Safeco's unwillingness to assume obligations directly to them, and also recognized that they had purchased something less than direct obligee rights.  As set forth in section III.B.2.d. of this Opinion, other mechanisms for securing such rights—including purchase of a letter of credit or other financial guarantee instrument—were available in the market.  Accordingly, to permit Bank One to bypass the carefully constructed assignment structure through a creative (and retrospective) application of the concept of "novation" would be both unfair and contrary to the terms of the transaction bargained for.[34]

---

[34] These conclusions are further buttressed by the discussion contained in section II.B.3.e. of the Bench Trial Opinion, including the Court's analysis of section 2.8 of the SSAs as providing reversionary rights in the Lease Bonds to CMC.  Further, as the Court noted in section II.B.3.e., "[h]ad the parties intended to memorialize an agreement that the SSAs would effect a novation rather than an assignment, it would not have been difficult to do

Further, as noted by the Court on the record of these proceedings, Feb. 15, 2011 Tr. at 10, even if the Court accepted Bank One's argument and found that execution of each SSA effected a novation, it is apparent that such a novation would convey rights only to the relevant Guardian Entity party to each transaction.  The Court rejects Bank One's theory whereby the execution of the SSA, and the subsequent assignment of rights by a Guardian Entity to Bank One, could be collapsed into a single "novation," and thus that Bank One would secure obligee rights immediately upon execution of the SSAs.  While Safeco (1) was aware that its Lease Bonds were assignable; (2) may have been aware of the identity of Bank One as the ultimate assignee; and (3) received notice upon the Guardian Entities' assignment of rights to Bank One, Safeco was not party to any document in which Bank One was designated as obligee or as the holder of any rights in the Lease Bond transactions.  To permit Bank One to argue that it was substituted as a new creditor of Safeco by virtue of the execution of the SSA (a document to which Bank One was not party) would defy logic and impermissibly conflate the intended separate stages of these transactions.

For these reasons, the Court rejects Bank One's novation argument and adheres to the findings set forth in section II.B.3.e. of the Bench Trial Opinion.

### 6. As a Matter of Law, Bank One Fails to Demonstrate Fraud on the Part of Safeco.

As an alternative basis for its reformation claim, Bank One argues that reformation is justified based on false representations made by Safeco and/or its agents, which would support a claim of fraud.  The bulk of the misrepresentations relied upon are alleged to be attributable to surety broker Michael Anthony.  In section III.B.2.c. of this Opinion, the Court assumed for purposes of its analysis (without deciding) that Anthony was authorized to speak on behalf of

so. . . ." Bench Trial Opinion, Doc. 2459, at 109.

Safeco for purposes of communicating with potential investors in the Lease Bond program.

Bank One claims that the alleged misrepresentations include representations by Safeco and/or its agents that Safeco intended to waive fraud in all instances, including fraud by CMC in the inducement to enter into the Lease Bonds.  Bank One relies in part on representations allegedly made by Michael Anthony to Neil Gurney, previously discussed in sections III.B.2.c. and III.B.2.d. of this Opinion.

In support of its assertion that Safeco knew that it was making fraudulent representations as to the effect of the fraud waivers contained in the Lease Bonds, Bank One also cites to the trial testimony of James Schrader.  Mr. Schrader testified:

> Q.    Okay.  And your understanding was, given that structure, that Safeco was to have available as a defense to any bond claim the defense of fraud [in] the inducement by CMC?
>
> A.    Fraud and the induce—fraud—
>
> Q.    Yeah—
>
> A.    --yeah, as a—
>
> Q.    Defense—
>
> A.    --defense to Safeco?
>
> Q.    Yes.
>
> A.    Yes.
>
>                          ***
>
> Q.    Right.  And part of the intent of setting up CMC as the obligee was so Safeco would have available as a defense to any bond claim the defense of the fraud of CMC?
>
> A.    Well, that—we never dreamed that CMC was going to defraud us and I guess that didn't enter into our thought process as to when we set it up that way.  I mean, that is— that is a defense to a surety.

116

***

Q.     All right.  So even though, obviously, it wasn't your intent to enter into a—a transaction with a party that—that you thought would be fraudulent, you did understand that by naming CMC as the obligee in the bond, that Safeco would have that defense of CMC's fraud available to it?

A.     Yeah.  I guess you can say we always—I'm aware of that on any bond, correct.

Q.     And you knew it at the time that you authorized Safeco to participate in the program under this form of bond?

A.     Yeah.  I guess that's part of our knowledge bank.  I'm not going to say that that was part of our thought process in putting this program together.

***

Q.     I'm asking you if, based on your knowledge of how the Safeco bond would operate with CMC as the named obligee, whether you would consider it to be not truthful and fair for Michael Anthony to market your bonds to investors of the CMC program with representations or statements to the effect that the bond waives all defenses of fraud, including fraud of CMC?

A.     That would not be correct for him to do that.

Q.     And the same would be true if CMC were marketing the bond in that respect?

A.     Correct.

Q.     And the same would be true if any Safeco employees were marketing the bond with those types of representations?

A.     Correct.

Tr., at 267:16-268:1; 268:16-22; 269:8-19; 270:3-16.

Bank One asserts, generally, that the representations made to Bank One and the Guardian

Entities by Safeco and/or its representatives—particularly Michael Anthony—demonstrate either

actual fraud by Safeco, or constructive fraud.  Either of these would entitle Bank One to reformation of the Lease Bonds under California law. *See, e.g.,* Cal. Civ. Code § 3399 ("[w]hen, through fraud . . . a written contract does not truly express the intention of the parties, it may be revised, on the application of a party aggrieved . . . ."); Cal. Civ. Code § 1571 ("[f]raud is either actual or constructive.").  Bank One further argues that, given the equitable nature of reformation as a remedy, the Court has discretion to order reformation to prevent a miscarriage of justice. *See, e.g., Jones v. First American Title Ins. Co.*, 107 Cal. App. 4th 381, 388 (2d Dist. 2003).  The Court examines Bank One's allegations of both actual and constructive fraud herein.

In order to demonstrate actual fraud by Safeco, Bank One must demonstrate "(1) a misrepresentation (false representation, concealment, or nondisclosure); (2) knowledge of falsity (or scienter); (3) intent to defraud, i.e., to induce reliance; (4) justifiable reliance; and (5) resulting damage." *Baggett v. Hewlett-Packard Co.*, 582 F. Supp. 2d 1261, 1267 (C.D. Cal. 2007)(internal quotations omitted).  Under this standard, concealment of a fact also is actionable where a defendant had a duty to disclose. *See id.*  A duty to disclose "arises in four circumstances: (1) when the defendant is in a fiduciary relationship with the plaintiff; (2) when the defendant had exclusive knowledge of material facts not known to the plaintiff; (3) when the defendant actively conceals a material fact from the plaintiff; and (4) when the defendant makes partial representations but also suppresses some material fact." *Id.* at 1267-68.  Bank One also relies on *Barrett v. Bank of America*, 183 Cal. App. 3d 1362, 1370 (4th Dist. 1986) for the proposition that a principal may be liable for fraud "where he intentionally misinforms or withholds information from the agent and the agent thereupon innocently misrepresents. . . ." *Id.*

Under California law, a showing of constructive fraud occurs "[i]n any breach of duty which, without an actually fraudulent intent, gains an advantage to the person in fault, or anyone

claiming under him by misleading another to his prejudice . . . ." Cal. Civ. Code § 1573.  "As a general principle constructive fraud comprises any act, omission or concealment involving a breach of legal or equitable duty, trust or confidence which results in damage to another even though the conduct is not otherwise fraudulent. . . ." *Assilzadeh v. California Federal Bank*, 82 Cal. App. 4th 399, 415 (2d Dist. 2000)(citation omitted).  "Constructive fraud . . . is presumed from the relation of the parties to a transaction, or the circumstances under which it takes place. . . .  Constructive fraud often exists where the parties to a contract have a special confidential or fiduciary relation . . . ." *Mary Pickford Co. v. Bayly Bros., Inc.*, 12 Cal. 2d 501, 525 (1939). "Most acts by an agent in breach of his fiduciary duties constitute constructive fraud. . . ." *Assilizadeh*, 82 Cal. App. 4th at 415.

A true fiduciary relationship is not required to support allegations of constructive fraud; rather a "confidential relationship" suffices as an element of this claim. *See General American Life Ins. Co. v. Rana*, 769 F. Supp. 1121, 1127 (N.D. Cal. 1991).  An agency relationship is a fiduciary or confidential relationship sufficient to support a constructive fraud claim. *See Mendoza v. Continental Sales Co.*, 140 Cal. App. 4th 1395, 1405 (5th Dist. 2006).

With respect to Bank One's "actual fraud" argument, the Court finds that Bank One has alleged no conduct by Safeco and/or its agents that would satisfy the elements of fraud under California law.  Initially, the testimony introduced by Bank One is insufficient to establish that Safeco made any misrepresentations to Bank One, or knew any material facts that it failed to disclose to Bank One.  By introducing the testimony of James Schrader, Bank One has established, at best, that (1) Mr. Schrader knew, generally, the law applicable to fraud waivers as applied to the obligee of a surety bond; and (2) Mr. Schrader did not think about or reflect upon these general legal principles in the context of the CMC Lease Bond transactions.  Mr. Schrader

was not the Safeco employee most directly involved in the negotiation of the Lease Bonds, and Bank One has introduced no testimony as to any conversation between Mr. Schrader and either Mr. Martin[35] or Michael Anthony as to the legal meaning of the fraud waivers.

Further, leaving aside Bank One's failure of proof as to any alleged knowledge of Safeco, Bank One has not alleged that any representation made by Anthony on behalf of CMC was actually false.  As described in section III.B.2.c. of this Opinion, Bank One has alleged only that Anthony made numerous broad, general statements relating to the applicability of the fraud waivers.  There has been no testimony in these proceedings to the effect that Anthony actually stated that the Lease Bonds waived all defenses based upon fraud in the inducement by CMC.

Even in the event that Anthony had made any such representations—and had made them as part of an attempt by Safeco to mislead Bank One—the Court further finds, as a matter of law, that Bank One cannot demonstrate justifiable reliance on any such statements.  As set forth in sections III.B.2.c. and III.B.2.d. of this Opinion, the negotiated language of the Lease Bonds was equally accessible to all parties, and all parties had access to counsel to assist them in interpreting the language.  In transactions such as these, involving a high degree of complexity and sophistication, it is unreasonable for Bank One to assert that it relied on its adversary's agent to interpret the terms of the Lease Bonds, and then to allege fraud based on its claim that that

---

[35] In this regard, Ken Martin testified as follows:

> Q.   When you declined to write the bonds initially to Guardian, did you and Mr. Schrader had any—have any discussion that this would have let us come up with some defense if we're ever, you know, not writing it—let me rephrase the question.
>
> Did you and Mr. Schrader discuss that writing the bond initially to CMC knowing they're going to assign it to Guardian would somehow give you a defense if Guardian ever asked for payment on the bond?
>
> A.   I do not recall that kind of conversation at all.

Martin Depo., at 273:3-15.

interpretation subsequently proved incorrect.[36]

Bank One apparently recognizes that it cannot establish the elements of actual fraud; Bank One in fact makes the "actual fraud" argument only in passing.  Throughout these proceedings, Bank One has focused on its argument that Safeco's conduct amounts to constructive fraud, which justifies reformation of the Lease Bonds to name a Guardian Entity and/or Bank One as obligee.  In essence, Bank One argues that Safeco had a fiduciary or confidential relationship with Guardian and Bank One by virtue of its status as closing agent and servicer under the SSAs.  Since the SSAs designated Safeco to act as "agent" of the Guardian Entities and Bank One, Bank One reasons, Safeco assumed special duties to its principals, including the duty to disclose material facts.  Bank One then leaps from this premise to the conclusion that Safeco's later-assumed status as closing agent retrospectively imposed fiduciary duties on Safeco as to any representations made by Safeco or its agents during the course of negotiations of the Lease Bond transactions.

The Court categorically rejects Bank One's contention that Safeco assumed any fiduciary duty to it or to the Guardian Entities relative to the negotiation of the Lease Bonds.  Rather, the Court finds that these parties were adversaries involved in complex negotiations leading up to an arm's-length business transaction.  While it is undisputed that Safeco did have fiduciary duties toward Bank One and the Guardian Entities in the context of its duties at closing, there is no allegation that these duties were breached in any manner.

---

[36] To the extent that Bank One attempts to argue that Safeco committed actual fraud through nondisclosure of a material fact, such an argument fails as well.  As set forth in the case law cited by Bank One, a claim for fraudulent nondisclosure requires a plaintiff to demonstrate either (1) a fiduciary duty; (2) the defendant's knowledge of information not otherwise known to plaintiff; or (3) other specific circumstances giving rise to a duty to disclose. *See, e.g., Baggett*, 582 F. Supp. 2d at 1267.  As described in detail in this section, (1) Bank One cannot show any fiduciary or confidential relationship between Safeco and either the Guardian Entities or Bank One; and (2) knowledge of the legal meaning of the terms of the negotiated transaction documents was equally accessible to both parties and their counsel.

As the Court observed on the record during closing arguments of these proceedings, Bank One has not alleged any malfeasance by Safeco that could constitute a breach of its fiduciary duties in connection with the closing of these transactions:

> THE COURT:  All right.  What is it that you're saying that Safeco did at the closing that was a breach of duty?  Did they not deliver the bonds completely as they were originally drafted?  Did they not deliver all the comfort letters?  Did they not deliver—I mean, you know, again, even if I agree with the other arguments, I'm having a hard time with this notion of constructive fraud.
>
> So you have to have the fiduciary obligation in order to get there, and yet, other than saying generally that they had a fiduciary obligation and therefore they should have somehow disclosed if the documents said something other than what the parties all knew they said going in, and that's [where] I'm having a hard time.

Closing Argument Tr., at 12-13.  As the Court further noted on the record, the Court declined to accept Bank One's argument that Safeco's status as closing agent "creates a fiduciary duty that somehow you can sweep into it every representation that was made in the past or any explanation as to what the contracts say with respect to what occurred in the past. . . ." Closing Argument Tr., at 16-17.  In fact, such a retrospective application of Safeco's fiduciary duties at closing defies logic, and Bank One has provided no authority to support such a novel interpretation.

Accordingly, even assuming that Bank One could demonstrate that Safeco knew facts that it failed to disclose during the negotiation of the Lease Bond transactions, Bank One's constructive fraud argument still would fail, since Bank One simply cannot establish any fiduciary or confidential relationship between Safeco and the Guardian Entities and/or Bank One during the negotiation phase of these transactions.  Moreover, as previously stated, in light of the plain language of the transaction documents, there is no basis for inferring justifiable reliance on the part of Bank One.

The Court finds, as a matter of law, that Bank One cannot demonstrate any fraud on the

part of Safeco such as would support reformation of the Lease Bond documents.  The Court declines, accordingly, to order reformation of the Lease Bonds on this basis.

### 7.    Safeco's Fraud Defenses Are Not Barred by the Doctrine of Judicial Estoppel.

Bank One's final argument is that Safeco should be judicially estopped from asserting its defenses of fraud in the inducement in these proceedings, based upon prior judicial filings by Safeco, which allegedly acknowledge the intended "principal" status of CMC, and/or CMC's status as an indemnitor on the Lease Bonds.  Bank One bases its arguments on (1) Safeco's filing of the California Action against CMC and its principals based upon the GAIs, Bank One Exh. 74; (2) the Sawyer Declaration filed in the California Action, Bank One Exh. 75; (3) Safeco's securing of injunctive relief against CMC based upon the Complaint in the California Action and the Sawyer Declaration in that action; (4) Safeco's filing of a Proof of Claim on November 12, 2002 in the CMC/CSC bankruptcy proceedings, based in part on the obligations undertaken in the GAIs, Bank One Exh. 109; and (5) Safeco's subsequent acceptance of a distribution in the bankruptcy proceedings on account of its Proof of Claim.

"The judicial estoppel doctrine protects the integrity of the judicial process by preventing a party from taking a position inconsistent with one successfully and unequivocally asserted by the same party in a prior proceeding. . . ." *Reynolds v. Commissioner*, 861 F.2d 469, 472 (6th Cir. 1988).  "The purpose of the doctrine is to protect the courts 'from the perversion of judicial machinery.'" *Id.*, *quoting Edwards v. Aetna Life Ins. Co.*, 690 F.2d 595, 599 (6th Cir. 1982). "The essential function of judicial estoppel is to prevent intentional inconsistency . . . ." *Edwards,* 690 F.2d at 599.  "Judicial estoppel addresses the incongruity of allowing a party to assert a position in one tribunal and the opposite in another tribunal. If the second tribunal adopted the party's inconsistent position, then at least one court has probably been misled." *Id.*

123

The crux of Bank One's argument here is that Safeco, having previously filed documents in which it attested to CMC's status as Safeco's bond principal and indemnitor, should be estopped in these proceedings from asserting that CMC was in fact a bond obligee.  Upon review of the documents relied on by Bank One, and careful consideration of Bank One's arguments, the Court rejects Bank One's contention that Safeco should be judicially estopped from asserting its defense of fraud in the inducement.

The Court has conducted a detailed review of both the Complaint and the Sawyer Declaration filed in the California Action.  The Complaint, while it indisputably seeks relief premised upon the indemnity agreements executed by CMC, its principals and their spouses, makes no specific reference to CMC as "principal" on the Lease Bonds.  In fact, the Complaint alleges: "SAFECO, as surety, issued lease bonds . . . on behalf of CMC's lessees, as principals, and in favor of CMC, as obligee." Bank One Exh. 74, at ¶ 21 (emphasis added).  The Sawyer Declaration does contain a reference to CMC as "SAFECO's bond principal". Bank One Exh. 75, at ¶ 1.  Like the Complaint, however, the Sawyer Declaration undisputedly focuses on CMC's alleged indemnity obligations, and not on CMC's status as principal or obligee in the Lease Bond transactions.[37]

This Court is aware of the district court's decision in the California Action, which awarded injunctive relief in favor of Safeco based upon the Complaint and the Sawyer Declaration.  There is not the slightest indication in any of the evidence proffered, however, that the California district court was asked to make a determination that CMC was a "principal" on the Lease Bonds.  The language of the Complaint, in fact, suggests that Safeco did not seek any

---

[37] Moreover, Mr. Sawyer testified at trial that his prior testimony as to the "principal" status of CMC was based upon his own error in understanding the transactional structure. *See* Guardian/CadleRock Trial Tr., at 533-34. "[J]udicial estoppel is inappropriate in cases of conduct amounting to nothing more than mistake or inadvertence. . . ." *White v. Wyndham Vacation Ownership, Inc.*, 617 F.3d 472, 476 (6th Cir. 2010).

relief based upon the alleged "principal" status of CMC.

Bank One does not seriously claim that the district court's award of injunctive relief in the California Action was premised upon any finding—or even any assertion by Safeco—of CMC's "principal" status on the Lease Bonds.  Bank One contends, rather, that Safeco should be barred from denying that CMC undertook indemnity obligations in favor of Safeco, which encompassed the obligations guaranteed by Safeco in the Lease Bonds.

Bank One's assertion that judicial estoppel bars Safeco from denying that CMC was an indemnitor on the Lease Bonds has some force.  As previously noted in section III.B.4. of this Opinion, Safeco's denial that CMC assumed such indemnity obligations is difficult to accept. Ultimately, however, even if the Court were to find Safeco judicially estopped from denying CMC's status as an indemnitor, that determination does not affect the Court's conclusions.

As explained in section III.B.4. of this Opinion (as well as in sections II.B.3.b. and II.C.3.b. of the Bench Trial Opinion), "evidence of indemnity obligations running from CMC (and/or its principals) to Safeco, while relevant circumstantial evidence of Safeco's intent, does not compel a finding of original obligee status on the part of the Guardian Entities and/or Bank One." *See* section III.B.4., *supra*.  For the reasons set forth in that section, the Court finds that Safeco's prior representations in the California Action as to alleged indemnity obligations on the part of CMC also provide no basis for a finding that Bank One and/or the Guardian Entities were intended original obligees.

With respect to the Proof of Claim filed by Safeco in the CMC/CSC bankruptcy proceedings, a similar analysis applies.  Initially, Safeco does not dispute that its Proof of Claim was based, at least in part, on alleged obligations undertaken by CMC in the GAIs.  Safeco's Proof of Claim also references, however, "the fraudulent activities of CMC in creating a '[P]onzi

scheme'. . . ." Bank One Exh. 109.   While the bankruptcy court's award to Safeco premised upon its Proof of Claim is undisputed, Bank One has proffered no evidence as to the <u>basis</u> for the court's award, *i.e.*, whether the distribution to Safeco was based upon its claims of indemnity, fraud, or some other grounds.   In this murky context, the bankruptcy court's award cannot support any invocation of the judicial estoppel doctrine against Safeco.

In any event, as noted above, even if Safeco were judicially estopped from denying CMC's status as an indemnitor on the Lease Bonds, the Court has already found in section III.B.4. of this Opinion, and in this section, that such a finding is an insufficient basis upon which to confer obligee status upon Bank One.  Accordingly, for the reasons set forth herein, the Court rejects Bank One's assertion that any application of the judicial estoppel doctrine bars Safeco from asserting its defenses based upon fraud in the inducement by CMC.

### C.      Summary and Impact of this Court's Ruling

In its prior Bench Trial Opinion, this Court reached conclusions identical to those set forth in this Opinion: that (1) CMC was the intended original obligee on the Lease Bonds; and (2) neither the Guardian Entities, nor any investor bank subsequently succeeding to the rights of any Guardian Entity, have original obligee status.   Bank One, in these proceedings, bore the heavy burden of persuading the Court, by clear and convincing evidence, that the parties' transactional intent in the Bank One transactions differed from those transactions considered in the Bench Trial Opinion.  While the volume of evidence proffered by Bank One far exceeds that considered in the prior bench trial proceedings, Bank One's actual proof of transactional intent still falls short of its burden.

As explained throughout this Opinion, the vast majority of the evidence and testimony proffered by Bank One either is duplicative of evidence considered by the Court in the prior

proceedings, or is irrelevant to the questions presented at this stage of the case.  As the Court has explained throughout its prior opinions and in this Opinion, the sole issue presented in these proceedings was the identity of the <u>intended original obligee</u> on the Safeco Lease Bonds.

Bank One has introduced a great deal of testimony pertaining to (1) Safeco's obligation to underwrite the CMC lessees; (2) the "unique" nature of the Lease Bond transactions, and Safeco's unfamiliarity with this type of structure;[38] (3) Safeco's lack of the expertise required to service the leases; and (4) the perceived inconsistency of Safeco's "claims process" with the guarantees that Bank One believed it had received.  While at least some of this evidence may be relevant at later stages of these proceedings—particularly with respect to issues of reliance in connection with Safeco's fraud defenses—it is no more than tangentially relevant in analyzing the issues presented here.

Based upon the evidence and testimony presented in these proceedings, the Court is persuaded that the parties' intent in the Bank One transactions was to create a transactional structure involving (1) Lease Bonds designating CMC as the original obligee; and (2) a series of subsequent assignments, through which CMC assigned its interests to the respective Guardian Entities, and the Guardian Entities later assigned those interests to Bank One.  While Bank One has argued that the purpose for naming CMC as obligee was only to permit Safeco to avoid violating the Appleton Rule, the Court finds the transactional form itself far more significant than the parties' <u>reason</u> for selecting that form.

That the parties may not have intended CMC actually to make a claim on the Lease

---

[38] While Bank One proffered a great deal of testimony pertaining to the "unique" nature of the transaction structure, as noted earlier, it is clear that virtually everything about these transactions was unique.  Although Safeco issued Lease Bonds to guarantee the obligations of the lessees to CMC, all parties understood that it did so in the context of a lease pooling program, in which investors would subsequently succeed to the rights of CMC.  All parties here also acknowledged that there was nothing "usual" about these transactions, and none of these parties had ever entered into transactions of this type.  In these undisputedly unusual circumstances, testimony as to what "usually" occurs in the issuance of simple lease bonds, or in connection with securitizations, is only marginally helpful.

Bonds has no impact on the Court's conclusions.  Even if it is true that CMC's position as original obligee was not particularly meaningful, that circumstance does not change the fact that the parties did place CMC in that position in the first instance.  While Bank One has suggested that it and/or the Guardian Entities were misled by Safeco into accepting a transaction that they did not understand, the plain fact is that the investors in these transactions knew that other, alternative transaction structures (including insurance policies and/or letters of credit) were available.  Again, all parties had access to counsel to assist in evaluating the benefits and drawbacks of each potential structure.  Regardless of the transaction structure selected, all parties were entitled to assume that their rights and obligations would flow from their chosen transactional form.

While the Court has found in this Opinion that CMC has original obligee status in the Bank One transactions—and that the Guardian Entities and/or Bank One merely succeeded to the rights of CMC—these findings do not resolve the claims between these parties, nor do they preclude Bank One from pursuing its claims against Safeco for recovery on the Lease Bonds.  As the Court made clear in the Bench Trial Opinion, the Court's findings as to the "obligee issue," while significant, do not provide Safeco with broad-based defenses to its obligations under the Lease Bonds.

The Court recognized previously, in the Lead Opinion (Doc. 1708), the extraordinarily broad nature of the fraud waiver provisions.  The Court consistently has stated that those fraud waivers operate to bar <u>all</u> fraud defenses by Safeco except those premised upon <u>fraud in the inducement by CMC</u> as Safeco's obligee. *See, e.g.* Bench Trial Opinion, Doc. 2459, at 177.  As stated in the Bench Trial Opinion, the Court's findings on the obligee issue mean only that, "to the extent [Safeco has] a colorable defense against CMC, that defense also may be asserted

against the Guardian Entities and their subsequent assignees. . . ." Bench Trial Opinion, Doc. 2459, at 178.  The Court further reiterates its prior finding that "only instances of demonstrated fraud will support [Safeco's] fraud in the inducement defense, and that proof of mere mismanagement and operational incompetence by CMC cannot suffice. . . ." Bench Trial Opinion, Doc. 2459, at 179.

The Court emphasizes that the narrow defense available to Safeco in this matter is limited to conduct (1) constituting fraud on the part of CMC, rather than a lessee or some other party; and (2) by CMC in its capacity as obligee, and as part of the inducement to Safeco to enter into the Lease Bond transactions, rather than in its capacity as servicer or subservicer of the lease pools.  As explained throughout this Opinion, the Court views CMC's role as servicer—which it assumed following the execution of the SSAs—as distinct from CMC's initial role as obligee. As such, fraud by CMC in its servicer capacity, after Safeco already had issued its Lease Bonds and CMC had assigned its obligee rights, would not constitute fraud in the inducement, and thus would not provide a defense to Safeco on Bank One's claims.

The validity of Safeco's fraud defenses, however, is a matter for jury determination, which must occur through a trial on the merits.  As the Court noted in the Bench Trial Opinion, to prevail on its fraud defenses, Safeco will be required to demonstrate all of the elements of fraud under California law, including the element of justifiable reliance. *See* Bench Trial Opinion, Doc. 2459, at 178-81; *see, e.g., South Tahoe Gas Co. v. Hofmann Land Improv. Co.*, 25 Cal. App. 3d 750, 765 (1st Dist. 1972).

In reaching its conclusions herein, the Court has considered the entirety of the evidence and testimony proffered by the parties.  To the extent that the Court has not addressed any issue raised in these proceedings, such omission results from the Court's finding that the parties have

129

presented no new arguments or evidence with respect to that issue.  To the extent applicable, and where not otherwise discussed, the Court incorporates by reference the findings and conclusions set forth in the Bench Trial Opinion.

**D.**     **Certification for Interlocutory Appeal Pursuant to 28 U.S.C. § 1292(b)**

For the reasons set forth in a separate Order, issued concurrently with this Opinion, the Court finds that this Opinion involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from this Opinion may materially advance the ultimate termination of this action, as well as other actions in this MDL. Accordingly, this Court certifies this decision for interlocutory appeal pursuant to 28 U.S.C. § 1292(b).

**IV.     CONCLUSION**

For the reasons set forth herein, the Court finds that Bank One has failed to satisfy its burden of demonstrating, by clear and convincing evidence, that the Guardian Entities (and/or Bank One) were intended to be the obligees on the Safeco Lease Bonds.  The Court determines, rather, that CMC was the intended original obligee, and that the Guardian Entities (and later, Bank One) succeeded to the rights of CMC by virtue of various assignment transactions.

Accordingly, Bank One is not entitled to reformation of the Lease Bonds.

This Opinion is hereby certified for interlocutory appeal pursuant to 28 U.S.C. § 1292(b).

**IT IS SO ORDERED.**

 _s/ Kathleen M. O'Malley_____
**KATHLEEN McDONALD O'MALLEY**
**UNITED STATES DISTRICT JUDGE**

**Dated: September 14, 2011**

86197-1

130